# Exhibit A

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 2 of 35 PageID #: 6

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

LONDON LUXURY LLC

                  Plaintiff,

         -against-

WALMART INC.

                 Defendant.

Index No.

Date Purchased: January 5, 2022

## SUMMONS

Plaintiff designates Westchester County as the place of trial.

Basis for venue: CPLR § 503(a), (c)

**TO THE ABOVE-NAMED DEFENDANT:**

      PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an answer to the Complaint in this action, or if the Complaint is not served with this Summons, to serve a notice of appearance on the Plaintiff's attorneys within twenty (20) days after service of this Summons, exclusive of the day of service, or within thirty (30) days after service is complete if the Summons is not personally delivered to you within the State of New York.  In case you fail to appear or answer, judgment will be taken against you on default for the relief demanded herein.

      Plaintiff designates Westchester County as the place of trial.  Venue lies in this Court pursuant to CPLR § 503(a), (c).

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 3 of 35 PageID #: 7

Dated:  New York, New York
        January 5, 2022

                        QUINN EMANUEL URQUHART &
                          SULLIVAN, LLP


                        By:   _____
                              Stephen R. Neuwirth
                              stephenneuwirth@quinnemanuel.com
                              Deborah K. Brown
                              deborahbrown@quinnemanuel.com
                              Jared E. Ruocco
                              jaredruocco@quinnemanuel.com

                              51 Madison Avenue, 22nd Floor
                              New York, New York  10010
                              (212) 849-7000

                              *Attorneys for Plaintiff London Luxury LLC*

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 4 of 35 PageID #: 8

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

---

LONDON LUXURY LLC

               Plaintiff,

        -against-

WALMART INC.

             Defendant.

Index No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

<u>**COMPLAINT**</u>

Plaintiff London Luxury LLC ("London Luxury"), by its attorneys Quinn Emanuel Urquhart & Sullivan, LLP, brings this Complaint against Defendant Walmart Inc. ("Walmart"). Except where otherwise indicated as to its own actions and conduct, London Luxury alleges upon information and belief as follows:

<u>**Nature of the Case**</u>

1.    This action arises out of Defendant Walmart's wrongful efforts to shirk its contractual obligation to buy tens of millions of boxes of nitrile gloves from London Luxury pursuant to the parties' February 23, 2021 Commitment Letter ("February Commitment Letter")[1] as amended by the parties' further commitment letters of April 28, 2021 ("April Commitment Letter")[2] and June 14, 2021 ("June Commitment Letter" and collectively with the February Commitment Letter and the April Commitment Letter, the "Amended Commitment Letter")[3]. Despite London Luxury's considerable efforts to source gloves to fulfill Walmart's massive

---

[1]  A true and correct copy of the February Commitment Letter is attached hereto as Exhibit 1.

[2]  A true and correct copy of the April Commitment Letter is attached hereto as Exhibit 2.

[3]  A true and correct copy of the June Commitment Letter is attached hereto as Exhibit 3.

3

glove purchase commitment—which Walmart initially made within the last year—Walmart has refused to accept shipments of nearly any of the gloves it committed to purchase and instead has attempted to avoid its obligations under the Amended Commitment Letter for pretextual reasons. Through this wrongful conduct, Walmart has attempted to deprive London Luxury of its valuable rights under the Amended Commitment Letter, clogged ports and factories with the unsent shipments of gloves, and severely stressed London Luxury's global supply chains.

2.     In the summer of 2020, Walmart began engaging in discussions with London Luxury regarding potential purchases of nitrile gloves.  At first, Walmart communicated that it intended only to purchase a few million boxes of gloves from London Luxury per month. However, soon thereafter, Walmart revised its purchasing plans and informed London Luxury that it wanted to purchase tens of millions of boxes of gloves over the next several months. Given the significant size of the intended purchases, which had a notional value of many hundreds of millions of dollars, and the difficulty in sourcing that quantity of nitrile gloves, especially during the COVID-19 pandemic, London Luxury demanded that the parties enter a definitive agreement memorializing Walmart's commitment to purchase the gloves before London Luxury would undertake to fulfill Walmart's purchases.  Accordingly, after months of negotiations, the parties entered the February Commitment Letter.

3.     The February Commitment Letter is simple and straightforward.   Under the agreement, Walmart "committed to purchase from London Luxury a minimum of 6,072,770 master cartons [*i.e.*, 60,727,770 boxes] of nitrile examination gloves (the 'Product') on a ___**non-cancellable and irrevocable**___ basis for a minimum of a twelve (12) month period commencing on the date of first shipment of the Product." Ex. 1 at 1 (emphasis added).  In exchange, London

Luxury agreed to supply Walmart with the gloves subject to certain other limited conditions provided for under the Commitment Letter.

4.      Following the execution of the February Commitment Letter, the parties executed two further amendments of that letter in which Walmart progressively increased both the quantity of gloves it committed to purchase and the time period over which it committed itself to make purchases.  First, in the April Commitment Letter, Walmart committed to purchase at least 72 million boxes of gloves from London Luxury and agreed to extend its letter of credit for the benefit of London Luxury until it had purchased that entire quantity.   Later, in the June Commitment Letter, which expressly references the February Commitment Letter, Walmart agreed to purchase 75-80 million boxes of gloves per year from London Luxury for the next 5 years.

5.      With Walmart making a non-cancellable and irrevocable commitment to purchase the gloves, London Luxury undertook considerable efforts to source the gloves and fulfill Walmart's purchases.  Because almost all of the world's nitrile glove production occurs outside of the United States, London Luxury spent a considerable amount of time and resources coordinating supplies of gloves for Walmart from factories in Malaysia and Thailand.  After months of work, and notwithstanding the considerable obstacles posed to international supply chains by the ongoing COVID-19 pandemic and related governmental responses, London Luxury began to ship gloves to Walmart in July 2021.  Walmart was very excited about the shipments and praised London Luxury's efforts to fulfill Walmart's purchases.

