# Exhibit AA

Maya Bowie 8/17/2023 vol(1)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF ARKANSAS

FAYETTEVILLE DIVISION

---------------------------------X

LONDON LUXURY, LLC,

        Plaintiff,

-vs-                          Case No. 5:22-cv-05059-TLB

WALMART, INC.,

        Defendant.

WALMART, INC.,

        Counterclaim-Plaintiff

-vs-

LONDON LUXURY, LLC,

        Counterclaim-Defendant.

---------------------------------X

VIDEOTAPED DEPOSITION OF MAYA BOWIE

TAKEN ON BEHALF OF THE PLAINTIFF

ON AUGUST 17, 2023, BEGINNING AT 9:08 A.M.

IN SPRINGDALE, ARKANSAS

REPORTED BY:  SHANNON S. HARWOOD, CSR, RPR, CRR

Maya Bowie, 8/17/2023, vol(1)

APPEARANCES

on behalf of the PLAINTIFF

Ms. Priyanka Timblo

HOLWELL, SHUSTER & GOLDBERG

425 Lexington Avenue

New York, New York 10017

(646) 837-5151

ptimblo@hsgllp.com


on behalf of the DEFENDANT

Ms. Rebecca Wernicke Anthony

JONES DAY

2727 North Harwood Street

Dallas, Texas 75201

(214) 969-4886

ranthony@jonesday.com

Mr. Vincent O. Chadick

QUATTLEBAUM, GROOMS & TULL, PLLC

4100 Corporate Center Drive

Suite 310

Springdale, Arkansas 72762

(479) 444-5200

vchadick@qgtlaw.com


Mr. Carl Frazier-Sparks

WALMART, INC.

Lead Counsel, Commercial Litigation

702 SW 8th Street

Bentonville, Arkansas 72716

carl.frazier@walmartlegal.com


ALSO APPEARING:  Mr. John Sims, videographer

Maya Bowie, 8/17/2023, vol(1)

A.   I believe the majority of them were not.  They were primarily all on Zoom, but there may have -- give or take moments where we tried to come together in '21, I don't remember, but mostly we were on Zoom for those.

Q.   And what about you?  Did you work for home primarily in 2021?

A.   I worked from home for the first portion primarily, although there were several trips, and I was actually still living in Pennsylvania and then I moved in June.  There were moments where we tried to come in the office and then COVID kind of re-sparked and we went back home.  So the answer to the question is primarily from home, but there were definitely in-person moments as well.

Q.   Do you recall a transaction to sell nitrile gloves to Heypex in 2021?

A.   In 2020?

Q.   In 2021.

A.   I recall discussions, yes, of an agreement to engage with Heypex, yes.

Q.   Do you recall that there was an agreement to sell nitrile gloves to Heypex in 2021?

A.   Yes.

Q.   And do you recall that the gloves to be sold to Heypex were to be sourced from a supplier named

Maya Bowie, 8/17/2023, vol(1)

London Luxury?

MR. CHADICK:  Object to form.

A.   I recall that that was the plan, yes.

Q.   (By Ms. Timblo)  Okay.  If I refer to that as the nitrile gloves transaction today, just to shorthand, you'll understand what I mean?

A.   Yes, the -- the Heypex relationship is what you're referring to?

Q.   I'm referring to the back-to-back Heypex London Luxury relationship.

MR. CHADICK:  Object to form.

A.   Not sure I fully understand that, if we shorten it, because it may be better to just keep it with the full length so I understand what you're referring to.

THE REPORTER:  Ms. Bowie, I'm really going to need you to speak up for me.

THE WITNESS:  Okay.  I know.  I have a low voice.  I'm sorry.  I'll get a little closer to the mic.

Q.   (By Ms. Timblo)  In 20 -- you said you recall an agreement to sell gloves to Heypex in 2021; isn't that correct?

A.   I recall that there was an agreement for them to sell gloves, yes.

Q.   And you also testified that it was the plan

for those gloves to be sourced from a supplier named London Luxury; isn't that correct?

MR. CHADICK: Object to form.

A. Yes, I said that.

Q. (By Ms. Timblo) Okay. So if I refer to the nitrile gloves transaction as the plan to source gloves from London Luxury and sell them to Heypex pursuant to the agreement, will you understand what I mean by that?

