**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**LONDON LUXURY, LLC**                                   **PLAINTIFF/COUNTER-DEFENDANT**

**V.**                              **CASE NO. 5:22-CV-5059**

**WALMART, INC.**                                   **DEFENDANT/COUNTER-PLAINTIFF**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case involves a contract for medical-grade nitrile gloves between a supplier, London Luxury, LLC, and a retailer, Walmart, Inc. Each party accuses the other of breaching the contract. In addition, London Luxury asserts claims against Walmart for violations of the Arkansas Deceptive Trade Practices Act and for common-law fraud; and Walmart asserts counterclaims for London Luxury's tortious interference with a Walmart employee's duties of loyalty and fiduciary responsibility, and for rescission of the parties' contract due to tortious conduct.   Walmart filed a Motion for Summary Judgment (Doc. 241), and London Luxury filed a Motion for Partial Summary Judgment (Doc. 253). The Motions are now ripe and ready for resolution. For the reasons stated below, both Motions are **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

By the end of the first quarter of 2020, the COVID-19 pandemic had triggered nationwide lockdowns, and Americans' growing sense of unease was morphing into outright panic. At the time, it was unclear how the virus spread from person to person, so everyone was encouraged to stay home. If people needed to venture out in public, they were advised to wear personal protective equipment ("PPE"), such as masks and gloves.

1

Walmart, the world's largest retailer, had a reliable source for medical-grade nitrile examination gloves prior to the pandemic, but as the crisis intensified, so did the public's demand for PPE. Walmart's in-house demand also increased, since the company required its associates to wear masks and gloves to keep them and their customers safe and healthy.

In the Summer of 2020, Walmart determined that it would need to order around three million boxes of nitrile gloves per month to keep up with the demand. Walmart solicited bids from other suppliers and ultimately selected a New York company called London Luxury. Though London Luxury did not manufacture the gloves in-house, it assured Walmart that it could secure enough product through its relationships with factories abroad.

As the pandemic wore on in 2020, the public's knowledge about COVID-19 changed, and so did its interest in purchasing nitrile gloves. Walmart initially informed London Luxury that it no longer wanted to buy millions of boxes of gloves per month, but within weeks changed gears and devised a new plan to buy more than double the number of gloves from London Luxury than had been previously contemplated. Walmart planned to resell most of those gloves—at a significant profit—to a third-party purchaser in a business-to-business ("B2B") transaction.

London Luxury alleges Walmart promised to buy at least 60 million boxes of nitrile gloves over the course of a year, while Walmart alleges it made no minimum purchase agreement and was free to terminate its contract at any point before an individual purchase order shipped. Walmart also complains that London Luxury's product was

substandard. As Walmart prepared to issue purchase orders in the Summer and Fall of 2021, concerns were raised about London Luxury's factory sources and the quality of its finished product. Walmart sought out independent product testing, and some of the gloves failed inspection. London Luxury argues any irregularities in the gloves were immaterial and either had been cured or were in the process of being cured when Walmart cancelled the contract in November 2021.

Each side accuses the other of breach and demands damages: Walmart requests reimbursement of the cost of gloves it paid for—but now says it cannot sell because of alleged defects—and London Luxury requests the value of the gloves it claims Walmart committed to buy but never ordered, as well as consequential damages for, among other things, the loans it took out to front-pay manufacturing costs and the diminution of the value of its business as a result of the cancellation of the contract.

Layered on top of these disputes is Walmart's allegation that London Luxury's CEO tortiously colluded with the Walmart sales director that was overseeing the glove deal. Walmart contends the two men worked together to benefit London Luxury and prejudice Walmart in the glove transaction. London Luxury disputes these accusations but argues that even if its CEO engaged in an improper business relationship with Walmart's employee, the two *companies* had a meeting of the minds as to all material terms of the contract.

Below is a chronological history of the parties' business relationship and the agreements they entered into along the way. A contract or contracts govern the instant dispute, but the parties disagree about which contract was operative when Walmart

began ordering large quantities of gloves from London Luxury in May 2021, and they further dispute what their respective rights and obligations were under that contract.

### A. July–August 2020[1]

In Spring 2020, Walmart's Health and Wellness Department assessed its inventory of medical-grade nitrile gloves and determined that it needed approximately two million more boxes per month to meet the unprecedented demand for PPE generated by the pandemic. *See* Doc. 257-8. After a formal bidding process in July, Walmart Global Sourcing Analyst Joshua Oaks emailed the winner, London Luxury, with the news that its bid had been selected. At the time, London Luxury was a supplier of home goods for Walmart, but not PPE. Mr. Oaks's email to London Luxury stated:

> I am pleased to inform you that you have been conditionally awarded business regarding your proposal for Powder-free Patient Examination Nitrile Gloves.
>
> Please see attached letter and please sign to begin the purchasing process. *You will have until 7/24/20 by 4PM CST to sign [the] document and return to myself.*

(Doc. 280-22, p. 2) (emphasis added).

The letter attached to the email added the following conditions:

- all glove purchases were to be made by purchase order;

- no minimum purchase was required;

- London Luxury's award was contingent on signing a Walmart "Supplier Agreement" by no later than August 1, 2020;

- a 100-count box of gloves was "not to exceed $6.9 (USD)"; and

---

[1] Unless specifically noted, the following facts are undisputed.

- the gloves needed to meet or exceed certain product specifications described in an attached protocol.

*Id.* at pp. 3–4.

The July 24 deadline to sign the award letter came and went. Although the parties had not yet agreed on a price term, Mr. Oaks believed that Walmart had committed to purchase "up to 3 million gloves or 300K cases of 1000" per month from London Luxury. (Doc. 258-3, p. 2). This was the same quantity that Walmart had solicited during the bidding process. *See* Doc. 258-3, p. 66 (London Luxury's July 15 Power-Point Bid Presentation, referencing "Walmart's requirement of 3–4 Million Nitrile Exam Glove Boxes per month").

On August 7, Mr. Oaks sent London Luxury a revised written offer. *See* Doc. 280-26, p. 2. London Luxury's Chief Commercial Officer, Moshe Abehsera, considered the offer but was not in a position to accept. He explained to Mr. Oaks in an email that London Luxury's manufacturing facility was no longer available to make gloves and that London Luxury was "work[ing] on" lining up another facility and "confirm[ing] pricing . . . the absolute best pricing that's possible." *Id.* Mr. Abehsera apologized for "not signing" the offer at this time, but anticipated working together in the near future. *Id.*

On August 11, just a few days after Mr. Abehsera's email, London Luxury signed two Walmart "General Supplier Agreements" (collectively, "August 2020 Supplier Agreements"), which were nearly identical, except that they referenced different Walmart Departments. *See* Docs. 140-3 & 140-4.

The August 2020 Supplier Agreements explained in detail the manner in which Walmart and London Luxury would do business when the time came time to order and pay for goods. The Agreements did not, however, specify what goods would be purchased, nor did they include information about pricing, quantities, or shipping deadlines. The Agreements explained that those material terms would appear in separate purchase orders, which, if written, would be incorporated by reference—and thereby transform the Agreements into enforceable contracts for the sale of goods.

### B. September–December 2020

The parties continued to negotiate into the Fall of 2020. In October, London Luxury executed a Walmart Realty Supplier Agreement, which was intended to govern the delivery of products for use by Walmart's in-store employees, rather than for resale. *See* Doc. 245-6. The Realty Supplier Agreement—like the August 2020 Supplier Agreements—included no product, pricing, or quantity terms, but instead set forth the "qualifications and the general terms of the business relationship" that would govern the shipment of goods—whatever they happened to be and whenever Walmart chose to order them. *Id.* The Agreement specifically stated that any modification of its provisions was not allowed. *See id.* at p. 3 ("The Contract is intended to be signed AS IS and is non-negotiable as we try to hold all of our suppliers to the same standards.").

By November, the parties had exchanged one or more proposed delivery schedules, which they referred to as "flow plans." *See, e.g.*, Doc. 258-9. London Luxury claimed it was ready to ship the gloves and only needed Walmart to write purchase orders.

6

Walmart, however, had been reluctant to write purchase orders due to its lack of confidence in London Luxury's supply chain. Back in September, Mr. Oaks had warned his team at Walmart that "labor issues in many glove factories" required London Luxury to "switch[] factories multiple times since [Walmart] originally awarded them [the nitrile glove business] back in July." *Id.* Then, on November 3, Senior Sourcing Director for Walmart, Garrett Small, emailed Mr. Abehsera of London Luxury, asking: "Can you please give me a status of the flow plan? . . . . I figured we would have containers on the water already." (Doc. 258-9, p. 2). Finally, on November 9, Walmart Senior Buyer Shannon Allen sent Mr. Oaks an email that read: "FYI—still no update from LL on shipment timing for the Nitrile Gloves therefore we have not been able to write POs yet." (Doc. 305-1, p. 21).

On December 14, Walmart wrote an entire year's worth of weekly purchase orders all at once, for a total of just over 53 million boxes of gloves, priced at $7.20 per box, and sent them in a combined spreadsheet to London Luxury. *See* Doc. 305-2, p. 7. Mr. Oaks told his team that London Luxury's price-per-box was "by far the lowest we have seen." (Doc. 305-1, p. 23). Each weekly order was to be delivered to the Port of Los Angeles, and once received, Walmart would deliver the gloves to its stores across the country. *Id.* at p. 5.

But less than a week after Walmart issued the purchase orders, its executives began questioning whether Walmart still needed such a large supply of gloves. On December 19, Walmart's Senior Vice President of Merchandising for Health and

Wellness, Julie Barber, sent the following email to Mr. Small and his boss, Alex Hurd,

Vice President of Health and Wellness Sourcing:

> Sorry to bother you on a Saturday. Can you all please send me your assessment of next steps on the nitrile gloves situation? I have a few people (Corey, Antoinette, Leslie) that are having some anxiety on the buy as it feels like the commitment is too much. Can you let us know what we are truly committed to if anything?

(Doc. 258-4, p. 4). Mr. Small responded to Ms. Barber that same day, explaining his view

that Walmart had made the following minimum purchase commitment:

> The commitment awarded in August was for supply through August next year.
>
> The award letter as approved by the merchants was an estimated monthly business across purchase orders (POs) shall be up to 3 million sellable units.
>
> This was to be split across D13 [Consumables Department], D40 [Health and Wellness Department] and GNFR [Goods Not for Resale, i.e., goods intended for use by Walmart's employees].
>
> The estimated range for the bid was 3–4 million selling units, or boxes of 100 each [per month].
>
> Please let me know if you have any questions or if we need to discuss more in depth.