6.      However, things changed abruptly in the fall of 2021, when, based on information and belief, Walmart lost a major business-to-business customer to which it planned to resell many of the gloves it had committed to buy from London Luxury.  At that point, Walmart

suddenly began trying desperately to back out of its non-cancellable and irrevocable commitment with London Luxury. In particular, Walmart began to assert that it was entitled to refuse shipments of gloves based on purported delays in London Luxury's shipments and the results of certain quality testing done on the gloves. However, before raising its concerns about purported delays, Walmart had been well aware that London Luxury's ability to source and ship product had been hampered by the COVID-19 pandemic, and Walmart was supportive of London Luxury's considerable efforts to overcome the COVID-related obstacles and even extended its purchase commitment with London Luxury and accepted shipments of gloves. Similarly, Walmart's purported concerns about the product testing on the gloves supplied by London Luxury are based on the findings of a single laboratory in China whose results are contradicted by its own Malaysian affiliate as well as several other reputable laboratories, all of which have uniformly confirmed the quality of the gloves. Even more shockingly, Walmart also has begun to assert that it was not bound by the Amended Commitment Letter—which the parties had been operating under for months—and instead asserted that Walmart was entitled to cancel its purchases under a separate supplier agreement. Once again, based on information and belief, Walmart has engaged in these machinations to avoid wrongfully its obligations under the Amended Commitment Letter simply because it lost the customer(s) to which it planned to resell many of the gloves it purchased from London Luxury.

7.  Despite London Luxury's considerable efforts to fulfill Walmart's massive glove purchases, Walmart has refused shipments of gloves that are packed and ready for transport, and is thereby depriving London Luxury of the money it is owed under the Amended Commitment Letter and causing London Luxury to incur other unwarranted expenses related to the delays in shipping the gloves. Walmart's conduct has also cast serious doubt over whether Walmart

6

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 8 of 35 PageID #: 12

intends to fulfill its ongoing obligations under the Amended Commitment Letter going forward, which has needlessly clouded the parties' contractual relationship.

## Jurisdiction and Venue

8.      This Court has jurisdiction over Walmart pursuant to CPLR § 302(a)(1) because this actions arises from business that Walmart has transacted within the State of New York as well as from a contract for the supply of goods in New York to which Walmart is a party.

9.      Venue is proper under CPLR § 503(a) and (c) because London Luxury is located in Westchester County.  In addition, venue is proper under CPLR § 503(a) because a substantial part of the events giving rise to this action occurred in Westchester County.

## The Parties

10.      Plaintiff London Luxury LLC is a New York limited liability company with its principal office located in New Rochelle, New York.

11.      Defendant Walmart Inc. is a Delaware corporation licensed to do business in the State of New York with its headquarters in Arkansas.  Walmart is a major retailer with a significant presence in the State of New York.  Based on publicly available information provided by Walmart, Walmart has a total of 110 retail units and 4 distribution centers in New York, employs 37,485 associates in New York, and spent $17.8 billion with suppliers in New York during the fiscal year ending in 2021.

## Factual Background

### I.      London Luxury Is A Leading Provider Of High-Quality Health And Wellness Products

12.      London Luxury is a leader in the manufacturing, design, development, and production of consumer home goods and consumer health and wellness products.  It employs a global workforce spanning many countries.  Among other things, London Luxury specializes in

the manufacture and import of goods such as towels, bedding products, sleepwear, and health and wellness supplies. Amidst the COVID-19 pandemic, London Luxury also has served as a leading supplier of crucial personal protective equipment such as face masks, medical gowns, and nitrile gloves. London Luxury's products are sold under its own brand name as well as the names of other major brands, such as Reebok, Columbia Sportswear, Claritin, Brookstone, Sharper Image, and Arm & Hammer and are available for purchase at major retailers such as Bed Bath and Beyond, Costco, Kohl's, and Walmart.

13.     London Luxury works with a variety of top-tier manufacturers around the world, including ones based in China, India, Turkey, Malaysia, Thailand, Portugal, Pakistan, and the United States, to manufacture and source products. Given its global reach, London Luxury specializes in logistics and has built a market-leading supply chain system.

14.     Moreover, London Luxury dedicates a significant amount of time and resources to ensuring the quality of its products. In particular, London Luxury has quality, manufacturing, and inspection teams in each of its factories, overseeing every stage of production, and it works diligently to ensure adherence with international quality standards. London Luxury also takes steps to ensure that its products are manufactured and sourced in environmentally sustainable and socially responsible ways.

## II.     Walmart And London Luxury Begin Discussing Potential Purchases Of Nitrile Gloves And The Parties Enter Standard Form Supplier Agreements

15.     In or about the summer of 2020, Walmart and London Luxury began discussing Walmart potentially purchasing London Luxury's nitrile gloves. Demand for nitrile gloves increased significantly as a result of the COVID-19 pandemic, and Walmart's interest in purchasing the gloves was consistent with that market trend.

8

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 10 of 35 PageID #: 14

16.     At first, Walmart communicated that it intended to order approximately one million or so boxes of gloves per month.  While this is a meaningful quantity, such orders are roughly in line with the quantities customarily ordered by other retailers in the ordinary course of business.  Accordingly, at first, London Luxury did not believe that there was any need for a special arrangement between itself and Walmart concerning Walmart's nitrile glove orders.

17.     In the initial phases of their discussions regarding nitrile gloves, Walmart and London Luxury entered two standard form supplier agreements in August 2020 (collectively, the "August 2020 Supplier Agreements").  Because Walmart initially anticipated placing orders through two of its purchasing departments, Department 13 for Household Chemicals ("D13") and Department 40 for Health/Wellness/OTC Pharmacy ("D40"), Walmart required London Luxury to enter separate supplier agreements with each department (respectively, the "August 2020 D13 Supplier Agreement" and the "August 2020 D40 Supplier Agreement").  However, the August 2020 D13 Supplier Agreement and the August 2020 D40 Supplier Agreement are substantially similar.  A true and correct copy of the August 2020 D13 Supplier Agreement is attached hereto as Exhibit 4, and a true and correct copy of the August 2020 D40 Supplier Agreement is attached hereto as Exhibit 5.

18.     The August 2020 Supplier Agreements are standard form contracts that, upon information and belief, Walmart generally requires all its suppliers to sign.  The parties did not negotiate the August 2020 Supplier Agreements.  Instead, Walmart merely asked London Luxury to accept the August 2020 Supplier Agreements wholesale and without comment by completing electronic check-box forms.

19.     Both the August 2020 Supplier Agreements contain "No Business Expectation" provisions that provide:

9

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 11 of 35 PageID #: 15

> [Walmart] has no obligation and makes no promises to purchase any minimum amount of Merchandise[4] from [London Luxury]. Projections, past purchasing history and representations about quantities to be purchased are not binding on [Walmart], and [Walmart] shall not be liable for any act or expenditure (including but not limited to expenditures for equipment, labor, materials, packaging or capital expenditures) by [London Luxury] in reliance on them.