MR. CHADICK: Object to form.

A. I will understand that reference, yes, but I don't recommend the abbreviation.

Q. (By Ms. Timblo) Why don't you recommend the abbreviation?

A. Just want to make sure when you're asking questions I understand exactly what you're referring to.

Q. Understood. Those monthly merchandising meetings with Scott McCall that you testified about, did you ever discuss the nitrile glove transaction during those meetings?

MR. CHADICK: Object to form.

A. I do not recall if that -- those came up at that meeting.

Q. (By Ms. Timblo) So sitting hire today, your testimony is that you have no recollection that they -- that the Heypex deal was ever discussed at any of those

Maya Bowie 8/17/2023 vol(1)

referencing here.

Q.   And that chance to deliver or over-deliver performance of sales would arise from the London Luxury nitrile gloves buy; is that correct?

MR. CHADICK:  Object to form.

A.   When I'm reading this here, I'm referencing the B2B opportunities in general.  During -- given some of our categories and the needs of B2B players, such as hospitals, etcetera, it would have been a broader reference here.

Q.   (By Ms. Timblo)  Would that have included the London Luxury nitrile gloves buy?

A.   It would have included London Luxury's opportunity potential.

Q.   You say, "Amazon is all over the b2b space and I don't want them to own this market."  Do you see that?

A.   I do.

Q.   You thought it was beneficial to Walmart's interests to compete with Amazon in the B2B space; is that correct?

A.   I did.

Q.   You then say, "But agree we need to get ahead of the details and ensure our ducks are in a row," correct?

A.   I did.

Maya Bowie 8/17/2023 vol(1)

Q.   (By Ms. Timblo)  And do you recall making a decision to continue despite delayed performance?

A.   I recall being part of dialogue on continuing despite delayed performance, yes.

Q.   And do you recall the decision being made after that dialogue to continue despite delayed performance?

A.   I recall -- I don't know that a decision was made, but I recall that ongoing discussions were had after my involvement.

Q.   So it's your recollection that you do not recall a decision being made to continue with London Luxury despite delayed performance?

A.   From what I recall, I -- I don't remember it being a decision or point in time, no, that I was involved with.

MR. CHADICK:  Not interrupting, but we can order lunch at some point if you want to get to a point to do that.  Just -- a note was passed to me to remind that.

MS. TIMBLO:  Oh, okay.

Q.   (By Ms. Timblo)  Do you remember considering whether to halt the entire process with London Luxury in the summer of 2021?

A.   In summer, I can -- I don't remember exactly,

Moya Bowie 8/17/2023 vol(1)

but I can imagine around that time pausing due to delayed performance would have been on my mind, yes.

Q.   And do you recall what the decision was made -- what decision was made after that?

A.   I don't think we paused.  We continued so we would have moved forward with ongoing discussions.  I don't know that we called it a decision.  I mean, it was more about ongoing discussions on this relationship, and you know, though it had been months, and you know, there was opportunity, costs to be had, there continued to be discussions post summer.  So we moved forward with understanding the status of -- of the -- the gloves and whether they were on the water or not, when they would ship, and -- and getting those updates from Garrett Smalls.

Q.   It's Garrett Small.

A.   Small.  Sorry.  Thank you.  It's been awhile.

Q.   Understood.  So just to be clear, you recall being involved in consideration of whether to halt the program with London Luxury because of ongoing delays and you then recall not halting the program and deciding to continue; is that correct?

MR. CHADICK:  Object to form.

A.   Post the goods not being on the water in January, I was definitely involved beginning as early as

Maya Bowie, 8/17/2023, vol(1)

March, April on trying to understand why goods that were supposed to be on the water in January were still not shipped, and so there were lots of conversations, not just at one point in time.  Honestly, too many conversations and a lot of time spent on this topic that I would have been pulled into at various cadences along the way and that continued through fall of '21 per my recollection.

Q.   (By Ms. Timblo)  So that wasn't my question. My question was, you recall being involved in consideration of whether to halt the program with London Luxury because of ongoing delays following which the decision was made not to halt the program and instead to continue it.  Do you recall that?

A.   Very fair.  The reason I said what I said is the -- the word delays.  The reason was much broader than delays.  It was on the water, not on the water, factory issue, FDA issue, core issue.  So the delays were -- felt a little simple for me, so that's what I wanted to give you context for.