*Id.* at p. 3.

Ms. Barber followed up on December 20, saying, "A few people have voiced to me

that we may have committed to too many [gloves,] and I want to better understand the

excess if any." *Id.* Mr. Small then contacted the Walmart buyers to solicit their revised

order estimates. Although in July they had estimated a need for 3 million boxes of gloves

per month, by December the buyers had changed their minds and only wanted 625,000

boxes per month. *Id.* at p. 2. On December 21, Mr. Small emailed those estimates to Ms. Barber (copying Mr. Hurd, Ms. Allen, and Walmart Senior Director Rhonda Berry), and made the observation that if Walmart canceled its current purchase orders and instead ordered the revised, lower totals, this would result in "a gap of 2.375M" boxes per month. *Id.* at p. 3. This "gap" was the difference between what Mr. Small believed Walmart had already committed to purchase from London Luxury—"up to 3M [boxes] per month"—and the revised totals the buyers had just given him. *Id.*

Mr. Small was not alone in believing Walmart had already made a minimum purchase commitment. Mr. Oaks emailed Mr. Small on December 22, reiterating his understanding that Walmart had "a commitment [to buy] up to 3 million [boxes of] gloves or 300K cases of 1000" with London Luxury, based on a "verbal" confirmation from London Luxury "in a call [that took place at] 11am on July 21st with the [Walmart] merchants." (Doc. 258-3, p. 2). Mr. Oaks conceded that this "commitment" for the purchase of millions of units of goods was *not in writing* and admitted that "[i]n hindsight I should have received [London Luxury's] written confirmation as well." *Id.*

At around the time Mr. Oaks sent this email, Mr. Small allegedly participated in a telephone call with Walmart's in-house legal counsel, Greg Dow, regarding the glove deal with London Luxury. After the call, Mr. Small sent a group email to eleven individuals at Walmart, including Ms. Barber, Mr. Hurd, Ms. Allen, and Ms. Berry, to advise what he believed Walmart's commitment to London Luxury entailed, per his discussion with Mr. Dow. This email (Doc. 258-14), which was dated December 22, contained Mr. Small's

summary of Mr. Dow's legal advice.[2] Regardless of what Mr. Dow *actually advised* Mr. Small with respect to Walmart's legal obligations to London Luxury, Mr. Small told Ms. Barber, Mr. Hurd, Ms. Allen, Ms. Berry, and others on the email chain that he understood Walmart was legally "on the hook for 3 million boxes of gloves per month" from London Luxury. (Doc. 258-14, p. 2).

After receiving Mr. Small's email, Ms. Barber emailed Ms. Allen to ask her "how [Mr. Small] ever got to 3M boxes," and Ms. Allen responded in a way that showed she understood the commitment as Mr. Small did—and could justify it with facts and figures. (Doc. 280-39, p. 2). Ms. Allen explained that in July 2020, she and others had calculated an estimated need for three million boxes per month, but no one had "followed up asking for updated projected [quantities] since July." *Id.* In the meantime, "much . . . changed" because Walmart acquired "a stable supply" of gloves from other vendors and "the [COVID-19] vaccine [was expected to] be rolling out," which meant Walmart no longer needed three million boxes per month. *Id.* Ms. Barber responded, "Makes sense," and said she "[h]ope[d] Mr. Small c[ould] negotiate quantities down." *Id.* Going forward, Ms. Barber, Ms. Allen, and others on their team did not question—at least in writing—Mr.

---

[2] This email was listed on Walmart's privilege log but was inadvertently disclosed during the course of discovery. After London Luxury cited to the email in its summary judgment briefing, Walmart attempted to claw it back, and London Luxury moved to deem the attorney-client privilege waived with respect to the document. *See* Doc. 270. In response, Walmart cross-moved to strike all references to Mr. Dow's purported advice to Mr. Small from the summary judgment record. *See* Doc. 309. In a separate ruling (Doc. 398) the Court determined that the privilege did not apply given the factual context here and because of the nature of the contract claims and defenses at issue.

Small's belief that Walmart had committed to purchase up to three million boxes of gloves per month from London Luxury.

Walmart ultimately canceled all its London Luxury purchase orders. On December 22, Mr. Small wrote an email to London Luxury's CEO, Marc Jason, advising him that Walmart would soon be issuing new purchase orders—but for only a fraction of the quantity previously ordered. Mr. Jason did not take the news well:

> Said <u>very</u> calmly, this email is freaking me out more than a little. These qualities [sic] are no where [sic] near the quantities that we've HARD committed to our factory on Walmart's behalf based on the ongoing written commitments we've received.   Most recently, in the last two weeks.   You know theres [sic] absolutely nothing that I haven't done for you, and wouldn't do for you, to demonstrate my unstoppable commitment and spirit of partnership, but this is so far off, this just can't be.   We need to stick to what was agreed and committed to.   There is simply no way in the world that I can back out now, I literally have tens of millions of dollars at risk, in addition to a significant personal guarantee that I gave the bank based solely on Walmart's written commitments and trust that I've been given throughout.

(Doc. 258-3, p. 3) (email from Jason to Small, emphasis in original).

Mr. Small responded with an apology "for the angst this has caused" and promised that "PO's will be reissued" for the new totals *and* that Walmart would buy the "remaining . . . cases," as well. (Doc. 258-16, p. 2). He closed with, "I want to reiterate that Walmart will buy your allocated amount and you can count on me to help you though [sic] this process." *Id.*

On December 24, Mr. Small reached out to an executive at Sam's Club, inquiring whether Walmart could utilize Sam's Club's wholesale network to locate "potential buyers" for the excess gloves he believed that Walmart had committed to buy from London Luxury but no longer needed. (Doc. 258-14, p. 2). Mr. Small noted that Walmart's glove supplier

"had to financially back the expansion of this state of the art facility in Vietnam to ensure they have their own dedicated production lines for this Walmart Business"; the gloves were "vetted and inspected to ensure proper labor practices meeting all Walmart requirements"; the price of the gloves was "$7.20 for a box of 100 gloves"; and the deal involved a year-long shipment broken down into "weekly containers arriving to the Port of LA/Long Beach starting in mid-January . . . . through December 31, 2021." *Id.* But Sam's Club was not interested.

### C. January–February 2021

By early January 2021, Walmart executives, spearheaded by Mr. Small, finally found a buyer for the excess gloves: a third-party company named Heypex that had clients in the medical industry. Walmart executives welcomed the prospect of this new business, as it meant Walmart could make a significant profit—provided London Luxury's low price held constant and Heypex could be persuaded to accept a higher purchase price from Walmart.

Chasity Prince, a Walmart B2B buyer, wrote an email to her team on January 19 stating she "[m]et with both Sandra Buja & Greg Dow in Legal, [and] Greg confirmed that WMT is liable to purchase the product [from London Luxury] based on the commitment letter that was sent out." (Doc. 258-15, p. 2).[3]   In a lemons-to-lemonade moment, Ms. Prince expressed excitement over the "significant opportunity" the new B2B transaction

---

[3] Walmart formally asked—and then moved—to claw back this document as privileged. This document is subject to the same motion practice cited earlier. *See supra*, n.2. The Court's ruling applies here, too.

represented for Walmart and noted that "[t]he potential to scale this long term [wa]s infinite!" *Id.* According to her initial estimate, "[t]he B2B portion of the buy" from London Luxury would result in an estimated profit to Walmart of $63 million. *Id.*

Heypex had previously done business with Walmart as a supplier of disposable face masks. Mr. Small communicated with Heypex executives and reported back to the Walmart team that Heypex's demand for gloves far exceeded the quantity Walmart was supposedly obligated to buy from London Luxury. (Doc. 258-25, p. 3). Ms. Berry, Ms. Allen, and Ms. Allen's supervisor, Maya Bowie, agreed that Heypex was "the first option." *See* Doc. 258-25, pp. 2–3.

On January 29, Ms. Allen emailed the Walmart team with news that the resale deal with Heypex would likely generate even more profit than previously expected—$72 million, to be exact. *See* Doc. 258-26, pp. 5–6. In making that calculation, she assumed Walmart was committed to buying gloves from London Luxury at a cost of $7.40 per unit and would resell the gloves to Heypex at $8.71 per unit. *Id.* Ms. Allen confirmed that Heypex had agreed to this price. *Id.* She also assumed the deal would continue "for the next 52 weeks"—meaning London Luxury would supply Walmart with gloves for at least that length of time. *Id.* The only remaining piece of the puzzle was the delivery schedule. Walmart's ability to make timely deliveries to Heypex depended on London Luxury's ability to acquire and deliver product. So, on February 8, Ms. Allen wrote the following email to Mr. Small, copying her supervisor, Ms. Bowie, and three other members of the gloves team:

> Garrett, Can you please ask Marc [Jason] what he needs to ensure on time shipment?
>
> Assuming we get both parties to sign the Heypex contract we still will not want to write 52 weeks' worth of POs to LL[,] I assume[,] so I don't want LL to have unrealistic expectations.

(Doc. 258-28, p. 2).

Shortly after that, on February 19, Walmart and Heypex signed their contract, wherein Walmart agreed to deliver just over 55 million boxes of nitrile gloves to Heypex over a 52-week period. *See* Doc. 258-27. Ms. Barber signed the contract on behalf of Walmart. *Id.* Walmart does not dispute that it intended London Luxury to supply 100% of the gloves for this B2B transaction—though Walmart insists it was not contractually precluded from seeking another source for gloves if it so chose. *See* Doc. 282, p. 60.

Meanwhile, Mr. Jason of London Luxury was becoming antsy about the fact that Walmart still had not written any new purchase orders. He was also concerned about London Luxury's ability to finance the steady supply of gloves that would be needed over the course of a full year without a firm commitment to a total minimum purchase. He began emailing Walmart executives with those concerns in mind, beginning with Ms. Allen. On February 10, he informed her[4] that London Luxury was "at a very critical juncture," having "made a MAJOR financial commitment of a $72MM SBLC to our factory and hav[ing] negotiated a more than 30% cost below the current pricing, and hav[ing] agreed to hold this constant for 52 weeks even with the demand that far outweighs the

---

[4] He also copied Michael Marchalonis and Brian Tromburg, who were then Walmart's Replenishment Managers for Pharmacy/Health and Wellness.

global supply." (Doc. 259-3, pp. 3–4). The fact that London Luxury had not been provided

with one year's worth of purchase orders was apparently a problem for London Luxury's

bank. Mr. Jason explained:

> We made our 12[-]month flow commitment which Walmart had agreed to
> up front to [sic] mirror . . . . In order for us to hold this flow, both the factory
> and the bank have asked for PO's for the flow duration. With only 4 weeks
> of PO's, we will be unable to hold the price constant for the full 52 weeks of
> flow, as I'm sure you can understand. I have asked the bank and the factory
> if they would accept a legal binding contract for the year and issuance of
> PO's four weeks in advance of the shipments, otherwise, we will need the
> 12[-]month flow of POs that Walmart has given us written confirmation of.
> If this is your preference, I will let you know if this is acceptable by the end
> of the week. The continued delay of PO's after the first ones were
> temporarily canceled bc of the reallocation due to the B2B changes, more
> than a month ago . . . is delaying the release of more cash from our line of
> credit and is putting the flow further at risk.