Ex. 4 (August 2020 D13 Supplier Agreement) § 27; Ex. 5 (August 2020 D40 Supplier Agreement) § 27.

20.    In addition, the August 2020 Supplier Agreements include "Orders; Cancellation" provisions, which, in relevant part provide:

> No [Walmart] representative has authority to order Merchandise except an Authorized Buyer through an Order issued pursuant to and subject to the terms of this Agreement. [London Luxury] may ship only after receipt of an Order.

Ex. 4 (August 2020 D13 Supplier Agreement) § 2; Ex. 5 (August 2020 D40 Supplier Agreement) § 2.

21.    The August 2020 Supplier Agreements define the term "Authorized Buyer" to mean "any buyer or category lead (or successor or equivalent titles) of [Walmart] assigned to the category/department corresponding to the purchased Merchandise." Ex. 4 (August 2020 D13 Supplier Agreement) § 1(b); Ex. 5 (August 2020 D40 Supplier Agreement) §1(b). Furthermore, the August 2020 Supplier Agreements define the term "Order" to mean "any written or electronic purchase order for Merchandise issued by [Walmart] through an Authorized Buyer." Ex. 4 (August 2020 D13 Supplier Agreement) § 1(h); Ex. 5 (August 2020 D40 Supplier Agreement) §1(h).

---

4    The August 2020 Supplier Agreements define the term "Merchandise" to mean "all products, goods, materials, equipment, displays, articles, and tangible items supplied by [London Luxury] to [Walmart] within [the United States of America, its territories and possessions and APO/FPO military addresses], and all packaging, warnings, warranties, advertising and other services included therewith." Ex. 4 (August 2020 D13 Supplier Agreement) § 1(g), (j); Ex. 5 (August 2020 D40 Supplier Agreement) § 1(g), (j).

10

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 12 of 35 PageID #: 16

22.     The August 2020 Supplier Agreements also state that "[Walmart] may cancel all or any part of an Order at any time before shipment."  Ex. 4 (August 2020 D13 Supplier Agreement § 2; Ex. 5 (August 2020 D40 Supplier Agreement) § 2.  Similarly, the August 2020 Supplier Agreements contain "Remedies" provisions that state:

> [London Luxury's] breach of or failure to comply with any of the Terms and Conditions of this Agreement or any Order shall be grounds for [Walmart] to exercise any one or more of the following remedies… (a) Cancellation of all or any part of any undelivered Order without notice, including but not limited to the balance of any remaining installment on a multiple-shipment Order; (b) Rejection (or revocation of acceptance) of all or any part of any delivered shipment… (c) Termination or suspension of all current and future business relationships.

Ex. 4 (August 2020 D13 Supplier Agreement) § 16(a)-(c); Ex. 5 (August 2020 D40 Supplier Agreement) § 16(a)-(c).

23.     The August 2020 Supplier Agreements have no definitive term and instead provide that "[t]his Agreement will commence on the Effective Date and continue in effect until terminated."  Ex. 4 (August 2020 D13 Supplier Agreement) § 23; Ex. 5 (August 2020 D40 Supplier Agreement) § 23.  Moreover, the August 2020 Supplier Agreements also provide that "[e]ither party may terminate this Agreement for any or no reason and without penalty on thirty (30) days' notice." *Id.*

24.     The August 2020 Supplier Agreements also state that "[a]ll prior agreements, negotiations, dealings and understandings, whether written (including any electronic record) or oral, regarding the subject matter hereof, are superseded by this Agreement."  Ex. 4 (August 2020 D13 Supplier Agreement) § 28; Ex. 5 (August 2020 D40 Supplier Agreement) § 28.

25.     Finally, the August 2020 Supplier Agreements provide that Walmart is to make payment on a 45-day net payment days basis under the August 2020 D13 Supplier Agreement

(Ex. 4 § 5, Appendix § 2) and a 60-day net payment days basis under the August 2020 D40

Supplier Agreement (Ex. 5 § 5, Appendix § 2).

## II.     Walmart Significantly Increases The Quantity Of Gloves It Plans To Order And The Parties Enter The Commitment Letter

26.     In the latter half of 2020 or early 2021, after its initial outreach to London Luxury,

Walmart communicated to London Luxury that it was interested in purchasing significantly more

nitrile gloves than it initially had planned.  Whereas Walmart initially planned to buy one million

or so *boxes* of gloves from London Luxury on a monthly basis, by at least the first quarter of

2021, Walmart had determined that it actually wanted to purchase several million *cartons* of

gloves from London Luxury over the next several months.  There are 10 boxes of gloves in each

carton, so Walmart's revised purchasing plans called for several times as many boxes of gloves

as Walmart had initially told London Luxury it was interested in buying.

27.     Fulfilling Walmart's significantly increased purchasing demands would be much

more difficult for London Luxury than providing the one million or so boxes of gloves per month

that Walmart had initially requested.  To this day, the vast majority of nitrile glove production

occurs outside the United States, principally at factories located in Asia.  Moreover, Walmart

was seeking a considerable quantity of nitrile gloves at a time when global demand for nitrile

gloves was unusually high due to the COVID-19 pandemic.  As a result, sourcing the quantities

of gloves Walmart wanted to purchase would require London Luxury to coordinate with foreign

manufacturers and ensure that a significant portion (if not all) of their production capacity would

be dedicated to fulling Walmart's purchases.

28.     While London Luxury was happy to meet Walmart's needs, it could not agree to

source and provide such a significant quantity of gloves without a hard commitment from

Walmart that Walmart in fact would purchase the gloves it planned to buy.  Moreover, London

12

Luxury also could not agree to provide the massive quantity of gloves Walmart desired pursuant to the standard form August 2020 Supplier Agreements, which the parties had not negotiated at all.

29.     Accordingly, London Luxury and Walmart extensively negotiated and agreed upon the February Commitment Letter, which the parties entered on February 23, 2021, more than six months after the parties initially executed the August 2020 Supplier Agreements.