I was involved in discussions of all of the issues of lack of performance, but continuing to do diligence on the relationship to see if these goods would ship to Walmart.  So that's why I answered it a little bit more detailed, not to evade the question but

Maya Bowie - 8/17/2023 - vol(1)

because the word didn't feel right for me.

Q.   Understood.  So it was your understanding in September 2021 that it was not just delays that were performance issues with London Luxury, there were other performance issues as well, correct?

A.   Yes.

Q.   Okay.  And at that point, you considered whether or not to halt the program, correct?

A.   It was one point among many where I considered whether the program was viable, correct.

Q.   You considered whether to halt the program, correct?

MR. CHADICK:  Object to form.

A.   Yeah, I mean, I'm trying to recall how I would have said it at the time, but it would have been stop having these conversations with this supplier who had not shipped to us.  I don't know that I would have called that halt or -- I could have used different words, but what I recall is weeks and months of conversations about something that had not occurred and why are we having this conversation and taking this time was a little bit of the context that I was feeling.

Q.   (By Ms. Timblo)  Do you recall saying my lean is we need to halt this entire process?

A.   I can imagine saying that, but I would -- if

Maya Bowie, 8/17/2023, vol(1)

continuing, you know, for another day, week on -- on seeing these -- these actions come to fruition.

Q.   I think what I'm asking is a really simple question --

MR. CHADICK:  Object to form.

Q.   (By Ms. Timblo)  -- at this point -- at this point in time, is it accurate, did -- were you being truthful to -- to your boss, Julie, when you said, "It's been a lot but I am ok allowing this program to continue"?

A.   Yes.

Q.   Okay.  Thank you.  And you don't recall consulting anybody else's opinion at this time as to whether it was okay to go forward with London Luxury?

A.   I -- I --

MR. CHADICK:  Object to form.

A.   -- absolutely consulted Garrett, who is in this email, and that's really the only -- the main data point I had for saying I'm okay, because he was doing all of the due diligence and providing all of the information.  I was giving my opinion based on what he had sent to me here and -- and letting her know my thoughts on it, but it was very much consulted with Garrett primarily in this case because I can see it right here --

Q.    (By Ms. Timblo)  Okay.

A.    -- that that would have been what I referenced, because I wasn't having those conversations with all of the other parties.

Q.    Okay.  So when you say, "I think due diligence has been done," you're telling your boss, "I think due diligence has been done," you mean you're blindly trusting the representations that Garrett has made about the due diligence?

MR. CHADICK:  Object to form.

A.    I wouldn't use the word blindly.  It's another strong word.  I'm trusting the senior director of global sourcing for my category that the bullets in his email were accurate and that he's followed up on the questions that we had asked at that moment in time, but I would not use the word blindly as an officer of the company, no.

Q.    (By Ms. Timblo)  Did you consider it important to do independent due diligence?

A.    Are you --

MR. CHADICK:  Object to form.

A.    -- suggesting that I call the ports and check on them in Malaysia?  I mean, I don't know what you mean by independent.  Like, me taking the actions that our senior director of global sourcing is responsible to

take?  I'm just trying to understand what you mean by that.

Q.   (By Ms. Timblo)  You -- you telling your boss, "I think due diligence has been done," and I'm asking you whether by due diligence there, you're referring only to the representations that Garrett Small made to you or whether you're referring to -- to due diligence --

A.   Yeah.

Q.   -- that you believe had been done by people at the company other than Garrett Small?

A.   I --

MR. CHADICK:  Object to form.

A.   -- I think Garrett was the sole -- the central party here as the senior director of sourcing focused on this particular agreement, relationship, buy.  He has Heidi Pow on this email and Alex Hurd and others.  So did I anticipate and expect that he was taking the right internal parties as a partner, absolutely, but as a VP talking to a senior director in the company, I expect them, managed by their leadership team, to be accurately informing me of information in a thorough manner and we pushed on the information.

I thought we did some really good pushing, whether it's emails, asking for PowerPoints, following

up on -- on questions in verbal and email conversations. This is one manifestation of that, so I think we pushed a lot.  I can't say we were 100 percent happy with the status, we were not, but diligence was happening here, and at this point in time, in my mind based on the diligence, I was okay allowing, as I note here, but I don't -- I mean, if your question is should I have done more, I feel like I did a lot given the status of my role versus his versus the team.