*Id.*

Mr. Jason separately forwarded his email to Mr. Small as an "FYI," *id.* at p. 3., and

Mr. Small responded directly to Mr. Jason on February 18, as follows:

> There have been multiple emails and letters stating that Walmart is taking
> 12 months of the supply you have secured.
> This is legal and binding even though it is via email.  We are buying 52
> weeks no matter what.
> Even with the above is the bank not accepting?
> I need to know exactly what the bank needs and that may mean some push
> back on the bank given the above clearly noted legally binding agreements
> made.
>
> Is it 8 weeks of PO's due to the lead time with the legally binding contract?
> If it is 12 months, why?
>
> Lastly, I need you to directly answer the shipment question, when will they
> ship, and if late from your earlier commitment, why?

*Id.*

15

Mr. Jason replied to Mr. Small on February 19, assuring him that the gloves could be "shipped immediately" but "ha[d] [not] yet shipped" because London Luxury was waiting on Walmart to issue the purchase orders. *Id.* at p. 2. He requested from Walmart "a simple 'truly binding' letter, 'confirming the 12[-]month committed quantity is unconditional and won't be canceled,'" which Mr. Jason understood London Luxury's bank would "immediately accept." *Id.*

After receiving Mr. Jason's email, Mr. Small attempted to secure the commitment letter the bank needed. On February 19, he emailed three people: Ms. Allen; Staci Cochran, who was Walmart's Senior Director of New Business Development; and Vicki Vasser-Jenkins, Walmart's Senior Counsel. *See id.* Mr. Small's email stated, "I finally think we know what [London Luxury's] bank wants, but it wasn't easy." *Id.* He then explained that Walmart could avoid issuing a whole year's worth of purchase orders at once by providing London Luxury's bank with a letter confirming the total purchase. He assured them: "This letter will allow [Walmart] to maintain flow starting next week if we can get it to [London Luxury] today. That will give them time to get the money from the bank, pack in their boxes and load containers to ship end of next week." *Id.*

About 30 minutes after receiving this email from Mr. Small, Ms. Allen responded to Mr. Jason's email from the previous week.   She apologized about ignoring his email and explained that she "thought [he] [was] already in communication with Garrett [Small]." (Doc. 259-1, p. 2). She then instructed Mr. Jason to communicate directly with Mr. Small

from then on, as he was to be London Luxury's "main point of contact on this buy."[5] *Id.*

Later in the day on February 19, Mr. Small and Mr. Jason communicated privately by text

message. *See* Doc. 259-2, pp. 3–4. Mr. Small asked Mr. Jason to tell him honestly "if

shipments [we]re delayed." *Id.* at p. 3. He also said he "need[ed] to know" exactly what

London Luxury's bank required to advance funds for the glove deal and "[i]f [he] need[ed]

to get on the phone with the bank." *Id.* In response, Mr. Jason again requested "[a] reissue

of the [December] POs" and a "[b]inding agreement" from Walmart. *Id.* Mr. Small texted

back, "So are shipments delayed? We already have a binding agreement. Email and the

letter are that." *Id.* Mr. Small also confided in Mr. Jason that Ms. Allen "d[id]n't want to

issue" an entire year's worth of purchase orders as had been done in December. *Id.* Mr.

Jason replied that he was planning to travel to Bentonville, Arkansas, where Walmart is

headquartered, to meet with Mr. Small in person. *Id.* at p. 4.

The men arranged a lunch date on February 22, where they discussed, among

other things, the possibility of Mr. Small leaving Walmart and going to work for Mr. Jason

on a new domestic glove manufacturing venture. *See* Doc. 259-2; Doc. 258-2, p. 53.

At 3:50 p.m. on February 22 (i.e., after the lunchtime meeting), Mr. Jason sent an

email to Mr. Small. The email contained language that Mr. Jason had crafted for Mr. Small

to insert in a working draft of a "[b]inding commitment" letter that London Luxury could, in

turn, present to its bank to secure financing for the large Walmart order. (Doc. 259-5, pp.

2–3). Mr. Jason suggested that the commitment letter state that Walmart was "hereby

---

[5] She also asked Mr. Jason to copy Ms. Cochran on future communications about the
glove deal.

formally committing to purchase from London Luxury a minimum of 6,072,770 master cartons of nitrile examination gloves . . . on a <u>non-cancellable</u> and <u>irrevocable</u> basis for a minimum of a twelve (12) month period commencing on the date of first shipment of the Product . . . . [and] delivered on a monthly flow basis."[6] *Id.* (emphasis in original). After receiving Mr. Jason's email, Mr. Small forwarded it in its entirety to Walmart attorney Ms. Vasser-Jenkins. *Id.* Several hours later, she responded to Mr. Small:

> I am sorry I misunderstood that I was to revise the letter. I did not work on the original letter (although I provided feedback) and thought you or someone on your team was tweaking former draft for me to review from legal perspective. Happy to work on it and get something to you.

*Id.* at p. 2.[7]

### D. The February 2021 Commitment Letter

Mr. Small emailed Mr. Jason a letter on February 23, 2021. (Doc. 259-6). The cover email stated that the attached letter was approved by "Walmart legal," though Walmart disputes that this was true. The letter was signed by Mr. Small on behalf of Walmart. *Id.* The subject line of the letter read: "Commitment to purchase nitrile examination gloves," and was addressed informally to Mr. Jason as "Marc." *Id.* In relevant part, the letter stated:

---

[6] One carton is the same as one "case pack," which contains equals ten 100-count boxes of nitrile gloves. Therefore, 6,072,770 cartons equals 60.7 million boxes. *See* Doc. 258-26, p. 5; Doc. 259-29, p. 3. Walmart agreed to sell Heypex just over 55 million boxes of gloves over the course of a year.

[7] Ms. Vasser-Jenkins's response was originally marked as privileged and submitted to the Court for *in camera* review.   The Court has separately found that the email is not privileged. *See* Doc. 398.

Walmart is pleased to inform London Luxury LLC ("Supplier") that Walmart is committed to purchase from London Luxury a minimum of 6,072,770 master cartons of nitrile examination gloves (the "Product") on a non-cancellable and irrevocable basis for a minimum of a twelve (12) month period commencing on the date of first shipment of the Product (the "Term"). During the Term, the Product will be delivered on a weekly flow basis. Walmart will pay Supplier for the Product via wire payment within two (2) days of Walmart's receipt of official documents. The wire shall be paid to a separate Supplier account to be created and supplied to Walmart by the Supplier. Supplier shall be responsible for procuring the SGS report for the Product and for importing the Product into the United States and clearing U.S. Customs upon arrival.

*Id.* at p. 3.

Later, the section labeled "Pricing" read:

52-week pricing to not exceed $7.48 (USD) DDP per box of 100ct. Pricing does not include US Customs duties per 4015.19.0550 HTS Code. Walmart will revisit price in the event HTS code no longer applies.

*Id.*

And yet another section labeled "Testing" read:

Walmart may require initial testing of your product to verify it meets industry standards, product claims, and regulatory standards. Random testing may also be conducted to validate that the product quality remains as required by standards and specifications per SGS tolerance standards. Any failure to meet attached testing protocol may result in the disqualification of purchase agreement.

*Id.*

This commitment letter incorporated a set of product specifications that the gloves would be required to meet or exceed: "Any failure to meet the attached testing specifications should be communicated in writing to [London Luxury] for [London Luxury] to immediately take action to compel said failure." *Id.*

19

Walmart points out that the version of the letter that Mr. Jason countersigned was slightly different than the version Mr. Small emailed to him on February 23. Mr. Jason received the letter and suggested some changes, which Mr. Small considered. On March 12, Mr. Small signed and emailed a modified version of the February 23 letter. *See* Doc. 248-12. Mr. Jason countersigned it exactly one week later, on March 19. *See* Doc. 248-14. The fully executed version of the letter did not contain a requirement that London Luxury enter into Walmart's "Goods Not For Resale Supplier Agreement" as a prerequisite, nor did that version of the letter specify that "[a]ny failure to meet attached testing protocol may result in the disqualification of purchase agreements."[8] *Compare* Doc. 259-6, p. 3 (earlier version), *to* Doc. 248-14, p. 3 (fully executed version). Other than those two differences, the earlier version of the letter and the fully executed version are identical—including the description of the product, the quantity, the price, the duration of performance (52 weeks), and the attached testing protocols and specifications. Even though the letter was countersigned on March 19 (which is important context for the factual timeline in the next section), the parties refer to it in their briefing as the "February 2021 Commitment Letter," so the Court will, as well.

Walmart contends that the February 2021 Commitment Letter was without legal effect because Mr. Small lacked the authority to execute it on Walmart's behalf. Further, Walmart insists that Mr. Small and Mr. Jason both knew that Mr. Small lacked the

---

[8] Though this "testing protocol" language was deleted from the final version, other language in the same document required products to "meet or exceed [the] attached specifications to qualify" as marketable. (Doc. 248-14, p. 3).

authority to execute the February 2021 Commitment Letter, and they colluded in an attempt to defraud Walmart.

London Luxury responds that the February 2021 Commitment Letter accurately summarized Walmart's understanding of its contractual obligations to London Luxury. Further, London Luxury believes it can prove at trial that Mr. Small was authorized to execute the letter on Walmart's behalf, since Mr. Small's boss, Mr. Hurd, approved of the material terms, other Walmart executives also were aware of and agreed to those terms, and Walmart attorney Ms. Vasser-Jenkins received a draft form of the letter and approved its material terms.

### E.   March 2021

On March 15, Mr. Small informed Mr. Jason via text message that Walmart employees were concerned about London Luxury's shipping delays. *See* Doc. 248-13. On March 23, Mr. Jason invited Mr. Small to meet with him in Florida and paid for Mr. Small's first-class air travel and a beachfront hotel on Miami Beach. *See* Docs. 248-15– 17. As part of that trip, Mr. Jason took Mr. Small on a private jet to visit a location in central Florida where Mr. Jason hoped to build a glove factory—and run it with Mr. Small's help.