30.     The parties' negotiations concerning the February Commitment Letter spanned months and involved high-level executives from Walmart and London Luxury, including Garrett Small, Walmart's Senior Director, Global Sourcing, and Marc Jason, London Luxury's Chief Executive Officer.   Walmart's legal department also reviewed and approved the February Commitment Letter before Walmart signed the agreement.

31.     In the course of the parties' negotiations, Walmart directed numerous e-mails, telephone calls, and other communications to London Luxury employees, all of whom were based at London Luxury's headquarters in New Rochelle, New York.   Walmart also sent the February Commitment Letter itself to London Luxury's office in New Rochelle, New York. Moreover, Walmart understood that, once the February Commitment Letter was signed, London Luxury would principally perform its obligations under the agreement and source Walmart's massive glove purchases from London Luxury's offices in New Rochelle, New York.   Finally, based on information and belief, Walmart has and/or intended to distribute some of the gloves it purchased pursuant to the February Commitment Letter (and any amendments thereto) to customers in New York, given Walmart's sizeable presence in the state.

32.     The very first sentence of the February Commitment Letter states that "Walmart is pleased to inform London Luxury LLC ('Supplier') that Walmart is committed to purchase

from London Luxury a minimum of 6,072,770 master cartons [*i.e.*, 60,727,700 boxes] of nitrile examination gloves (the 'Product') on *__a non-cancellable and irrevocable__* basis for a minimum of a twelve (12) month period commencing on the date of first shipment of the Product (the 'Term')." Ex. 1 at 1 (emphasis added).

33.     The February Commitment Letter states that "Walmart will pay [London Luxury] for the Product via wire payment within two (2) days of Walmart's receipt of official documents." *Id.*  The Commitment Letter further provides that "[London Luxury] agrees to the following payment terms for POs sent directly from Walmart: 2 Net Days or payment upon completion of PO.  PO is complete upon Walmart's receipt of documents." *Id.*

34.     Moreover, the February Commitment Letter further provides that:

> Walmart's award of business to [London Luxury] is contingent upon you (a) providing an updated certificate of insurance (if not current), and (b) meeting the other requirements described in this letter as well as any and all compliance and regulatory requirements associated with the Supplier Agreement.  In the event of a conflict between the terms of this letter and the Supplier Agreement, the terms of the Supplier Agreement will control.

*Id.*

35.     Walmart's purchase commitment under the February Commitment Letter is thus contingent only upon a number of limited conditions specifically enumerated in the Commitment Letter itself.  While the February Commitment Letter states that London Luxury must "meet[]… all compliance and regulatory requirements associated with the Supplier Agreement," it does not generally incorporate the terms of the August 2020 Supplier Agreements or any other standard form supplier agreement.  Moreover, the February Commitment Letter provides that the Supplier Agreement will only trump the terms of the February Commitment Letter if the terms of the February Commitment Letter conflict with the Supplier Agreement regarding "compliance and regulatory requirements," *i.e.*, the only topics on which the February Commitment Letter

14

incorporates the Supplier Agreement. The February Commitment Letter is not otherwise subject to the terms of any Walmart supplier agreement, and no Walmart supplier agreement alters or modifies Walmart's non-cancellable and irrevocable purchase commitment under the February Commitment Letter.

36.     The February Commitment Letter also states that:

Walmart may require initial testing of your product to verify it meets industry standards, product claims, and regulatory standards. Random testing may also be conducted to validate that the product quality remains as required by standards and specifications per SGS tolerance standards.

*Id.*

37.     The February Commitment Letter also incorporates a set of product testing protocols that are set forth in a document entitled "WMUS Medical Glove Protocol V1_MD." *Id.* at 3. A true and correct copy of those protocols is also attached hereto with the Commitment Letter in Exhibit 1.

38.     These testing protocols also do not modify or alter Walmart's non-cancellable and irrevocable purchase obligation under the February Commitment Letter (or any amendments thereto).

### III.    Walmart Reissues The D40 Supplier Agreement While Setting Up London Luxury In Walmart's Internal Payment System

39.     In early March 2021, just a few weeks after the parties entered the February Commitment Letter, Walmart began the process of setting up payments to London Luxury in Walmart's internal payment system. As part of this process, Walmart decided to move London Luxury from Walmart's domestic supplier program to Walmart's direct import supplier program.

40.     In the course of this process, the D40 purchasing department at Walmart changed the internal supplier ID number it used for London Luxury and issued London Luxury a new supplier agreement that bore that new supplier ID number. Walmart initially reissued London

Case 5:22-cv-05059-TLB  Document 1-1  Filed 01/24/22  Page 17 of 35 PageID #: 21

Luxury a new D40 Supplier Agreement on March 14, 2021, and then issued yet another new D40 Supplier Agreement on March 30, 2021, with a nominal effective date of March 31, 2021 ("March 2021 D40 Supplier Agreement").  A true and correct copy of the March 2021 D40 Supplier Agreement is attached hereto as Exhibit 6.

41.    That Walmart mechanically reissued the D40 supplier agreement after changing its internal supplier ID number for London Luxury is evidenced by the fact that the August 2020 D40 Supplier Agreement does not bear a "Supplier ID," but the March 2021 D40 Supplier Agreement does, as shown below in Figure 1:

**Figure 1**

**August 2020 D40 Supplier Agreement:**



**Effective Date:** 08/11/2020

# WALMART GENERAL MERCHANDISE AGREEMENT
### General Supplier Information

| Agreement Number: | SAP Supplier Number: | Supplier ID: |
|---|---|---|
| 517052-40-0 | 1400036283 | |

(Ex. 5 at 1)

**March 2021 D40 Supplier Agreement:**

          

**Direct Import Supplier Agreement**

**Effective Date:** 03/31/2021

| Agreement Number: | SAP Supplier Number: | Supplier ID: | Banner: |
|---|---|---|---|
| 026157-40-0 | 1600037845 | 36178308 | Walmart |

(Ex. 6 at 1)

16

42.     Walmart also did not reissue or otherwise change the August 2021 D13 Supplier Agreement.  In fact, to this day, the August 2021 D13 Supplier Agreement is still listed as an "Active" contract in Walmart's "Retail Link" computer system, as shown in Figure 2 below. This further evidences that Walmart's issuance of the March 2021 D40 Supplier Agreement was a simple clerical act that Walmart undertook in the course of setting London Luxury up in Walmart's internal payment system.