Q.   (By Ms. Timblo)  Okay.  You had mentioned the other people on the email, so I do want to go through that right now.

MR. CHADICK:  Let's do that at some point -- I mean, you've been going an hour --

MS. TIMBLO:  I'm happy --

MS. CHADICK:  -- and 44 minutes --

MS. TIMBLO:  -- to take a break.  If -- if you want to take a break right now --

MR. CHADICK:  I think we should.

THE VIDEOGRAPHER:  We're going off the record. The time is approximately 12:26 p.m.

(A recess was taken from 12:26 p.m. to 12:27 p.m.)

THE VIDEOGRAPHER:  We are back on the record. The time is approximately 12:27.

Maya Bowie - 8/17/2023 - vol(1)

Q. Okay. In March of 2021, what did you understand to be the difference between direct import and direct supplier relationship?

A. Direct supplier relationship versus domestic?

Q. Sorry. Direct import and domestic supplier relationship. My mistake.

A. Where we take ownership of the goods of a program, so domestic means it ships in the US and direct import is it's imported from overseas.

Q. Do you understand the differences to be in logistics and shipping and handling?

MR. CHADICK: Object to form.

A. Generally speaking, it's related to supply chain and inventory ownership and when Walmart takes ownership of the goods.

Q. (By Ms. Timblo) And would you agree that the difference is that in a direct import relationship, Walmart takes ownership of the goods at the foreign port?

A. Yes, or at our port. I -- I honestly don't recall, but it's -- it's at one of the ports we take ownership of the goods.

Q. Versus a domestic supplier relationship where Walmart -- where -- where the supplier is responsible for bringing the goods into the country?

A.   Correct.

Q.   That's correct?

A.   Yeah.  Well, domestic means it's just all domestic, so yes, they're bringing it in and we take ownership at our port or our warehouse.

Q.   Okay.  So you would agree that any differences between a direct import relationship and a direct supplier relationship --

A.   Domestic supplier?

Q.   Domestic supplier relationship all involve steps that occur after goods are ordered, correct?

MR. CHADICK:  Object to form.

A.   I wouldn't have been involved in exactly the step by step of orders versus that and so I don't want to answer on process and timing, to be really honest, because I won't recall.  It would have been the -- the -- the buyers and the merch ops teams that would have been involved in that and I wouldn't have done that and so I don't want to try to remember what it would have been, because it wasn't my ownership, if that makes sense.

Q.   (By Ms. Timblo)  You see that in -- on this document, which is the attachment, right?

A.   Uh-huh.

Q.   It's -- it's -- the Bates Stamp of the page

Maya Bowie 8/17/2023 vol(1)

number we're looking at is WM-LL0100353.  Do you see that?

A.   I do.

Q.   Okay.  Do you have an understand that on March 12, 2021, the decision lay with you as to whether to move -- approve the -- moving the program to DI?

MR. CHADICK:  Object to form.

A.   I remember at that time Staci was overseeing the program as we discussed earlier, but given the -- the fact that I was a VP or a DMM, they were pulling -- Garrett was pulling me back in, and hence, Staci.  So I knew that I had to be part of a discussion given they needed information from me and alignment from me.

Q.   (By Ms. Timblo)  Okay.  Let's look at the parent email.  This is WM-LL0100351.  Do you see that -- that first email?

A.   Yes.

Q.   Okay.  First email, that's Staci to you --

A.   Yes.

Q.   -- Correct?

A.   Yes.

Q.   Okay.  And she says, "Maya - Garrett provided further detail around 'Why DI' in the future for the B2B gloves buy.  This is not time sensitive - it is an option for more streamlined execution for Walmart.  I am

Maya Bowie, 8/17/2023, vol(1)

aligned.  DMM approval is needed on the attached email."

Do you see that?

A.  I do see that.

Q.  Do you understand her to mean that your approval is needed?

A.  Yes, I did understand that me or another DMM or higher was needed.

Q.  When your approval is needed for a decision as part of your job, do you think it's important to understand the details of what you are approving?

MR. CHADICK:  Object to form.

A.  Generally speaking, that would be an accurate statement, yes.

Q.  (By Ms. Timblo)  And as of this time, March 12, 2021, your understanding of the significance of the move to DI was that it would involve a change in logistics in shipping, correct?