Though Walmart had still not written any purchase orders for London Luxury gloves as of March 2021, the parties understood that the purchase was imminent, as Walmart's contract with Heypex was still in place. At Walmart's insistence, London Luxury signed a "Direct Import Supplier Agreement" on March 31, 2021 ("March 2021 Supplier Agreement") (Doc. 259-7), which materially altered the shipping method the parties had previously agreed to in the August 2020 Supplier Agreements. Under the new March 2021

Supplier Agreement, Walmart would take custody of the gloves at the foreign port and arrange for overseas shipping. This would relieve London Luxury of the responsibility and costs associated with delivering the gloves to a U.S. port.

Aside from this change in shipping, the March 2021 Supplier Agreement was remarkably similar in content to the August 2020 Supplier Agreements. For example, the March 2021 Supplier Agreement generally described the way in which the parties agreed to conduct business with one another; but the document—standing alone—lacked product, pricing, and quantity terms, as well as delivery deadlines. Instead, the March 2021 Supplier Agreement—like the August 2020 ones—contemplated incorporating all material terms needed for an enforceable contract for goods by writing future purchase orders. Generally speaking, supplier agreements contain boilerplate terms that Walmart uses to standardize the way it does business across all suppliers. Those standard provisions did not necessarily contemplate the context of a written purchase commitment. For example, the March 2021 Supplier Agreement—like the August 2020 ones—did not contemplate Walmart making required to make any minimum purchase of goods or automatically renewing any purchase. The March 2021 Supplier Agreement also and contained an express limitation on damages and a clause that read in relevant part: "[I]f there is a conflict of terms between this Agreement, an Order, the Standards, business programs, processes, directives or policies incorporated into this Agreement, this Agreement shall be the controlling document." *Id.* at p. 16.

**F.   April–June 2021**

On April 7, London Luxury signed an agreement with MNA Gloves, an entity incorporated in Malaysia, to supply nitrile gloves to Walmart. Under the agreement, MNA would provide London Luxury with six million boxes of gloves per month for a twelve-month period. (Doc. 248-21, p. 3). This equated to 72 million boxes of gloves a year.   The parties agree that MNA only repackaged gloves but did not manufacture any gloves of its own.

From April 12 to April 16, London Luxury tried to ascertain the exact factory address where the gloves that MNA was repackaging were being manufactured. Little progress was made. *See* Docs. 248-24, pp. 2–12; 248-25, pp. 2–3). On May 5, London Luxury thought a factory called Nitritex was making the gloves. *See* Doc. 248-28. But on May 12, London Luxury learned its information was wrong and that Nitritex was not the right factory. *See* Doc. 248-29, p. 2.

At around this same time, on April 14, Ms. Cochran of Walmart was messaging Mr. Small to ask him to try to renegotiate the price of gloves with London Luxury. She reasoned that since Walmart was now assuming the cost and responsibility of international shipping pursuant to the newly signed March 2021 Supplier Agreement, London Luxury's price-per-box of gloves should be cheaper. (Doc. 259-19, p. 3). Mr. Small responded that a price cut was not possible. He explained that over the past months, the factory London Luxury was working with in Asia "continued to increase cost," such that now, London Luxury was expecting to pay "above $7" a box. *Id.* Ms. Cochran responded that London Luxury's increased costs were not Walmart's fault and insisted

23

that Walmart "need[ed] to make more than 14.5% margin" on the resale of gloves to Heypex. *Id.* She also said that Ms. Barber, the Senior V.P. of Merchandising, was "worried this [glove deal with London Luxury] isn't going to come to fruition." *Id.* Mr. Small responded confidently, "[O]h[,] it will happen . . . cost and margin is the question." Ms. Cochran followed up: "[C]an happen? or absolutely will happen?" *Id.* And Mr. Small replied, "WILL," and confirmed that the gloves would likely ship the following week since a letter of credit to secure the cost of manufacturing had been "approved" and was "waiting on [the] bank." *Id.*

That letter of credit Mr. Small referred to was issued two days later, on April 16. *See* Doc. 259-12, pp. 10–12 ("April Letter of Credit"). London Luxury's bank had been unwilling to release the funds necessary to secure the glove manufacturing costs unless Walmart offered assurances that it did, in fact, plan to order a significant volume on an ongoing basis. The April Letter of Credit represented Walmart's promise to provide collateral for the benefit of London Luxury, as secured by HSBC Bank, USA, NA, in an amount equivalent to $89.76 million to secure two months' worth of nitrile gloves orders. The April Letter of Credit specified that London Luxury's gloves were expected to ship between April 24, 2021, and March 25, 2022, and amounted to 7.2 billion "pieces."[9] *Id.* at p. 10. Walmart's Senior Director and Head of Capital Markets, John Egerman, testified at his deposition that he understood that Walmart had given him the authority to sign off

---

[9] The parties stipulate that 7.2 billion pieces equals 72 million boxes of gloves.

on the April Letter of Credit.   He also testified that Mr. Small had supplied him with the dollar value to include in the Letter of Credit.

On April 27, Mr. Small sent an email to Mr. Egerman, Mr. Hurd, Walmart Vendor Rodolfo Sanchez, and two HSBC Bank employees, with the following documents attached: (1) the fully executed February 2021 Commitment Letter, and (2) a new letter dated April 28, 2021 ("April 2021 Commitment Letter"), containing the subject line, "Re: Commitment to purchase nitrile examination gloves," which Mr. Small proposed sending to Mr. Jason as proof of Walmart's intent to reissue a new letter of credit every two months until the year-long purchase order was completed. (Doc. 259-16).

The April 2021 Commitment Letter was signed by Mr. Small on behalf of Walmart. *Id.* at p. 8. The document referenced the parties' "initial twelve[-]month commitment agreement to purchase . . . nitrile examination gloves . . . dated February 23, 2021," i.e., the February 2021 Commitment Letter, and explained that in connection with that commitment, Walmart "hereby irrevocably commit[ted] to reissuing [letters of credit] for the same value and on the same terms of [the April Letter of Credit] every 60 days for the next 12 months or when 7.2 billion pieces of nitrile gloves have been delivered, whichever is later." *Id.* Mr. Small's supervisor, Mr. Hurd, testified at his deposition that he was involved in negotiating the April Letter of Credit and the April 2021 Commitment Letter. *See* Doc. 280-1, p. 89. Mr. Hurd claims Mr. Small told him that a Walmart merchant, possibly Ms. Barber, had given Mr. Small approval to sign the April 2021 Commitment letter. *Id.* at p. 91.

25

On May 17, London Luxury executives wrote to Walmart that the company was once again "changing the factory" that would produce the nitrile gloves. (Doc. 248-31, p. 3). The new factory was called Ansell (Kulim) and was located in Malaysia.

On or about May 20, Walmart and Heypex sales executives had a meeting about the price of gloves. *See* Doc. 259-21, p. 6. In the end, Heypex offered to pay $9.25 per box—up from the original agreement of $8.75 per box. *Id.* Heypex also wanted to increase its order by 11 million more boxes, for a total order of 66 million boxes of nitrile gloves, and emailed Mr. Small, Ms. Bowie, and Ms. Cochran with the request. *Id.* at p. 5.

London Luxury contends that Ms. Cochran agreed to the new Heypex price and new quantity terms   in writing. *See id.*[10] Afterward, Ms. Barber sent an email thanking Ms. Cochran and copying the gloves team, consisting of Ms. Berry, Ms. Bowie, Mr. Small, and Mr. Hurd. Ms. Barber asked the group: "Is the agreement with London Luxury for 66M boxes or 55M boxes?" *Id.* at p. 4. Mr. Small responded, "It is for 66.3 Million boxes now. Vicki [Vasser-Jenkins, Senior Counsel] is drafting the addendum." *Id.* Ms. Barber replied to the group, which now included Ms. Vasser-Jenkins, "So there will be an addendum for both Heypex and London Luxury?" *Id.* Mr. Small responded in the affirmative, and Ms. Barber asked again, "Is the agreement with London Luxury for 66M or 55M?" *Id.* at p. 3. At that point, Mr. Small responded, "The total agreement with London Luxury is 73M.

---

[10] Walmart disagrees that Ms. Cochran's email constituted a formal, written agreement to amend the price and quantity terms with Heypex. Walmart instead characterizes her email as merely setting forth "certain high-level terms of a proposed amendment" that "were tentatively agreed on" but not formally accepted. (Doc. 282, p. 120).

Includes your store [retail] volume of 6.1M, GNFR [for employee in-store use] 0.6M and B2B [with Heypex] of 66.3M." *Id.* Ms. Barber then forwarded the entire email thread to a second Walmart attorney, Nicole Chapman—apparently asking assistance. *Id.*[11] Ms. Chapman responded to Ms. Barber and attached a document titled, "Amendment – Heypex-Walmart – S.21.21.doc.x." *Id.*[12]

On May 24 and 25, Walmart wrote its first four London Luxury purchase orders for gloves and uploaded them electronically through Walmart's Retail Link System. *See* Doc. 27-2, p. 3. However, on May 27, the Ansell (Kulim) factory, which London Luxury had told Walmart was the true manufacturer of MNA's gloves, emailed both London Luxury and Walmart to inform them that it did "not supply Medical Nitrile gloves." (Doc. 248-32, p. 2). This caused Mr. Abehsera of London Luxury no small amount of heartburn. He immediately wrote to Freda Laas, London Luxury's agent in Malaysia who was coordinating with MNA Gloves, and relayed the following message:

> We have an urgent matter that just arose. Ansell sent a note to [Walmart] that they don't at all produce nitrile medical exam gloves at the kedah plant [sic]. This is both a major surprise and a big blow. As an FYI not only do we have this plant listed, we also stressed that the majority will be coming from this location.

(Doc. 248-33, p. 2). Ms. Laas responded:

---

[11] For the same reasons as discussed *supra*, *see* n.2 & 7, the Court has ruled that counsel's comments are not protected by privilege.

[12] Walmart concedes that its legal department drafted a formal, written amendment to the Heypex contract, altering the price and quantity terms, and that Heypex signed it on June 8, 2021. However, Walmart claims "London Luxury has identified no evidence that Walmart signed" this document—which the Court assumes means that Walmart did not, in fact, sign it, and disputes that it went into effect. (Doc. 282, p. 119).