**Figure 2**

| Agreement No. 517052130 | | | | ACTIVE |
|---|---|---|---|---|
| | Author | STACEY JOHNSON | Distribution Channel | Walmart Stores | Supplier Number | 517052 |
| | Supplier | LONDON LUXURY LLC | Department | 13 Household Chemicals | Date Created | 08/11/2020 |
| | | | | | ✎ VIEW / EDIT | ⬇ DOWNLOAD PDF |

43.     As with the August 2020 Supplier Agreements, the parties did not negotiate the March 2021 D40 Supplier Agreement.  Instead, as described above, the March 2021 D40 Supplier Agreement was simply issued by Walmart to London Luxury as a ministerial act that Walmart undertook in the process of setting up London Luxury in Walmart's internal payment system.

44.     The terms of the March 2021 D40 Supplier Agreement are also substantially similar to those of the August 2020 Supplier Agreements.

45.     The March 2021 D40 Supplier Agreement makes no reference to the February Commitment Letter, and the parties never discussed or negotiated replacing the February Commitment Letter with the March 2021 D40 Agreement or any other contract.  Just as the February Commitment Letter existed in addition to the August 2020 Supplier Agreements, so it continued to exist in addition to the March 2021 D40 Supplier Agreement.

17

Case 5:22-cv-05059-TLB Document 1-1 Filed 01/24/22 Page 19 of 35 PageID #: 23

## IV. Walmart Reaffirms The Commitment Letter Several Times Following The Reissuance Of The D40 Supplier Agreement

46. Following its reissuance of the D40 supplier agreement in March 2021, Walmart, through a series of amendments to the February Commitment Letter, reaffirmed its obligations under the February Commitment Letter and substantially increased its purchase commitment to London Luxury, further underscoring that the March 2021 D40 Supplier Agreement did not alter or supersede Walmart's obligations under the February Commitment Letter.

47. First, in an April 28, 2021 letter (*i.e.*, the "April Commitment Letter") which, like the February Commitment Letter, Walmart sent to London Luxury's offices in New Rochelle, New York under the subject line "Commitment to purchase nitrile examination gloves," Walmart stated:

> As requested, we Walmart with a registered address at 702 SW 8th St, Bentonville, AR 72716 represented by the authorized signatory below and with the power and authority to issue this letter of confirmation, hereby ***irrevocably*** confirm that we will re-instate or renew lc [*i.e.*, letter of credit] number: dc hkh 978800 forwarded/transferred lc number: dc hkh 978800 02 Continuously [sic] every 60 days for the same value ***until the exhaustion of the total contracted quantity of 7.200.000.000 pieces [of] nitrile gloves [i.e., 72 million boxes] placed on order for a period of 12 months***.

Ex. 2 (emphasis added).

48. As with the February Commitment Letter, in the course of negotiating the April Commitment Letter, Walmart directed numerous communications to London Luxury employees based in New Rochelle, New York.

49. Then, in a further letter dated June 14, 2021 (*i.e.*, the "June Commitment Letter"), which Walmart also sent to London Luxury's offices in New York under the subject line "Continued commitment to purchase nitrile examination gloves," Walmart stated:

> Further to Walmart's ***irrevocable and noncancelable commitment letter to you, dated 2/23/2021***; and in keeping with our publicly [sic] media announcement of Walmart's major commitment and initiative of sourcing significantly more

18

*"Made In The USA*" products wherever possible, and in order to maintain supply of US made Nitrile Exam gloves, ***Walmart hereby agrees to purchase approximately 75-80 million boxes of Nitrile Exam gloves per year, for the next five years, from London Luxury's, US based manufacturing facilities and operation due to open in the near future***… Thank you for all your excellent and continued hard work on our behalf, and for being such an attentive partner and reliable supplier.

Ex. 3 (emphasis added).

50.     Like the February and April Commitment Letters, in the course of negotiating the June Commitment Letter, Walmart directed numerous communications to London Luxury employees based in New York.

51.     The April and June Commitment Letters confirm that Walmart understood that the March 2021 D40 Supplier Agreement did not affect its non-cancellable and irrevocable commitment to purchase gloves from London Luxury, as originally memorialized in the February Commitment Letter.  These letters refer back to the February Commitment Letter, either expressly and/or by using the same subject line as that letter, and reiterate that Walmart made a non-cancellable and irrevocable purchase commitment to London Luxury.  Moreover, the April and June Commitment Letters reflect that Walmart progressively increased its purchase commitment under the Commitment Letter throughout 2021 from approximately 60.7 million boxes over a twelve-month period, to 72 million boxes over a twelve-month period, and then to 75-80 million boxes per year over a five-year period.  Walmart agreed to these increases over the course of several months *after* Walmart reissued the D40 Supplier Agreement in March 2021.

52.     Further evidencing that Walmart fully understood its purchase commitment under the Commitment Letter, Walmart also entered purchase orders with London Luxury for more than 72 million boxes of nitrile gloves in 2021 alone.

19

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 21 of 35 PageID #: 25

53.     Moreover, Walmart continued to renew its letter of credit for the gloves throughout much of 2021 pursuant to the commitment it made to do so in the April Commitment Letter.  Walmart most recently amended its letter of credit on August 24, 2021, such that the letter of credit now extends until August 15, 2022.  This further evidences that Walmart understood its minimum purchase obligation to London Luxury and made concrete financial arrangements to ensure it could comply with that obligation.

## V.     London Luxury Expends Considerable Time and Resources Fulfilling Walmart's Glove Purchases

54.     After the parties executed the Commitment Letter in February 2021, London Luxury set to work to source Walmart's sizeable glove purchases.  As noted above, this required London Luxury to coordinate with a number of suppliers and factories located in Malaysia and Thailand—a process which London Luxury ran from its offices in New York.  Given the massive size of Walmart's purchases, London Luxury was forced to dedicate a substantial amount of its staff and other resources to sourcing gloves for Walmart.

55.     As relevant here, London Luxury sourced gloves from two specific manufactures in filling Walmart's purchases (though it has procured gloves from other sources as well): (1) Mercator Medical (Thailand) Ltd. ("Mercator"); and (2) Careglove Global SDN BHD ("Careglove").  Before London Luxury sourced any gloves from Mercator or Careglove factories, those factories were audited for social impact, security, quality control, and compliance.  In particular, those factories were audited for (among other things) good practices relating to manufacturing, packaging, and warehouse operations for nitrile gloves.  The Mercator and Careglove factories passed these audits, and London Luxury kept Walmart informed of the results of these audits to the best of its ability.