MR. CHADICK:  Object to form.

A.  It would involve a change of when we took ownership of inventory, which I consider supply chain generally, so generally speaking, yes.

Q.  (By Ms. Timblo)  And at this particular point in time, March 2021, was it your understanding that the move to DI had any impact on how the goods were actually ordered?

Maya Bowie 8/17/2023 vol(1)

directly.

Q. Okay. So just to be clear, in March 2021 when you approved the move to DI as DMM, you did not understand that moving the program to DI would revoke any quantity commitments that Walmart had made to buy gloves from London Luxury?

A. What is --

MR. CHADICK: Object to form.

A. What do you mean by the word revoke?

Q. (By Ms. Timblo) I mean what that word means in the English --

A. Can you use a different word?

Q. Negate.

A. Okay. Can you restate the -- the full question?

Q. Sure. In March 2021, when you approved the move to DI as DMM, is it correct that you did not understand that moving the program to DI would negate any quantity commitments that Walmart had previously made to buy gloves from London Luxury?

MR. CHADICK: Object to form.

A. I don't know that at this time or at that time if it negates or solidifies anything related to commitments, no. I -- I don't know that DI and commitments are interrelated, no.

Maya Bowie  8/17/2023  vol(1)

Page 145

Q.    (By Ms. Timblo)  You didn't have the understanding in March 2021 that DI and commitments were interrelated; is that correct?

A.    Correct, or now.

Q.    Or now.  Okay.

A.    Thanks.

Q.    If you could pass this to counsel.  I've just placed in front of you a document I have marked as Exhibit 107, bears Bates Stamp WM-LL0095408.

(Deposition Exhibit No. 107 was marked for identification and made part of the record.)

Q.    (By Ms. Timblo)  It is an email chain, top email from Staci Cochran to you copying others.

A.    Okay.

Q.    My question will be about the -- the top email and I do want to give you a moment to just read it.

A.    Okay.  Thank you.  Appreciate it.

Q.    And of course you can read other parts of the document as you wish.

A.    Okay.

Q.    Just let me know when you're done.

A.    Yeah, sorry.  Okay.  Very helpful.  Thanks --

Q.    Sure.

A.    -- for the time.

Q.    Sorry, what was your question?

Maya Bowie, 8/17/2023, vol(1)

A. Yes, I see that.

Q. Okay. So you participated in reaching the agreement with Heypex to increase the volume of boxes Walmart would sell Heypex to 66 million; is that correct?

A. I participated, yes, correct.

Q. And that would increase the potential topline for Walmart on the deal, correct?

A. Yes.

Q. I want to go to the May 21st, 9:17 a.m. from Garrett Small that you pointed out earlier.

A. Yes.

Q. He says, "The total agreement with London Luxury is 73M includes your store volume of 6.1M, GNFR 0.6M and B2B of 66.3M."

Do you see that?

A. Yes.

Q. Do you recall anyone telling Garrett at this point that that was -- that should not be the agreement with London Luxury?

MR. CHADICK: Object to form.

A. I -- that wasn't the topic of the email. It was just answering the questions Julie was asking on what it was, so no, I don't recall that.

Q. (By Ms. Timblo) I'm not asking about the

Maya Bowie 8/17/2023 vol(1)

email.  I'm just asking about this -- this period around May 21st, 2021.  Do you have a recollection of after Garrett sending this email anyone saying, wait a minute, why are we -- why do we have an agreement with London Luxury for 73 million boxes?

MR. CHADICK:  Object to form.

A.   I do not recall that, no.

Q.   (By Ms. Timblo)  All right.  And do you agree you received this email?

A.   I am on the email as a carbon copy, correct.

Q.   Okay.  And who is Vicki Vasser?

A.   She was legal.  She was a member of our -- she's a lawyer with -- with Walmart.

Q.   Do you recall Vicki Vasser raising any concerns?

MR. CHADICK:  I'm going to object to that. It's a privileged communication.

MS. TIMBLO:  I'll withdraw.

Q.   (By Ms. Timblo)  Do you -- do you know who Alex Hurd is?

A.   I do.

Q.   Okay.  Do you have an understanding that he's Garrett's boss?

A.   Yes.

Q.   Do you recall him raising any concerns about