We do not know which factory will produce the Nitrile gloves. As mentioned to you that on my expedition trying to find out I was informed that Ansell make use [sic] of a few manufacturers in Malaysia that supplies then [sic] with their Nitrile. So we will not know until we have the orders. I told you from the beginning we cannot say anything until we know for sure.

*Id.*

Following that communication, London Luxury scrambled to pin down the manufacturing location for its gloves. Walmart needed this information before it would approve the facility for quality and safety. London Luxury was frustrated at having to postpone Walmart's factory audit, and Walmart's shipping managers were equally frustrated.

On June 11, a London Luxury employee named Michael Chen wrote an email warning that "if LL d[id] not complete [the] following necessary Audits & documents, [Walmart] w[ould] not confirm any vessel containers to [London Luxury]." (Doc. 249-13, p. 11). Mr. Abehsera responded, "If we don't have the lot numbers soon, and we don't know which exact locations are making each batch and have all that information soonest, [Walmart] will give up." *Id.* at p. 9. He started making phone calls to factories in Malaysia and then reported back to Mr. Chen that the facility manufacturing MNA's gloves was called Careplus. *Id.* at p. 5. Mr. Chen relayed the information to Walmart's shipping managers and then emailed Mr. Abehsera and Mr. Jason once more, urging that London Luxury "MUST make 100% sure **Careplus (M) SDN BHD** is the final manufacture facility" because Walmart "will not accept [that] we do any further manufacture name change for this business." *Id.* at p. 2 (emphasis in original).

On June 14, Walmart's leadership scheduled a call with Mr. Jason. Before the call, Mr. Small circulated an agenda to Walmart executives—and sent a more detailed agenda to Mr. Jason. During the call, Mr. Small exchanged text messages with Mr. Jason, coaching him on what to say to Walmart's senior leaders.[13]

That same day, Mr. Small provided Mr. Jason with a letter that had not been authorized by anyone else at Walmart. *See* Doc. 244-6 (the "Unauthorized June Letter"). According to the Unauthorized June Letter, Walmart was extending its commitment to buy nitrile gloves from London Luxury for a period of five years. The Unauthorized June Letter made reference to Walmart's excitement about Mr. Jason's "soon to be launched US glove operations"—though that business concept had not yet come to fruition and no one at Walmart besides Mr. Small had even heard about it. *Id.* The Unauthorized June Letter made a further "pledge and commitment to support local US employment and the US economy" through the new gloves facility, which was "due to open in the near future." *Id.* Mr. Small testified at his deposition that he knew the Unauthorized June Letter was not legitimate all along—and so did Mr. Jason. A text message exchange between the two men seems to confirm this. *See* Doc. 244-6, p. 9 (Mr. Small: "Please please please do not let this [letter] get out of your hands[.]"; Mr. Jason: "NEVER!!!!!!!!!!!!!!!! This is for investment purposes and will never leave my sight.").[14]

---

[13] Walmart contends this is proof that Mr. Small had already switched allegiances and had violated or begun to violate his fiduciary duties to Walmart. London Luxury disagrees and claims Mr. Small only coached Mr. Jason to get the glove deal finalized and to make sure that Mr. Jason was aware of Walmart's concerns and requirements.

[14] At the beginning of this lawsuit, London Luxury attached the Unauthorized June Letter to its complaint and argued the document showed Walmart's five-year commitment to

### G.     July–December 2021

In July 2021, Walmart's understanding was that London Luxury's gloves were being manufactured at a Malaysian factory called Careglove and then delivered to MNA Gloves for repackaging and shipping. *See* Doc. 249-18. Walmart audited the Careglove factory and received photographic evidence that the gloves made there were a recognized brand, "Ansell" nitrile gloves. *See* Doc. 285-10. London Luxury begam filling Walmart's May purchase orders.

In August 2021, Walmart requested assurances that London Luxury's gloves could pass quality testing requirements. Walmart hired a third-party testing company named SGS to test samples of London Luxury's gloves. At least one batch passed quality testing, but it was unclear at the time what facility had manufactured the gloves.

Walmart wrote fourteen more purchase orders for gloves on September 10, 13, and 30 and uploaded them electronically through the Retail Link system. *See* Doc. 27-2. On October 1, Walmart received a shipment of gloves from London Luxury and commissioned a subsequent round of third-party testing. *See* Doc. 249-35. Some gloves tested in November received a failing grade on performance, specifically in the "ultimate elongation" category. (Doc. 250-2). London Luxury disputes that rating and explains that the gloves only failed in that category because they had been denatured on the way to the testing facility due to environmental exposure and poor transportation conditions out

---

purchase nitrile gloves. Eventually, London Luxury conceded the Unauthorized June Letter was inauthentic and invalid. The Unauthorized June Letter is part of Walmart's evidence that London Luxury tortiously interfered with Mr. Small's fiduciary duties to Walmart.

of its control. London Luxury claims that the originating factory tested the same batch of gloves, and they met all quality standards.

At around this same time, London Luxury abandoned its use of MNA Gloves and switched to a factory in Thailand called Mercator Medical Manufacturing, which made "Dr. Smart" brand nitrile gloves. This factory was audited and approved by Walmart. Nevertheless, Walmart requested that Mercator send a sample of its gloves to SGS for testing. The sample also failed inspection in the "ultimate elongation" category. *See* Doc. 250-1. London Luxury maintains that a testing failure in this category is fairly common and does not mean the gloves were unfit for use. And London Luxury again blames environmental and storage conditions on the failing test scores. Walmart responds that the Mercator gloves failed quality testing, categorically—just as the Careglove product failed.

On November 11, Mr. Hurd emailed Mr. Jason to ask that he "stop production of any outstanding Walmart nitrile glove orders from [his] Malaysia and Thailand manufacturing facilities." (Doc. 245-3, p. 5). Mr. Hurd noted that "London Luxury has had ongoing and significant issues meeting its obligations," including "repeated delays and a failure to comply with Walmart's supplier standards," which are "strict." *Id.* Further, Mr. Hurd maintained Walmart had still "not received timely and accurate information about the products" and was so "disappointed in the performance of London Luxury" that it was not planning to issue more purchase orders. *Id.*

Mr. Jason responded to Mr. Hurd on November 12, claiming the cancellation notice "came out of the blue" and that London Luxury was "surprised to receive that email given

31

the blood, sweat, tears, time, money and resources we have dedicated to supplying WM with its requirements for nitrile examination gloves." *Id.* at p. 4. Mr. Jason observed that London Luxury had "sacrificed many other business opportunities" to devote itself fully to the Walmart business and claimed Walmart gave an "'irrevocable and non-cancellable' commitment to purchase gloves." *Id.* He continued:

> Based on that binding commitment, we entered into several exclusive contracts with best glove manufacturers in Asia which required us to guaranty certain minimum purchases at WM specified pricing. There are presently hundreds of containers of nitrile gloves produced for Walmart and ready to be shipped. Raw materials, chemicals, boxes and packaging, and other components have been long financially guaranteed based on Walmart's binding commitment. All of this required complex financial instruments, legal contracts, lawyers, accountants, financiers, etc. We solidly relied on your commitment and cannot now back out of the commitments we made. Simply put, at this point in time and given everything that's been put into this relationship, it's simply "too big to fail."

*Id.* Mr. Jason also found unfair Walmart's criticisms about delayed deliveries and confusion surrounding product sourcing. He stated:

> WM should well know (better than anyone) the total government shut downs, military enforced restrictions, factory curfews, SGS lock downs, general supply chain issues and Covid protocols that had to be followed on the ground in both Malaysia and Thailand. We dedicated countless hours and other resources to both navigate and mitigate these unforeseen crises plaguing the Asian manufacturing market. And we have kept you and your team up to date in real time on the status of these issues so there was never a time that Walmart did not have visibility on what was going on in Asia. If that were not enough, we single-handedly established relationships to ensure we had dedicated production lines for Walmart with Mercator and Careglove factories–both of whom have worked tirelessly to get WM what it needed. Ironically, after navigating these crises, the finish line of completing this agreement is in sight. Gloves are being shipped and a lot more are ready to go. We suspect that this apparent change of heart is the result of one of WM's B2B clients recent cancellation of glove orders. However, that obviously has nothing whatsoever to do with us.

*Id.*

Mr. Hurd replied to Mr. Jason on November 15. He repeated that MNA's facility "failed its Supply Chain Security Audit," that Walmart still needed to receive and review the inspection reports issued by the third-party auditor for gloves made in the Careglove facility, and that Walmart still had lingering questions about the Mercator facility's Supply Chain Security Audit and testing results. *Id.* at p. 2. Mr. Hurd added:

> We are concerned that Walmart's 3rd party auditors from Bureau Veritas (BV) were not granted access to the Mercator facility today. We advised you of their upcoming visit last Friday November 12.  As a reminder, announced and unannounced factory inspections and audits are part of Walmart's standard policies [and] procedures and [are] included in the Walmart supplier agreement.

*Id.*

In the end, Walmart received shipments of gloves corresponding to sixteen out of eighteen purchase orders before London Luxury stopped shipping entirely. (Doc. 27-2, pp. 5–6). The last shipment was received on January 31, 2022. In total, Walmart paid London Luxury in excess of $26 million for the gloves it received, but Walmart seeks recoupment of these costs because it maintains the gloves cannot be sold because they could not be guaranteed as to quality and source. The gloves are sitting in storage containers in a Walmart warehouse.

London Luxury contends it did not materially breach the parties' contract and that Walmart lacked sufficient cause to cancel. London Luxury demands damages for Walmart's breach of its minimum purchase commitment and reimbursement of more than $75 million in consequential damages, equal to the alleged diminution in the company's

value resulting from Walmart's unlawful termination of the contract. London Luxury claims it spent nearly all of its resources on the Walmart contract, to the exclusion of other lucrative business, and when Walmart cancelled the deal, London Luxury became insolvent.

## II.  LEGAL STANDARD

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). The same standard applies where, as here, the parties have filed cross-motions for summary judgment. Where there is no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998). Summary judgment should be denied to the moving party if a genuine, material dispute of facts exists "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

Both parties ask the Court to declare as a matter of law which of several possible contract documents were operative and enforceable in May 2021, when Walmart began writing large purchase orders for London Luxury's nitrile gloves. They also ask the Court to clarify their respective duties and obligations under the operative contract or contracts. The Court will therefore begin its discussion by analyzing the parties' contractual obligations as a matter of law, given the undisputed facts. These rulings partly resolve the claim and crossclaim for declaratory judgment.