20

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 22 of 35 PageID #: 26

56.     Arranging the production, inspection, and shipment of gloves during the COVID-19 pandemic was tremendously difficult. The countries from which London Luxury sourced the gloves were acutely impacted by the pandemic, and the governments of those countries imposed a number of health and safety protocols in response to the pandemic that severely restricted the movement of people and goods. All of this created serious obstacles for London Luxury in its effort to fulfill Walmart's glove purchases, and Walmart was aware of the COVID-related difficulties that London Luxury and its manufacturing and supply partners were encountering.

57.     Despite these obstacles, London Luxury was able to begin shipping gloves to Walmart in July 2021. At that time, and until very recently, Walmart expressed great appreciation for all that London Luxury had done to source and deliver the gloves notwithstanding the serious obstacles posed by COVID-19.

## VI.     Walmart Loses A Major Business-To-Business Client And Attempts To Renege On The Amended Commitment Letter

58.     For much of 2021, Walmart and London Luxury worked constructively together to fulfill Walmart's glove purchases. London Luxury kept Walmart regularly informed of the developments with sourcing and shipping the gloves, and Walmart remained committed to purchasing the gloves notwithstanding the obstacles to manufacturing and shipping the gloves posed by the COVID-19 pandemic. In fact, as noted above, Walmart progressively increased its purchase commitment to London Luxury throughout 2021 and, in June 2021, specifically committed to purchase 75-80 million boxes of gloves per year from London Luxury over the next five years.

59.     However, things changed abruptly in the fall of 2021, when Walmart, upon information and belief, lost a major business-to-business client to which it planned to resell gloves it purchased from London Luxury. Based on information and belief, throughout 2021,

21

Walmart was working with one or more brokers to distribute the nitrile gloves Walmart purchased from London Luxury to institutional clients in the United States, including large hospital groups. On October 22, 2021, Garrett Small, Walmart's Senior Director, Global Sourcing, informed London Luxury that Walmart was "continuing to have issues with the group [he was] working with for these gloves" and told London Luxury "to stop all production until this is resolved," even though that request ran counter to Walmart's obligations under the Amended Commitment Letter. Shortly thereafter, Mr. Small, who had been London Luxury's primary point of contact at Walmart for some time, suddenly was no longer permitted to speak with London Luxury.

60.     Since that time, Walmart has engaged in a number of machinations to gin up pretextual reasons for abandoning its obligations under the Commitment Letter.

61.     First, in late October 2021, Walmart began to raise questions about the gloves produced by Mercator, one of the companies that was manufacturing gloves for Walmart in Thailand. Even though Walmart had just approved Mercator as a manufacturer one month earlier, in September 2021, after Mercator's facilities had passed a series of fulsome and thorough audits, Walmart purported to have concerns that Chinese-manufactured gloves were being sold under the "Mercator" name.

62.     In response, London Luxury provided Walmart a letter from Mercator's chief executive officer confirming that the gloves London Luxury had sourced from Mercator had been produced in Mercator's factory in Thailand and explaining that Mercator had already reported the fraudulent sale of other gloves under the "Mercator" name to the FDA. Nonetheless, Walmart demanded that the Mercator facility be re-audited by an auditor of Walmart's choosing, even though that factory had been audited just a short time ago and had

passed its audit. In the spirit of cooperation, London Luxury arranged for Walmart's hand-picked auditors to re-examine the Mercator factory in November 2021, and the factory once again passed the audit.

63.     In addition to its purported concerns over the integrity of Mercator's operations, Walmart also has complained about purported delays in London Luxury's shipments of gloves. For example, in a November 11, 2021 email from Alex Hurd, a Vice President at Walmart, Walmart accused London Luxury of having "ongoing and significant issues meeting its obligations" and cited "repeated delays" in support of that allegation.

64.     However, as noted above, Walmart was well aware that London Luxury's ability to source and ship gloves from abroad was severely impacted by the COVID-19 pandemic and the related governmental responses. For example, Walmart had been aware in the first half of 2021 that Malaysia had issued a level 4 lockdown that severely limited the ability of laborers and inspectors to access factories, as well as the ability of product to be transported to ports. Nevertheless, Walmart gladly extended its purchase commitments with London Luxury and praised London Luxury as an "attentive partner and reliable supplier" in the June Commitment Letter and began accepting shipments in July 2021.

65.     Finally, Walmart also has raised purported issues with the quality testing on the nitrile gloves.

66.     As noted before, the February Commitment Letter incorporates a set of testing standards that are to be applied to the gloves. As relevant here, the gloves are supposed to be reviewed pursuant to the ASTM D6319 standard, which is a widely accepted international specification standard for nitrile gloves.

67.     The gloves generally were tested by SGS, a well-recognized international product testing laboratory organization, though certain categories of the gloves also were tested at their factories of origin and by other independent laboratories. Because the nitrile gloves were manufactured abroad and in an effort to complete the testing as quickly as possible, the gloves were tested at SGS laboratories in Malaysia, the United States, and China, depending on their source of origin.

68.     Pursuant to the ASTM D6319 standard, nitrile gloves are tested for (among other things) both tensile strength and elongation. Per the ASTM D6319 guidelines, testing for tensile strength and elongation is generally to be conducted "[b]efore and after accelerated aging" of the gloves. The testing that occurs before accelerated aging is colloquially known as "pre-elongation." However, the ASTM D6319 guidelines provide that "[f]or gloves that are older than 6 months from the date of manufacture or for which the date of manufacture cannot be determined, no accelerated aging shall be performed. If such gloves are tested, their physical requirements for tensile strength and ultimate elongation shall not be less than the 'After Accelerated Aging' values specified [in the ASTM D6319 guidelines]." Put another way, for gloves that are older than 6 months from the date of manufacture or for which the date of manufacture cannot be determined, no pre-elongation testing needs to be conducted. Moreover, given that gloves often are used several months after their manufacturing, their pre-elongation values are not necessarily indicative of their quality.

69.     As noted above, London Luxury worked with a number of different suppliers, including Mercator and Careglove, to source gloves for Walmart.

70.     The gloves sourced from Mercator initially were sent to the SGS laboratory in Malaysia for testing, but that laboratory forwarded the gloves to the SGS laboratory in China.