Then, the Court will turn to the remaining requests for summary judgment in the following order:

(1) the parties' equitable claims, remedies, and defenses;

(2) London Luxury's claims for violations of the Arkansas Deceptive Trade Practices Act ("ADTPA") and for fraud;

(3) Walmart's counterclaims for tortious interference with Mr. Small's employment contract, aiding and abetting in violation of his fiduciary duties, and acting in concert with him to breach these duties; and Walmart's counterclaim for rescission; and

(4) London Luxury's demand for both consequential and punitive damages for breach of contract.

### A. Declaratory Judgment: Contract Construction

#### 1. The supplier agreements were not contracts until purchase orders were written.

Walmart seems to argue in its summary judgment briefing that supplier agreements were enforceable contracts on the day they were executed, even if purchase

orders identifying specific products had not yet been written. As a matter of basic contract law, Walmart is incorrect.

"The essential elements of a contract are: (a) competent parties; (b) subject matter; (c) legal consideration; (d) mutual agreement; and (e) mutual obligations." *Moss v. Allstate Ins., Inc.*, 29 Ark. App. 33, 36 (1989) (internal citations omitted). "Arkansas courts have long held agreements to agree are 'too vague to enforce.'" *DWDubbell Ark., LLC v. Bushey*, 2021 WL 4392493, at *4 (W.D. Ark. Sept. 24, 2021) (quoting *Troutman Oil Co. v. Lone*, 75 Ark. App. 346, 352 (2001)). "Where 'the parties have by their words made clear that there is no present intent to be bound, and that they intend to be bound only in the future, and then only if they subsequently reach an agreement with respect to the unsettled terms,' no contract is created." *Id.* (quoting 1 Richard A. Lord, Williston on Contracts § 3:5 (4th ed.)). This is so because agreements to agree in the future are not reasonably certain. "Terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Ciba-Geigy Corp. v. Alter*, 309 Ark. 426, 446 (1992) (citing Restatement (Second) of Contracts, § 33); *see also* AMI Civ. 2407 (2024) (same). An offer that is "incomprehensibly vague or incapable of being understood" cannot form a contract. *Aon Risk Servs., Inc. v. Meadors*, 100 Ark. App. 272, 281 (2007).

The Court has carefully reviewed the supplier agreements at issue in this case. Though Walmart seems offended at London Luxury's description of them as "boilerplate," that descriptor is accurate. All suppliers must sign these agreements in order to do business with Walmart; no products are specified (let alone quantities, prices, or other

36

material terms); no consideration is described or offered; and the same generic language appears in every agreement, giving instructions on how to handle returns, cancellations, taxes, insurance, shipping, credits, and remedies. At most, these documents are normative agreements about future business procedures, since the only benefit a supplier receives upon signing a supplier agreement with Walmart is *the hope* of someday doing business with the retailing giant. The Supplier Agreements may define the rules for how the game will be played, but until the game actually begins, the rules are of no moment because no one has yet to step to the plate, much less throw the first pitch.

Therefore, the Court finds that the supplier agreements—viewed in isolation from other operative terms—were unenforceable agreements to agree that imposed no legal obligation on either party.

### 2. The February 2021 Commitment Letter is enforceable as long as Mr. Small had the authority to sign it on behalf of Walmart.

The jury must determine whether Mr. Small had the authority to enter into the February 2021 Commitment Letter (which was fully executed on March 19) on behalf of Walmart.[15] If Mr. Small had authority to sign, and assuming such authority was not

---

[15] The parties dispute whether Mr. Small possessed the authority to sign the February 2021 Commitment Letter and bind his employer. Walmart argues he did not have actual authority, based on Walmart policies he signed during his employment that prohibited anyone in his department from agreeing to a purchase commitment worth more than $10 million—which the London Luxury contract satisfied. *See* Docs. 280-12 & 280-13.

Assuming for the sake of argument that Mr. Small lacked internal corporate authority, it will be for the jury to decide whether he presented externally as having apparent authority to bind Walmart, and that depends on whether Walmart "manifested" to London Luxury that Mr. Small had "authority to act with legal consequences" and if London Luxury "reasonably believe[d] [Mr. Small] to be authorized, and the belief [was] traceable to the

negated by fraudulent conduct by London Luxury and/or knowledge by London Luxury that Mr. Small lacked such authority, then the February 2021 Commitment Letter would be construed as an enforceable contract.[16]

"In order for a contract to exist, there must be: (a) competent parties; (b) subject matter; (c) legal consideration; (d) mutual agreement; and (e) mutual obligations." *Kearney v. Shelter Ins. Co.*, 71 Ark. App. 302, 306 (2000). All elements are present in the February 2021 Commitment Letter. It stated Walmart's promise to purchase a total of

---

manifestation." Restatement 3rd Agency § 3.03 (2024).

The following facts may be relevant to the jury in determining whether Mr. Small had been delegated actual authority and/or whether he was cloaked with apparent authority:

(1) Mr. Small forwarded Mr. Jason's requested language for the February 2021 Commitment Letter to Ms. Vasser-Jenkins for her review;

(2) Mr. Small noted in his cover email to Mr. Jason that the Letter had been approved by Walmart legal;

(3) Mr. Small's supervisor, Mr. Hurd, received a copy of the Letter and did not raise a concern or objection at the time as to whether Mr. Small had authority to sign on Walmart's behalf;

(4) Ms. Allen and Ms. Cochran were copied, along with Ms. Vasser-Jenkins, on Mr. Small's email stating he had drafted a letter of commitment for the gloves, and neither supervisor expressed reservations at the time about Mr. Small's authority to sign the document;

(5) Ms. Allen advised Mr. Jason in an email dated February 10, 2021, that Mr. Small was to be London Luxury's "main point of contact on this buy" going forward and that London Luxury should direct all communications to him, (Doc. 259-1, p. 2); and

(6) Mr. Small testified in his deposition that he believed he had the authority to sign the document on Walmart's behalf.

(7) There is also evidence from which a reasonable juror might infer that Mr. Small and Mr. Jason were actively colluding by (if not before) March 23, when they went on a trip to Miami Beach and then flew to Central Florida to scout locations where the two purportedly intended to operate a glove factory.

[16] To be clear, the authority-to-sign and fraud issues remain in dispute

60.7 million boxes of nitrile gloves, "in separate lots to be separately delivered" on a weekly basis for 52 weeks "until the total commitment [wa]s met." *Id.*; *see also* Doc. 248-14. The parties agreed that London Luxury's price-per-box would not exceed $7.48, and they further agreed that Walmart would pay in installments upon receipt of each shipment, i.e., within "2 Net Days or payment upon completion of [each] PO." *Id.*

The Court rejects Walmart's argument that the February 2021 Commitment Letter was unenforceable because it was premised on Walmart's mistaken belief about its preexisting obligation to purchase three million boxes a month from London Luxury. A party's mistake of fact about the subject matter of a contract may render it unenforceable if the mistake indicates there was no meeting of the minds. *See Frazier v. State Bank of Decatur*, 141 S.W. 941, 943–44 (Ark. 1911).

Walmart contends that its mistaken belief about a purchasing commitment made in July 2020 originated from Mr. Oaks, Mr. Small, and/or Walmart's counsel Mr. Dow. *See* Walmart's Response to London Luxury's Statement of Facts, Doc. 281, p. 19 ("[E]ven if . . . Dow believed there was a binding minimum purchase commitment . . . Dow was wrong."). But Walmart's mistaken belief about whether the July 2020 award letter obligated it to buy three million boxes of gloves per month says nothing about whether it intended to buy nearly double that amount pursuant to the newly negotiated terms in the February 2021 Commitment Letter. The question is whether the parties had a meeting of the minds about the February 2021 Commitment Letter's terms.

"A meeting of the minds, or what is more commonly known as an objective indicator of agreement, does not depend upon the subjective understanding of the parties, but

instead requires only objective manifestations of mutual assent for the formation of a contract." *Johnston v. Curtis*, 70 Ark. App. 195, 200 (2000). Walmart's "objective manifestation" of assent to the terms of the February 2021 Commitment Letter is clear from the record, and no reasonable juror could believe otherwise. First, there is no genuine, material dispute that Walmart *not only wanted* to order at least 55 million boxes of gloves a year to sell to Heypex in February 2021, *but was enthusiastic* about the serendipitous opportunity to do so and intended to source all gloves from London Luxury. *See, e.g.*, Docs. 258-25–258-27. Second, the February 2021 Commitment Letter contained no references to any prior purchase commitments. Third, the 2021 agreement promised new consideration for a new minimum purchase quantity. For these reasons, the February 2021 Commitment letter was a binding contract for goods—provided that Mr. Small had the authority to enter into it on behalf of Walmart, and further provided that it was not procured by fraud, which are questions for the jury.

### 3. The terms of the August 2020 Supplier Agreements did not supersede the terms of the February 2021 Commitment Letter.

There are at least two provisions in the August 2020 Supplier Agreements that appear to materially conflict with provisions in the February 2021 Commitment Letter.

To begin, the February 2021 Commitment Letter contains the following language:

Walmart's award of business to your company is contingent upon you . . . meeting the other requirements described in this letter as well as any and all compliance and regulatory requirements associated with the Supplier Agreement. In the event of a conflict between the terms of this letter and the Supplier Agreement, the terms of the Supplier Agreement will control.

(Doc. 248-14). Walmart points out that the August 2020 Supplier Agreements, which were

operative on March 19, 2021, the date Mr. Jason countersigned the February 2021 Commitment Letter, state explicitly that Walmart is not obligated to make any minimum purchase. *See, e.g.*, Doc. 140-3, § 27. Walmart therefore contends that this "no minimum purchase" provision should be read into the February 2021 Commitment Letter, rendering the minimum purchase term in the Letter void. Said another way, Walmart asks the Court to interpret the February 2021 Commitment Letter to mean that the parties agreed Walmart would purchase a minimum of 60.7 million boxes of gloves and, at the same time, have no minimum purchase obligation.

Walmart also points to a second sentence in the February 2021 Commitment Letter that reads, "In the event of a conflict between the terms of this letter and the Supplier Agreement, the terms of the Supplier Agreement will control." (Doc. 248-14). Walmart argues that this means the parties broadly intended all terms in the August 2020 Supplier Agreements to control over the terms in the February 2021 Commitment Letter. But incorporating the "no minimum purchase" provision from the August 2020 Supplier Agreements into the February 2021 Commitment Letter would entirely defeat the parties' unambiguous intent in entering into a contract for a particular quantity of goods at a specified price.