Though the Chinese laboratory reported that the Mercator gloves had "failed" the pre-elongation tests across all sizes, the Mercator gloves subsequently were re-tested by the SGS laboratory in Malaysia and received a full pass, including for pre-elongation. The Mercator gloves also were tested at one of Thailand's governmental labs, as well as at TUV, another well-respected laboratory, and also passed all relevant quality standards during those tests. Accordingly, the Chinese lab's testing results for pre-elongation conflicted with the results from several other reputable laboratories, all of which determined the gloves had met all required quality standards.

71.     The gloves sourced from Careglove currently are being tested by the SGS laboratory in the United States. While some of the results of that testing are still pending, the U.S. SGS laboratory already has determined that the Careglove gloves meet the standards for pre-elongation.

72.     Thus, the gloves London Luxury has sourced for Walmart have met the required production testing standards. To the extent there are any discrepancies in the results of that testing, such discrepancies are attributable to the SGS laboratory in China whose results are contradicted by those of several other reputable laboratories. Thus, there is ample reason to believe that the "fail" results produced on pre-elongation by the SGS laboratory in China are the product of some error by that laboratory and not any issue with the gloves themselves.

73.     Nevertheless, Walmart has seized on the aberrant findings of the SGS laboratory in China as a pretext to refuse shipments of gloves and to attempt to evade its non-cancellable and irrevocable commitment to purchase gloves from London Luxury. Walmart has taken this position even though the Amended Commitment Letter is expressly "non-cancellable and irrevocable."

74.     Specifically, Walmart has refused to authorize shipment and accept delivery of at least 145 containers of gloves from Mercator, which contain more than 5.5 million boxes of gloves.  Likewise, Walmart also has refused to authorize shipment of at least 13 containers of gloves from Careglove, which contain nearly half a million boxes of gloves.  While Walmart refuses to accept shipment of these gloves, these containers are sitting idly at factories and ports abroad.

75.     Moreover, Walmart also has created significant doubt about whether it plans to honor its contractual obligations under the Amended Commitment Letter and has created unnecessary uncertainty about the parties' contractual relationship.  For example, in the same November 11, 2021 email from Alex Hurd referenced above, Walmart accused London Luxury of "fail[ing] to comply with Walmart's supplier standards" and requested that "London Luxury stop production of any outstanding Walmart nitrile glove orders from [its] Malaysia and Thailand manufacturing facilities."  London Luxury understands Mr. Hurd's reference to "Walmart's supplier standards" to be a reference to the March 2021 D40 Supplier Agreement, even though the March 2021 D40 Supplier Agreement makes no express reference to the February Commitment Letter (or any amendments thereto), concerns a different subject matter than the February Commitment Letter (or any amendments thereto), and Walmart's actions confirm that Walmart understood the February Commitment Letter and the amendments thereto to be a binding contract even after the March 2021 D40 Supplier Agreement was issued.

76.     London Luxury has attempted to work collaboratively with Walmart to address Walmart's purported concerns over shipping delays and product testing, but Walmart has rebuffed London Luxury's efforts.

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 28 of 35 PageID #: 32

## VII. Walmart's Refusal To Accept Shipments And Honor The Amended Commitment Letter Is Causing Serious Harm To London Luxury

77.     As mentioned above, Walmart has wrongfully refused to accept shipment of a hundred plus containers of gloves that are sitting at foreign factories and ports.  Many of these containers are accruing substantial demurrage charges as Walmart wrongfully refuses to authorize their transport.  Walmart's refusal to accept shipments also has needlessly choked London Luxury's supply chain for nitrile gloves and strained London Luxury's relationships with its glove suppliers.

78.     In particular, as noted before, there are at least 145 Mercator containers containing approximately 5.5 million boxes of gloves that have been sitting idly at factories and ports abroad for months.  Though Luxury London Luxury has provided Walmart with all necessary documentation related to these containers, Walmart has refused to pay London Luxury and accept the shipments.  As a result of Walmart's refusal to accept shipment of these Mercator containers, Walmart has wrongfully deprived London Luxury of at least $41,214,800 that it owes to London Luxury for the boxes contained therein and has caused London Luxury to suffer other unwarranted expenses related to the delay in shipping these containers.

79.     Similarly, Walmart has yet to authorize shipment of an additional 13 containers from Careglove containing approximately half a million boxes of gloves.  While the product testing on these gloves in still pending, they already have passed the testing for pre-elongation, and London Luxury expects that they will soon also pass all other relevant testing standards. Nevertheless, Walmart's conduct raises considerable unwarranted doubt about whether Walmart will accept shipment of these Careglove containers.  Walmart owes London Luxury at least $3,695,120 for the gloves in these Careglove containers, and Walmart's wrongful refusal to accept shipment of these gloves would wrongfully deprive London Luxury of that amount and

cause London Luxury to incur other unwarranted expenses related to the delay in shipping the containers.

80.     Moreover, as explained above, Walmart has created substantial doubt about whether it plans to honor its ongoing obligations under the Amended Commitment Letter. To date, Walmart has only accepted shipment of approximately 3 million of the tens of millions of boxes of gloves it committed to buy pursuant to the Amended Commitment Letter. Walmart has created uncertainty regarding whether it intends to accept and pay for the vast majority of the gloves it committed to buy, which would deprive London Luxury of more than $500 million for the gloves Walmart committed to buy over the first twelve months of the Amended Commitment Letter plus hundreds of millions of dollars more in purchases Walmart committed to make over the next several years. London Luxury already has dedicated a substantial amount of its personnel time and other resources to being able to fulfill Walmart's massive glove purchases.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Declaratory And Injunctive Relief)**

81.     London Luxury repeats and realleges the foregoing allegations as though they were fully set forth here.

82.     The Amended Commitment Letter is a valid and binding contract between London Luxury and Walmart.

83.     London Luxury has performed in full under the Amended Commitment Letter, including by undertaking substantial efforts to fulfill Walmart's purchases of gloves under that agreement.

84.     Under the February Commitment Letter, Walmart "committed to purchase from London Luxury a minimum of 6,072,770 master cartons [*i.e.*, 60,727,700 boxes] of nitrile

examination gloves (the 'Product') on a non-cancellable and irrevocable basis for a minimum of a twelve (12) month period commencing on the date of first shipment of the Product (the 'Term').”