The Court finds that the parties' agreement to purchase millions of boxes of nitrile gloves over the course of a year was embraced by multiple instruments: (1) the February 2021 Commitment Letter, (2) the applicable supplier agreement incorporated by reference, and (3) the weekly purchase orders (yet to be written). "[A]ll of the instruments must be considered together to determine the intent of the parties." *Lindell Square Ltd.*

41

*P'ship v. Savers Fed. Sav. and Loan Assoc.*, 27 Ark. App. 66, 71 (1989). "A construction which neutralizes any provision of the contract cannot be adopted if the contract can be construed in a way which gives effect to all its provisions." *Id.* (citing *North v. Philliber,* 269 Ark. 403, 602 S.W.2d 643 (1980)). Further, "In construing a contract the court must, if possible, give effect to the intention of the parties as far as that can be done consistently with legal principles, and this intention must be ascertained from the whole contract." *Schnitt v. McKellar*, 244 Ark. 377, 385 (1968).

In order to read the February 2021 Commitment Letter in harmony with the August 2020 Supplier Agreements, certain terms from the Supplier Agreements cannot be incorporated by reference. After all, the Commitment Letter is a completed contract, while the Supplier Agreements, by their terms and prior to the incorporation of purchase orders, are not contracts at all. Therefore, the "no minimum purchase" term from the 2020 Supplier Agreements is not read into the Commitment Letter; doing so would fail to give effect to the material terms of the Commitment Letter.

Lastly, the parties dispute the meaning of the phrase "noncancellable and irrevocable" in the February 2021 Commitment Letter, but the Court finds it to be unambiguous. The parties agreed that the one-year commitment to purchase gloves would be noncancellable and irrevocable during that term. This does not mean that Walmart was required to accept and pay for products that failed to meet agreed-upon standards of quality and merchantability, nor does it mean that Walmart was forced to put up with unreasonable delivery delays for a solid year. Rather, the jury will be asked to decide whether any breaches of the contract or contracts by London Luxury were

42

material.[17]

### 4. The terms of the March 2021 Supplier Agreement did not supersede the terms of the February 2021 Commitment Letter.

Walmart next contends that if the February 2021 Commitment Letter was binding on the parties, it was superseded entirely by the later-executed March 2021 Supplier Agreement. But, again, that Supplier Agreement specifies no particular product, quantity, price, or delivery terms and, by Walmart's admission, was entered into "for the purpose of implementing [the parties'] agreement to change the nitrile examination glove program from a domestic delivery program to a Direct Import Program," (Doc. 282, p. 97)—in other words, a new shipping arrangement.

Walmart misconstrues the March 2021 Supplier Agreement's legal effect. On the day this document was executed, it was not an "agreement" about a "nitrile examination glove program," as Walmart claims. There was no product specified in the March 2021 Supplier Agreement. It contemplated, instead, that the material terms necessary to create a contract for the sale of goods would be supplied in a separate writing. Therefore, the

---

[17] Generally, "the failure of one party to perform his contractual obligations releases the other party from his obligations." *Taylor v. George*, 92 Ark. App. 264, 272 (2005) (collecting cases). But "for one party's obligation to perform to be discharged, the other party's breach must be material." *Id.* at 272–73. If the breach "'is not so material as to discharge the other party's duty of performance, the latter's only remedy is damages for the partial breach.'" *TXO Prod. Corp. v. Page Farms, Inc.*, 287 Ark. 304, 307 (1985) (quoting Corbin, Contracts, § 1253 (1962)). "A material breach is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party." *Spann v. Lovett & Co.*, 2012 Ark. App. 107, 21 (2012). "An influential circumstance in the determination of the materiality of a failure fully to perform a contract is the extent to which the injured party will obtain the substantial benefit that he reasonably anticipated." *Taylor*, 92 Ark. App. at 273 (citing *TXO Prod. Corp.* 287 Ark. 304 (1985)).

March 2021 Supplier Agreement, by its own terms, could not have superseded and rendered null the February 2021 Commitment Letter—which was, in fact, a separate writing stating product, price, and quantity terms. If anything, the March 2021 Supplier Agreement superseded the August 2020 Supplier Agreements and became the operative supplier agreements that were incorporated by reference into the February 2021 Commitment Letter. As previously stated, the parties' complete agreement appears in multiple instruments—the Commitment Letter, the applicable supplier agreement referenced in the Commitment Letter, and the purchase orders referenced in the supplier agreement.

### 5.   The April 2021 Commitment Letter is enforceable as long as Mr. Small had the authority to sign it on behalf of Walmart.

Just as the jury must decide whether Mr. Small was authorized by Walmart to sign the February 2021 Commitment Letter, it must also decide whether he was authorized to sign the April 2021 Commitment Letter.[18]  If Mr. Small was authorized to sign both Letters,

---

[18] Assuming Mr. Small lacked actual authority, the question of his apparent authority depends on London Luxury's "reasonable belief" about what Mr. Small was authorized to do. *See* Restatement 3d Agency § 3.03 (2024). In considering this dispute, the following facts may be relevant to the jury:

(1) Mr. Small copied his boss, Mr. Hurd, on the email addressed to Mr. Jason that attached the April 2021 Commitment Letter;

(2) there is evidence to suggest Mr. Hurd made no protest about the April 2021 Commitment Letter being sent to London Luxury or about Mr. Small's authority to sign it; and

(3) there is evidence to suggest that Mr. Small and Mr. Jason were actively colluding as of the date Mr. Small emailed the April 2021 Commitment Letter— such that Mr. Jason either knew or should have known upon receipt of the Letter that Mr. Small had abandoned his fiduciary duties to Walmart and lacked authority to modify the quantity term on Walmart's behalf.

and assuming such authority was not negated by fraudulent conduct by London Luxury and/or knowledge by London Luxury that Mr. Small lacked such authority, then the April 2021 Commitment Letter modified the earlier Letter's quantity term. The April 2021 Commitment Letter, if enforceable, increased Walmart's minimum purchase of gloves from 60.7 million boxes to 72 million boxes over the course of a year.[19]

In summary: The case comes down to whether Mr. Small had the actual or apparent authority to enter into the February 2021 and April 2021 Commitment Letters. The jury's decisions on those questions will dictate whether the claim and counterclaim for breach of contract are analyzed through the lens of: (1) the February 2021 Commitment Letter, (2) the February 2021 Commitment Letter as modified by the April 2021 Commitment Letter, or (if neither (1) nor (2) apply) (3) the March 2021 Supplier Agreement, incorporating by reference the individual purchase orders written in 2021. If the February Commitment Letter is found to be valid, the jury would then be required to apply Arkansas contract law regarding substantial performance and the implied covenant

---

[19] The Arkansas Statute of Frauds did not require a representative of London Luxury to countersign the April 2021 Commitment Letter to manifest acceptance of the increased quantity term. And the February 2021 Commitment Letter did not specify that written amendments needed to be signed by both parties. A contract for the sale of goods is enforceable if signed "by the party against whom enforcement is sought or by his authorized agent," Ark. Code Ann. § 4-2-201(1). A party's subsequent conduct is also sufficient to recognize the existence of a contract, "even though the moment of its making is undetermined." Ark. Code Ann. § 4-2-204(1)–(2). Here, if Walmart cloaked Mr. Small with the apparent authority to amend the quantity term on Walmart's behalf, the quantity term was amended when Mr. Jason received the April 2021 Commitment Letter and London Luxury accepted the amendment of the quantity term therein, either explicitly in a subsequent writing or through performance.

of good faith and fair dealing.

## B.  Non-Contract Claims

### 1.  Summary judgment is granted as to the equitable claims, remedies, and defense raised in the Motions.

Walmart moves for summary judgment as to London Luxury's equitable claims for promissory estoppel and reformation, and London Luxury moves for summary judgment as to Walmart's affirmative defense of unclean hands. Both parties' requests are granted.

Beginning with London Luxury's promissory estoppel claim, this is a valid basis for recovery "only when formal contractual elements do not exist." *Barrows/Thompson, LLC v. HB Ven II, LP*, 2020 Ark. App. 208, at *17 (2020). There is no question that a contract for goods governs the parties' dispute. To the extent London Luxury is trying to assert a promissory estoppel claim as a way "to engraft a promise on a contract that differs from the written terms of the contract," that theory is rejected. *Mickens v. Corr. Med. Servs., Inc.,* 395 F. Supp. 2d 748, 752–53 (E.D. Ark. 2005). Accordingly, the promissory estoppel claim is subject to dismissal.

Summary judgment is also appropriate with respect to London Luxury's equitable remedy of reformation. This remedy is available when the parties have made an agreement, but through mutual mistake, the terms of their agreement were not accurately reflected in the written contract. *See Longing Family Revocable Tr. v. Snowden*, 2013 Ark. App. 81, at *6 (2013). Given the Court's interpretation of the various written instruments signed by the parties, it is clear that reformation is not a necessary remedy here.

Finally, London Luxury is entitled to summary judgment as to Walmart's equitable affirmative defense of unclean hands. Walmart concedes that this defense would only apply if London Luxury were permitted to assert its reformation theory. Since reformation is dismissed, so is Walmart's corresponding affirmative defense.

### 2. Summary judgment is granted as to London Luxury's ADTPA and fraud claims.

Walmart moves for summary judgment on London Luxury's claims for violations of the ADTPA and for common-law fraud. London Luxury opposes summary judgment, arguing that it should be given an opportunity to present both claims to the jury. These claims are pleaded in the alternative to breach of contract; London Luxury asserted them out of concern that its contract claims would be nullified if the Court determined that the February 2021 Commitment Letter was entirely superseded by the March 2021 Supplier Agreement.

However, as explained above, the February 2021 Commitment Letter and March 2021 Supplier Agreement are viewed as one unified contract manifesting the parties' agreement. The terms of both instruments are to be read in harmony with one another, and, in particular, the Supplier Agreement is not to be interpreted in such a way as to neutralize the effect of the Commitment Letter, which is the primary contract document containing product, quantity, and pricing terms. The Court doubts London Luxury means to pursue its non-contract claims over its contract claims in light of these rulings, but without confirmation of that, the Court will turn to the meris of London Luxury's ADTPA and fraud claims.

The ADTPA prohibits "deceptive consumer-oriented act[s] or practice[s]" that are misleading "in a material respect." *See Parnell v. FanDuel, Inc.*, 2019 Ark. 412, at \*4 (2019) (citing *Skalla v. Canepari*, 2013 Ark. 415, at \*13 (2013); Ark. Code Ann. § 4-88-113(f)). London Luxury claims Walmart behaved deceptively by inducing London Luxury to invest substantial funds to manufacturing millions of nitrile gloves, and then cancelling the contract and claiming that no minimum purchase agreement was ever in place. London Luxury admits it is not a consumer of Walmart's goods but contends that Walmart's deceptive acts were "consumer-oriented" because canceling the parties' contract deprived the consuming public of London Luxury's gloves. This is a strained interpretation of "consumer-oriented act[s]," to say the least. The Court finds that no reasonable jury could conclude that Walmart's treatment of London Luxury, viewed in the light most favorable to London Luxury, was consumer-oriented. Therefore, the ADTPA claim is dismissed.