85.     Following its execution, London Luxury and Walmart amended the February Commitment Letter through the April Commitment Letter in which Walmart committed to buy at least 72 million boxes of gloves from London Luxury over a 12-month period and further agreed to renew its letter of credit for the benefit of London Luxury until it had fully exhausted that purchase commitment.

86.     In the June Commitment Letter, Walmart further agreed “to purchase approximately 75-80 million boxes of Nitrile Exam gloves per year, for the next five years, from London Luxury's, US based manufacturing facilities and operation.”

87.     As described in detail above, Walmart has created substantial doubt regarding whether it intends to fulfill its commitment to purchase gloves under the Amended Commitment Letter and, as noted above, has taken the position that the Amended Commitment Letter does not govern the parties' relationship with respect to purchases of nitrile gloves and that that relationship is instead governed by the March 2021 D40 Supplier Agreement.  Walmart also has taken the position that it can avoid its “non-cancellable and irrevocable” commitment under the Amended Commitment Letter here based on purported delays in the shipment of product and the outcome of product testing of the nitrile gloves.

88.     As set forth above, London Luxury contests each of these assertions by Walmart. Moreover, Walmart's baseless assertions have created a significant amount of unwarranted uncertainty for London Luxury as it continues to perform under the Amended Commitment Letter.

89.     There is thus a justiciable controversy between the parties regarding the validity and enforceability of the Amended Commitment Letter.

90.     Therefore, London Luxury respectfully requests a declaration, pursuant to CPLR § 3001, that:

      a.     The Amended Commitment Letter is a valid and enforceable contract;

      b.     That Walmart has a "non-cancellable and irrevocable" commitment under the Amended Commitment Letter to purchase at least 72 million boxes of nitrile gloves from London Luxury over a 12-month period and to renew its letter of credit for the benefit of London Luxury until it has fully exhausted that commitment;

      c.     That Walmart has a "non-cancellable and irrevocable" commitment under the Amended Commitment Letter to purchase approximately 75-80 million boxes of nitrile gloves per year, for the next five years, from London Luxury's U.S. based manufacturing facilities and operation;

      d.     That neither the March 2021 D40 Supplier Agreement, nor any of Walmart's other standard form supplier agreements, supersedes the Amended Commitment Letter; and

      e.     That Walmart does not have the right to avoid its obligation to purchase gloves under the Amended Commitment Letter based on the circumstances here.

91.     London Luxury further respectfully requests an order enjoining Walmart to specifically perform its obligations under the Commitment Letter.

Case 5:22-cv-05059-TLB Document 1-1 Filed 01/24/22 Page 32 of 35 PageID #: 36

## SECOND CAUSE OF ACTION
### (Breach Of Contract)

92.     London Luxury repeats and realleges the foregoing allegations as though they were fully set forth here.

93.     The Amended Commitment Letter is a valid and binding contract between London Luxury and Walmart.

94.     London Luxury has performed in full under the Amended Commitment Letter, including by (among other things) undertaking substantial efforts to fulfill Walmart's purchases of gloves under that agreement.

95.     Under the February Commitment Letter, Walmart "committed to purchase from London Luxury a minimum of 6,072,770 master cartons [*i.e.*, 60,727,700 boxes] of nitrile examination gloves (the 'Product') on a non-cancellable and irrevocable basis for a minimum of a twelve (12) month period commencing on the date of first shipment of the Product (the 'Term')."

96.     Following its execution, London Luxury and Walmart amended the February Commitment Letter through the April Commitment Letter in which Walmart committed to buy at least 72 million boxes of gloves from London Luxury over a 12-month period and further agreed to renew its letter of credit for the benefit of London Luxury until it had fully exhausted that purchase commitment.

97.     In the June Commitment Letter, Walmart further agreed "to purchase approximately 75-80 million boxes of Nitrile Exam gloves per year, for the next five years, from London Luxury's, US based manufacturing facilities and operation."

98.     As described in further detail above, Walmart has wrongfully refused to receive and pay for shipments of gloves that London Luxury is prepared to send pursuant to the Commitment Letter.

99.     In particular, Walmart has refused to accept shipment of at least 145 containers of gloves for which it owes London Luxury at least $41,214,800. Moreover, Walmart's wrongful refusal to accept shipments also has forced London Luxury to incur other expenses related to the delays in these shipments.

100.    As a direct and proximate result of Walmart's breach, London Luxury has and will continue to suffer damages in an amount to be determined at trial.

### Prayer for Relief

WHEREFORE, London Luxury respectfully requests:

(a)    a declaration that:

(i) the Amended Commitment Letter is a valid and enforceable contract;

(ii) Walmart has a "non-cancellable and irrevocable" commitment under the Amended Commitment Letter to purchase at least 72 million boxes of nitrile gloves from London Luxury over a 12-month period and to renew its letter of credit for the benefit of London Luxury until it has fully exhausted that commitment;

(iii) Walmart has a "non-cancellable and irrevocable" commitment under the Amended Commitment Letter to purchase approximately 75-80 million boxes of nitrile gloves per year, for the next five years, from London Luxury's U.S. based manufacturing facilities and operation;

Case 5:22-cv-05059-TLB   Document 1-1   Filed 01/24/22   Page 34 of 35 PageID #: 38

(iv) neither the March 2021 D40 Supplier Agreement, nor any of Walmart's other standard form supplier agreements, supersedes the Amended Commitment Letter; and

(v) Walmart does not have the right to avoid its obligation to purchase gloves under the Amended Commitment Letter under the circumstances here.

(b)    an order of specific performance compelling Walmart to perform under the Amended Commitment Letter;

(c)    monetary damages in an amount to be proven at trial for breach of the Amended Commitment Letter;

(d)    pre- and post-judgment interest;

(e)    where appropriate, attorneys' fees and costs; and

(f)    such other, further, or different relief as the Court deems just and proper.

33

Dated:  New York, New York
        January 5, 2022

                         QUINN EMANUEL URQUHART &
                           SULLIVAN, LLP


                    By:  _____
                         Stephen R. Neuwirth
                         stephenneuwirth@quinnemanuel.com
                         Deborah K. Brown
                         deborahbrown@quinnemanuel.com
                         Jared E. Ruocco
                         jaredruocco@quinnemanuel.com

                         51 Madison Avenue, 22nd Floor
                         New York, New York  10010
                         (212) 849-7000

                         *Attorneys for Plaintiff London Luxury LLC*