As for London Luxury's fraud claim, it relies on the same false and deceptive acts that formed the basis for the ADTPA claim. To prove fraud, a party must demonstrate a false representation of a material fact, knowledge that the representation is false, and an intent to induce the other party to take certain actions based on the false representation. *Bomar v. Moser*, 369 Ark. 123, 131 (2007). London Luxury points to no evidence in the summary judgment record to show that Walmart entered into the April Commitment Letter (or any other related contract) knowing at the time that the promises contained therein were false and that Walmart did not intend to perform. There is no genuine, material

dispute of fact that Walmart committed fraud, and the claim is dismissed on summary judgment.

### 3. Summary judgment is denied as to Walmart's counterclaims for bribery and rescission.

London Luxury moves for summary judgment as to Walmart's counterclaims for tortious interference with Mr. Small's employment relationship with Walmart, alleging that Mr. Jason bribed Mr. Small and caused him to abandon his fiduciary duties and duty of loyalty to Walmart. The Court finds there are genuine, material disputes of fact as to whether—and, if so, when—Mr. Jason's interactions with Mr. Small crossed the line and became tortious, such that those actions may have materially interfered with Walmart's employment relationship with Mr. Small and caused Walmart to incur damages separate and apart from any contract damages arising from the glove transaction. To establish a claim of tortious interference, Walmart must prove:

(1) the existence of a valid contractual relationship or a business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interfering party;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Vowell v. Fairfield Bay Cmty. Club, Inc.,* 346 Ark. 270, 276 (2001). Because these matters remain in dispute, Walmart's counterclaims concerning bribery are preserved for trial.[20]

---

[20] As for London Luxury's argument that the Unauthorized June Letter should be deemed

Walmart also asserts a counterclaim for rescission of the parties' contract based on London Luxury's alleged tortious conduct involving Mr. Small. This claim appears to have been asserted in the alternative to Walmart's counterclaim for breach of contract. *See Herrick v. Robinson*, 267 Ark. 576, 587 (1980) (finding that the remedies for breach of contract and rescission "are not consistent, because rescission is based upon disaffirmance of the contract and recovery for breach requires its affirmance").

Professor Brill explains that "[r]escission is a remedy by which the parties abandon, or recede from, a contract they now realize they did not intend to make or should not have been made." Howard W. Brill, Arkansas Law of Damages, § 31:3 (5th ed. 2004). "[E]quitable rescission requires the court to affirmatively rescind the contract and return the parties to the status quo." *Id.* Walmart's rescission theory is that when Mr. Small signed the February 2021 Commitment Letter, Walmart was laboring under a material mistake of fact about the nature of the parties' contractual relationship, caused by Mr. Jason's and Mr. Small's tortious conduct. This mistake was allegedly so pervasive that it rendered the parties' entire contract void from the time of formation. London Luxury responds that, to the extent any tortious conduct—or even impropriety—was committed, it did not affect the parties' mutual understanding of their respective rights and obligations under the contract.

---

inadmissible, the Court declines to exclude it at this juncture. The Unauthorized June Letter may be competent intrinsic evidence showing how Mr. Jason (on behalf of London Luxury) tortiously interfered with Mr. Small's employment agreement with Walmart and/or aided and abetted and/or acted in concert with Mr. Small to violate his fiduciary duties to Walmart. For that reason, the Court reserves judgment on the admissibility of the Letter for the time being, and will take it up again when ruling on the liminal motions.

Here, London Luxury argues that rescission is not a cognizable remedy available to Walmart, as fraud did not taint the formation of the contract, and Walmart asserted its counterclaim after it either knew or should have known about the nature of Mr. Small's and Mr. Jason's improper conduct. Time is of the essence in seeking to rescind a contract.

> One who desires to rescind a contract on grounds of fraud or deceit must do so as soon as he discovers the truth. The rescinding party must announce his purpose at once and act with reasonable diligence so that the parties may be restored to their original position as nearly as possible. But if he continues to treat the property involved as his own or conducts himself with reference to the transaction as though it were still subsisting and binding, he will be held to have waived his right to rescission and will be conclusively bound by the contract as if the fraud had not occurred.

*Bauer v. Beamon*, 2023 Ark. 194, at *9–10 (2023) (internal citation omitted) (citing *Herrick*, 267 Ark. at 585). Ordinarily it is a question of fact whether rescission has been timely made. *See Herrick*, 267 Ark. at 577–78.

The Court finds there is no genuine, material dispute of fact concerning the timeliness of Walmart's counterclaim for rescission. The Arkansas Supreme Court instructs that the purpose of the speedy-notification requirement for rescission claims is to insure "that all parties may be restored to their original position as nearly as possible." Id. at 585. The reason is that if a party claiming rescission based on fraud or deceit "continues to treat the property involved in the transaction as his own or conducts himself with reference to the transaction as though it were still subsisting and binding," it will be more difficult, if not impossible, for the court to return the parties to their original positions "as if the fraud had not occurred." *Id.*

In the case at bar, London Luxury asserts that "Walmart has long known or should

51

have known the allegations underlying its recission claim because it conducted an internal investigation of the glove transaction in 2021." (Doc. 256, p. 28). But this is speculation unsupported by any proof. The only non-speculative evidence in the record concerning the timeliness of the rescission claim is as follows:

(1) Mr. Jason and Mr. Small took active steps to conceal their personal relationship from Walmart;

(2) other employees at Walmart were unaware of any close/inappropriate relationship between Mr. Jason and Mr. Small;

(3) the Unauthorized June Letter was first revealed to Walmart at the start of this litigation when London Luxury unwittingly attached it to the original complaint, believing it was a legitimate contract; and

(4) Walmart asserted its counterclaim for rescission on May 8, 2023, shortly after its attorney attested (Doc. 163-3, p. 5) that she received from London Luxury "hundreds of documents . . . evidencing communications between London Luxury CEO Marc Jason and former Walmart employee Garrett Small from late 2020 to early 2022" that established a good-faith claim for rescission.

Finally, London Luxury does not contend that Walmart's rescission claim was asserted too late for the parties to be restored to their original positions.

Therefore, no reasonable jury could find that the rescission counterclaim was untimely asserted. The counterclaim will proceed to trial as an alternative theory to breach of contract.

### C.  Consequential and Punitive Damages

Walmart's last summary judgment argument is that London Luxury's claims for consequential and punitive damages for breach of contract should be dismissed prior to trial.

"Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach." *Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 364 Ark. 168, 175 (2005). "Lost profits are well recognized as a type of consequential damages." *Id.* London Luxury seeks in addition to compensatory damages "an additional $75 million . . . due to the destruction of London Luxury's business." (Doc. 295, p. 29). London Luxury contends that it "put its business on the line for Walmart . . . and made it impossible to fulfill other contracts." *Id.*

The Arkansas Supreme Court has held that "[i]n order to recover consequential damages in a breach of contract case, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff. It must also appear that the defendant at least tacitly agreed to assume responsibility." *Reynolds Health Care Servs., Inc. v. HMNH, Inc.,* 364 Ark. 168, 176 (2005). London Luxury acknowledges that Walmart did not expressly agree to be liable for consequential damages for breach of contract. However, London Luxury suggests there is a genuine material dispute of fact that Walmart tacitly agreed to pay consequential damages in the event of a breach. The Court disagrees.

The facts London Luxury cites in support of a tacit agreement are:

- Mr. Jason told Mr. Small the company would be put in financial risk if the contract were canceled

- Mr. Jason told Mr. Small that he had given the bank his personal guarantee for such a large investment;

- Mr. Jason told Mr. Small London Luxury would have to amortize the investment over the long haul to survive;

- Mr. Small assured Mr. Jason that contracted-for quantities would be purchased;

- Mr. Jason told Mr. Small and Ms. Allen that London Luxury was making a huge $72 million investment in factory start-up costs; and

- Walmart agreed to issue a letter of credit for London Luxury to present to its bank because Walmart understood London Luxury lacked sufficient liquid capital to fund manufacturing costs.

*See* Doc. 295, pp. 30–31.

None of these facts, assumed as true, are proof that Walmart tacitly agreed to assume liability for the diminution in the value of London Luxury's business—or any other consequential damages. Walmart's mere knowledge that the contract posed a significant financial risk to London Luxury is not proof of a tacit agreement. Therefore, the claim for consequential damages is dismissed.[21]

London Luxury's claim for punitive damages fares no better. Punitive damages "are not ordinarily recoverable for breach of contract, and to support such a claim there

---

[21] The Court views lost profits from Walmart's alleged breach of the 2021 Commitment Letters as compensatory damages that would directly flow from London Luxury's loss of the benefit of its bargain. The Court also leaves open damages that might directly flow from Walmart's dishonor of obligations it had with respect to the stand-by letters of credit, if any. To the extent such damages are more properly labeled "consequential," then they are carved out of this ruling.

must be a showing of a willful or malicious act in connection with a contract." *Dews v. Halliburton Indus., Inc.*, 288 Ark. 532, 541 (1986). London Luxury suggests, without citing to any proof, that Walmart might have cancelled the parties' nitrile gloves contract for a malicious reason—that is, *for the purpose of causing injury to London Luxury*. However, all evidence of record viewed in the light most favorable to London Luxury shows, at most, that Walmart's decision to cancel was motivated by its own economic interests. The claim for punitive damages for breach is therefore dismissed on summary judgment.

## IV. CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that Walmart's Motion for Summary Judgment (Doc. 241) and London Luxury's Motion for Partial Summary Judgment (Doc. 253) are both **GRANTED IN PART AND DENIED IN PART** as follows:

- London Luxury's claim and Walmart's counterclaim for declaratory judgment are partially resolved as stated above;

- Walmart's request for summary judgment as to London Luxury's claims for promissory estoppel, reformation, violations of the ADTPA, fraud, consequential damages, and punitive damages is granted, and those claims are dismissed; and

- London Luxury's request for summary judgment is granted as to Walmart's affirmative defense of unclean hands but denied as to Walmart's counterclaims for tortious interference (including aiding and abetting and acting in concert) and rescission.

**IT IS SO ORDERED** on this 8th day of March, 2024.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

55