IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**LONDON LUXURY, LLC**                                              **PLAINTIFF/COUNTER-DEFENDANT**

**V.**                                **CASE NO. 5:22-CV-5059**

**WALMART, INC.**                                                      **DEFENDANT/COUNTER-PLAINTIFF**

## MEMORANDUM OPINION AND ORDER

Before the Court are the following ripe motions:

- London Luxury's Motion to Exclude the Expert Testimony of Dr. Randy V. Bradley (Doc. 246);

- Walmart, Inc.'s Motion to Exclude the Expert Testimony of Dr. Willy Shih (Doc. 237);

- London Luxury's Motion to Exclude the Expert Testimony of Mr. Sheshank Kamalapuram (Doc. 260);

- Walmart's Motion to Exclude the Expert Testimony of Mr. Ryan Siskey (Doc. 229); and

- Walmart's Motion to Exclude the Expert Testimony of Dr. Robert N. Phalen (Doc. 233).

On March 11, 2024, the Court held a pretrial conference and entertained oral argument from the parties as to each Motion listed above. After oral argument concluded, the Court ruled from the bench, **DENYING** the Motions concerning Dr. Bradley, Mr. Kamalapuram, Mr. Siskey, and Dr. Phalen, and **GRANTING IN PART AND DENYING IN PART** the Motion concerning Dr. Shih. The following Order sets forth the Court's reasoning in greater detail. To the extent this Order differs from what was announced from the bench, this Order will control.

1

## I.  LEGAL STANDARD

The decision whether to exclude expert testimony is committed to a district court's discretion—subject, of course, to the Federal Rules of Evidence, including Rule 702. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (2014).  Rule 702 states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Eighth Circuit has "boiled down" these requirements into a three-part test:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Johnson*, 754 F.3d at 561 (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008)). The proponent of expert testimony bears the burden of showing by a preponderance of the evidence that these requirements are satisfied. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006).

A district court possesses broad discretion in making its reliability determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). When assessing the validity of expert opinions, the trial court may consider one or more of the following non-exclusive factors: (1) whether the theory or methodology can be tested; (2) whether the theory or

methodology has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 702. However, "[e]xpert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (internal citations omitted).

"A witness can be qualified as an expert by knowledge, skill, experience, training or education . . . ." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (internal quotations omitted). And "[t]he relative skill or knowledge of an expert goes to the weight of that witness's testimony, not its admissibility." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 569 (8th Cir. 1988). "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in [a] case." *Wheeling Pittsburg Steel Corp.*, 254 F.3d at 715.

To prove useful to a jury, an expert's opinion should rely on their specialized knowledge; "[w]here the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous." *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984). Further, an expert should not make unsupported assertions that go beyond their area of expertise. *See Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003) (finding the district court did not abuse its discretion where it prohibited an

3

expert from testifying on matters admittedly beyond his expertise). To that end, an expert should not opine on legal conclusions, as they will not assist the jury either. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir.1995) ("The legal conclusions were for the court to make. It was an abuse of discretion to allow the testimony.").

## II.  DISCUSSION

### A.  Dr. Randy V. Bradley (Doc. 246)

Walmart has designated Dr. Randy V. Bradley as an expert witness on supply chains. London Luxury seeks to exclude his testimony because it is speculative, "divorced from any of the facts of this case," and "of no use to the jury." (Doc. 297, p. 5). London Luxury criticizes Dr. Bradley because he supposedly "did no work to investigate the facts" and instead discussed in his expert report only general principles and practices used in supply chain management. *Id.* Finally, London Luxury critiques Dr. Bradley's expert report for containing impermissible legal conclusions.

Despite these critiques about the substance of Dr. Bradley's opinions, London Luxury at least agrees that he is a qualified expert in the field of supply chain management. Dr. Bradley is Associate Professor of Supply Chain Management at the University of Tennessee. He has published a number of articles in peer-reviewed publications on various topics in the field of supply chain management. Therefore, the Court finds him qualified to offer expert testimony on global supply chains and strategic sourcing, supply chain management, and risk management.

Next, the Court turns to the question of whether Dr. Bradley's opinions are reliable and trustworthy in the evidentiary sense and likely to assist the jury in deciding the

4

ultimate issues of fact. He explains in his expert report the effect that supply-chain disruptions tend to have on the global economy and the importance of transparency in all aspects of the supply chain. As for the particular challenges supply chains faced during the COVID-19 pandemic, Dr. Bradley opines that "there were tremors prior to and unrelated to COVID-19 that could have given organizations reason to fortify 'weak links' in their supply chains and supply chain strategies" and mitigate the risk of supply chain failure. (Doc. 272-1, p. 19). He also opines that high ethical standards are required of businesses working in each link in the supply chain, since unethical behaviors—like bribery and lying—negatively impact supply chain efficiency and inhibit "a truly collaborative relationship between buyers and suppliers." *Id.* at p. 20. In the Court's view, these opinions are relevant to fact issues that the jury must address in this case. Therefore, Dr. Bradley's testimony on these topics is likely to assist the jury.

London Luxury's objections to Dr. Bradley's testimony are focused on the last five pages of his report. *See id.* at pp. 23–27. He starts off by acknowledging four main factual disputes the jury must resolve: whether London Luxury failed to deliver goods on time, whether London Luxury sourced gloves improperly and/or misrepresented its factory sources, whether London Luxury failed to deliver gloves of adequate quality, and whether London Luxury bribed a Walmart employee in connection with the glove transaction. Dr. Bradley does not attempt to resolve any of these factual disputes—which causes London Luxury to label his report as unhelpful. However, Dr. Bradley does opine as to the negative effects that would have been likely if London Luxury had done any of these four things. For example, Dr. Bradley explains in his report how a supplier's failure to deliver goods

5

by an expected deadline impacts the buyer's operating costs, potential sales, and relationships with existing customers. *See id.* at p. 23. In another section of the report, he explains how a supplier's failure to disclose its factory sources prohibits the buyer from verifying whether those sources "are consistent with the buyer's established standards for socially responsible practices." *Id.* at p. 25. And if the sources violate the buyer's standards, news of this could negatively impact the buyer's image and jeopardize its ability to fulfill promises to its customers about responsibly sourcing goods. *Id.* at p. 24.

The Court finds that these opinions of Dr. Bradley's are not, as London Luxury contends, unduly speculative and unreliable. They are based on his expertise regarding supply chains and the suppliers and buyers who navigate within them. His opinions—which the Court finds are the product of reliable principles and methods that are reliably applied to the facts of this case—will likely assist the jury in evaluating whether any breach or partial breach by London Luxury was material and substantially impaired the contract as a whole, and he offers a fair counter-opinion to London Luxury's experts on these matters. Finally, if Dr. Bradley's predicate assumptions about the facts of this case are wrong, London Luxury is free to cross-examine him and test the bases for his opinions. *See Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929–30 (8th Cir. 2001) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

To the extent Dr. Bradley's rebuttal report could be interpreted as offering legal opinions, *see, e.g.*, Doc. 274-1, p. 5 ("[T]hose factors do not absolve parties from agreed upon contractual obligations."), he is cautioned that such testimony will not be countenanced by the Court during trial. Dr. Bradley may generally opine that suppliers and buyers in a supply chain should adhere to their contractual responsibilities, and he may offer specific opinions about how the parties' actions here likely affected the players in the supply chain. But he may not opine on the ultimate legal question, i.e., whether either party's particular acts breached the contract. Subject to that admonishment, London Luxury's Motion to Exclude the Testimony of Dr. Bradley is **DENIED**.

### B.  Dr. Willy C. Shih (Doc. 237)

London Luxury has designated Dr. Willy C. Shih as an expert witness on supply chains. His expert report is lengthy and detailed, spanning just under 100 pages in length (not including appendices), and citing to numerous documents in the record. Walmart does not dispute Dr. Shih's academic and professional credentials, and the Court finds him qualified to offer expert testimony on the functioning of supply chains involving complex or technical products, the impact of manufacturing problems (generally and with respect to PPE) on supply chains, and the impact of the COVID-19 pandemic on supply chains, the prices of medical devices, and the demand for PPE.

Walmart criticizes Dr. Shih's expert report as relying on a selective set of documents to support a predetermined conclusion. Having reviewed the report in detail, the Court disagrees with Walmart's assessment and finds that, for the most part, Dr. Shih has reviewed and cited hundreds of documents produced by *both* parties in the course of

discovery for the purpose of painting a fair picture of the parties' business relationship throughout the course of the pandemic. His opinions are likely to assist the jury in understanding the context of Walmart's glove orders and the market forces and structural and governmental stresses placed on the supply chain at various points in time during the pandemic. Though Walmart claims Dr. Shih's testimony about the market price and demand for gloves changing through the course of the pandemic is not necessary for the jury to hear, the Court disagrees.

On the other hand, the Court agrees with Walmart that certain portions of Dr. Shih's expert report are speculative and improper. In particular, he offers some "ultimate" opinions as to whether each party did or did not breach the contract, which is for the jury to decide. For example, he speculates about whether Walmart had just cause to cancel the contract, whether London Luxury had a good excuse for its delivery delays, whether delays were out of London Luxury's control and "not its fault," and whether Walmart should have excused London Luxury's delivery and product-quality failures. *See, e.g.*, Doc. 239-1, ¶ 126 (speculating that London Luxury's "ability to immediately supply gloves was impeded by issues that arose outside of its control)"; *id.* at ¶ 166 (opining that London Luxury's delays "were entirely outside of its control"); *id.* at ¶ 171 (opining as to the ultimate issue that Walmart "walked away from its firm commitments").

At times, Dr. Shih also improperly enters the corporate mind of Walmart and speculates about its true motivations for cancelling the contract. He will not be allowed to enter that headspace at trial. Dr. Shih's expertise in supply chains clearly qualifies him to testify as to the market-level context to this litigation—including testimony on the key

8

concepts in supply chains and Covid-19's impact on the nitrile glove supply chain that he details in his report. He may also opine as to how supply chain experts would expect a sophisticated buyer (like Walmart) or seller to act against that contextual background. However, Dr. Shih may *not* speculate as to why Walmart did, in fact, act with respect to the contract at issue in this case. The following passage from Dr. Shih's report illustrates this distinction:

> A sophisticated purchaser like Walmart *would* have known its suppliers would need to rely on certain contractual assurances to assume risk and that in this case the supply chain was gearing up to satisfy the full production schedule Walmart had committed to. As I discuss in Section IV and show in this section, this is because although long-term agreements can be mutually beneficial, they also carry important commercial risks for all parties.

*Id.* at ¶ 106. The problem with that passage is the word, "would." Dr. Shih may testify that "Walmart *should* have known" or that "a sophisticated market actor in the field of supply chain management would assume that Walmart knew," and so on. But the current composition of Paragraph 106 toes the line between Dr. Shih's expertise and conjecture into what may be the central issue for the jury to decide: "Did Walmart, in fact, act as an expert in supply chain management would expect them to as a sophisticated actor in the contract at bar." Other passages toe the same line. *Compare, e.g.*, *id.* at ¶ 141 (footnote omitted) ("While the disruptions from COVID-19 were unprecedented, Walmart, as one of the leading global retail firms and top U.S. importer, *should have been aware* of the susceptibility of this supplier relationship to the broader global trade disruptions.') *with id.* at ¶ 153 ("[I]t is clear that, by the Fall of 2021, the market situation had evolved from a dynamic of shortages to greater supply, As I detail in the next section, Walmart *was well*

*aware* of these changing market dynamics."). Bearing this distinction in mind, Dr. Shih must not enter the mind of Walmart in his testimony to the jury—under *Anderson* he must testify from his own perspective as an expert. 340 F.3d at 523.

Lastly, some paragraphs in Dr. Shih's report contain interpretations of the parties' contract, including his view of the parties' legal obligations and his assessment of who was at fault. These are completely improper legal opinions and are not to be presented to the jury. *See, e.g.*, Doc. 239-1, ¶ 96 ("The Agreement was consistent with the initial discussions between the two parties for a full upfront commitment from Walmart for the entirety of the nitrile glove order."); *id.* at ¶ 104 (offering a legal opinion for the jury as to what the February and April Commitment Letters provided and required of each party).

Accordingly, Walmart's Motion to Exclude the Testimony of Dr. Shih is **GRANTED IN PART AND DENIED IN PART**, as set forth above.

### C. Mr. Sheshank Kamalapuram (Doc. 260)

Walmart has designated Mr. Sheshank Kamalapuram as an expert witness on nitrile gloves and the nitrile glove industry. London Luxury seeks to exclude his testimony as confusing and unhelpful to the jury. In London Luxury's view, Mr. Kamalapuram applied no scientific methods in forming his opinions, ignored relevant evidence, and is neither qualified to speak on glove quality nor quality systems for manufacturing gloves, given his background as a buyer and seller of gloves.

The Court has reviewed Mr. Kamalapuram's qualifications and finds he is competent to offer expert testimony regarding the nitrile glove industry, including during the COVID-19 pandemic, and to evaluate laboratory testing results of nitrile gloves. He is

also qualified to testify about the sourcing, shipment, and distribution of PPE products before, during, and after the pandemic; the manufacturing process of nitrile gloves; the function and properties of nitrile gloves; the manufacturing capabilities of facilities that produce nitrile gloves; and the pricing, production, and quality issues that impacted the PPE industry before, during, and after the pandemic.

London Luxury first objects that Mr. Kamalapuram "regurgitates the test results" without analyzing them in a helpful way. (Doc. 263, p. 11). The Court disagrees. His analysis of the test results is likely to assist the jury.

Second, London Luxury objects to Mr. Kamalapuram's evaluation of MNA glove testing, as London Luxury believes MNA did not produce a statistically significant number of gloves for Walmart, so any failing test results for MNA gloves are irrelevant. Again, the Court disagrees. Test results for MNA Gloves are a hotly disputed fact issue in this case and therefore relevant.

Third, London Luxury claims that Mr. Kamalapuram's opinion reveals that he actually disagrees with Walmart's reliance on "one set" of failing test results to draw conclusions about the quality of a manufacturer's product. *Id.* at p. 13. If London Luxury wishes to make this point to the jury, it may do so on cross-examination; forbidding Mr. Kamalapuram from testifying about the "one set" of failing gloves would be inappropriate, as this testimony is relevant to the issues before the jury.

Fourth, London Luxury attacks as conclusory and unsupported Mr. Kamalapuram's opinion that retesting of failing products should include every performance metric, not simply the failing one. Upon review of Mr. Kamalapuram's expert report and rebuttal

report, the Court finds that his opinions on these matters are not conclusory. For example, he explains in his rebuttal report that several test reports focused on retesting in only two categories, though the original third-party testing indicated failures in multiple other categories. He concludes: "This shows the importance of conducting all ASTM required testing as opposed to picking specific criteria to test." (Doc. 262-2, p. 9). If London Luxury disagrees with Mr. Kamalapuram's opinion in this regard, it may cross-examine him at trial. The jury is capable of evaluating whether his opinion is persuasive in light of all other evidence and testimony. In any event, there is no indication that his opinion is unsupported by his extensive experience analyzing test results and evaluating product quality. *See Kudabeck v. Kroger Co.*, 338 F.3d 856, 862 (8th Cir. 2003) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (quoting *Daubert*, 509 U.S. at 596)).

Fifth, and finally, London Luxury claims Mr. Kamalapuram evaluated gloves based on their color and determined that certain gloves that appeared in photographs were not the same as ones that were tested. As a preliminary matter, the Court finds Mr. Kamalapuram qualified to opine on the various color codes used by glove manufacturers due to his extensive experience as a glove buyer and seller. He may therefore testify as to his opinion that gloves that appeared to be different colors (cobalt, regular blue, or sky blue) were likely not from the same production lots or factories. Disagreement with an expert's opinion is not a valid basis to exclude it. Therefore, London Luxury's Motion to Exclude the Testimony of Mr. Kamalapuram is **DENIED**.

### D.  Mr. Ryan Siskey (Doc. 229)

London Luxury has designated Mr. Ryan Siskey as an expert on industry standards for facilities that produce medical devices, such as nitrile gloves, as well as on regulatory and compliance issues surrounding medical devices. He has worked with clients and regulators to design and conduct quality testing on various forms of PPE to determine whether they conform to industry performance specifications. In particular, he has conducted glove testing in support of manufacturing clients seeking regulatory approval for their PPE products. He is also a certified auditor for quality management systems and has participated in and led standards development for testing methods for medical devices. His private consulting services focus on assisting medical device manufacturers with regulatory and compliance hurdles, devising protocols to address failing products, assessing gaps in quality, and dealing with internal and external audits. The Court finds Mr. Siskey well qualified to offer expert opinions in these areas.

The Court also finds that Mr. Siskey's testimony will help the jury understand the sorts of regulatory standards that glove manufacturers must meet to pass factory audits, like the ones Walmart required. He will assist the jury in assessing whether London Luxury and its manufacturing partners followed accepted industry protocols in response to failing test scores on certain glove samples. He opines that London Luxury and its partners behaved in a manner typical for the industry when confronted with a report of a non-conforming product. He further opines that Walmart did not behave according to industry standards when the company ignored the results of at least one root-cause investigation

and did not allow London Luxury enough of an opportunity to address the root cause of the problem and take corrective action.

Walmart first objects to Mr. Siskey's extensive discussion in his expert report about ISO 13485, which Walmart contends is not in dispute in this case. "ISO" stands for "International Organization for Standardization." (Doc. 231-1, p. 58). London Luxury contends that Mr. Siskey's discussion of this international standard is relevant to the jury's understanding of the requirements a glove manufacturer must adhere to when producing medical-grade products, including implementing quality management systems and risk-management protocols. The Court agrees with London Luxury that Mr. Siskey's testimony provides relevant insight into the manufacturing process for medical devices and highlights for the jury the various quality control procedures that international standards require.

Next, Walmart contends that Mr. Siskey's analysis of the manufacturing facilities at issue is deficient because he did not consider the repackaging facility, MNA Gloves, which London Luxury used for a period of time and whose products or processing are accused of testing failures. The Court finds that Mr. Siskey's analysis of certain factories and their quality assurance procedures, namely Careglove and Mercator,[1] are relevant to

---

[1] Walmart claims Mr. Siskey mislabeled two factory audits as "passing." Walmart claims they failed inspection. London Luxury responds that the meaning and significance of Walmart's "passing" rating is in dispute, and there is evidence that Walmart approved manufacturers to continue producing goods despite receiving an "orange" or "halt production" rating. *See* Doc. 289, p. 13. In light of this factual dispute, the Court finds Mr. Siskey's reliance on and citation to "passing" factory audits to be reliable or trustworthy in an evidentiary sense and therefore appropriate to present to the jury. Walmart is free to cross-examine Mr. Siskey regarding the factual assumptions on which he based his

the matters before the jury for decision. The omission of MNA Gloves, whether purposeful or not, is a proper topic for cross-examination. The fact that Mr. Siskey was not asked by London Luxury to consider MNA Gloves does not mean he should be prohibited from testifying about the facilities he did review and consider.

Relatedly, Walmart criticizes Mr. Siskey's focus on failing test results from 2021 while ignoring the failing test results from 2022. However, in London Luxury's view, Walmart canceled the parties' contract in 2021, so only the 2021 test results are relevant, and that is why only those results were provided to Mr. Siskey. On the surface, it does seem problematic that Mr. Siskey was only provided with some failing test results and not others in performing his analysis. But London Luxury's reason for doing this is as least arguable, and Walmart's objection goes to the opinion's weight and credibility, rather than its admissibility. The Court finds that, on balance, Mr. Siskey's analysis of the test results he did consider is reliable or trustworthy in an evidentiary sense and will likely assist the jury in understanding of how failing tests are generally handled in the industry and were handled by the manufacturers in this case. Walmart is free to cross-examine Mr. Siskey and point out his failure to consider other failing test results from 2022.

Finally, Walmart objects to Mr. Siskey opining about the unreasonableness of Walmart's actions in deciding not to proceed with the London Luxury contract after a certain number of product failures came to light. Certainly, Mr. Siskey is not an expert in Walmart's internal policies and procedures and is not permitted to speculate as to what

---

opinion.

factors motivated Walmart's decision-making with respect to this contract. However, given Mr. Siskey's twenty years of consulting experience in the PPE industry and his familiarity with the development and implementation of medical device manufacturing, testing, and quality standards, the Court is persuaded that he is competent to provide opinion testimony as to whether Walmart's decision to cancel the contract when it did, given the test results and corrective actions taken up until that point, was generally in line with the usual practices of buyers in the medical device industry. Mr. Siskey's opinion is grounded in his experience and is a plausible one. If Walmart believes the facts he considered in forming his opinion were incomplete or untrue, Walmart may point those discrepancies out to the jury to undermine the credibility of his opinions. See *Bonner,* 259 F.3d at 929–30. Therefore, Walmart's Motion to Exclude the Testimony of Mr. Siskey is **DENIED**.

### E.  Dr. Robert N. Phalen (Doc. 233)

London Luxury designated Dr. Robert N. Phalen as an expert on the laboratory testing of nitrile gloves. He runs his own laboratory where he researches the performance of disposable nitrile gloves for protection against biological and chemical agents. Over the course of his career, he has conducted "thousands of glove integrity tests, including tensile strength, elongation at break, and water-leak testing." (Doc. 235-1, p. 5). The Court finds that he is experienced in both conducting such testing and interpreting its results, and Walmart does not disagree that he is qualified to opine on these matters.

Walmart objects to Dr. Phalen's conclusion that the third-party test results he analyzed pertained to gloves made in factories that either actually shipped to Walmart or were intended to ship to Walmart. Dr. Phalen assumed in his product testing that

Careglove and Mercator actually manufactured the gloves in the test reports that he was provided; he opined, generally, about the quality of these two factories and their products. In Walmart's view, Dr. Phalen improperly assumed as true a disputed fact, namely, the manufacturing sources of London Luxury's gloves. On balance, the Court agrees with London Luxury that if there is credible evidence to suggest that Careglove and Mercator actually manufactured the gloves, then Dr. Phalen's testimony should not be excluded. Instead, the jury should be given an appropriate limiting instruction reminding them that Dr. Phalen made certain baseline assumptions about the factory origins of the gloves that were tested, and his analysis of those tests and opinions about those facilities is only relevant if the jury ends up agreeing with those assumptions—i.e., that the gloves described in the tests were shipped to Walmart or intended to be shipped to Walmart by Careglove and Mercator. *See Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) ("[M]ere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony.").

Next, Walmart objects that Dr. Phalen's opinions amount to a conclusion that gloves that fail independent product testing are nonetheless a "quality product." Having reviewed Dr. Phalen's report, the Court does not find that he made such a sweeping claim. Instead, he explains possible reasons for failing test scores in various categories, based on his laboratory experience and familiarity with manufacturing and testing conditions. He did not wave away failing test scores but instead attempted to contextualize them, which is helpful evidence for the jury as it decides whether London

17

Luxury materially breached the contract in a manner that substantially impaired the performance of the contract as a whole.

Walmart's last objection to Dr. Phalen's testimony is that the thirty-five test reports he lists in a table in his report include some revisions of earlier test reports, rather than thirty-five unique tests. Walmart therefore contends that the table listing thirty-three out of thirty-five "passing" reports is misleading. In addition, Walmart complains that Dr. Phalen failed to mention the fact that some of the test reports he reviewed did not specifically mention either of the parties by name on the face of the reports or list particular lot numbers for the gloves that were tested. The Court has reviewed the table at issue and finds that Dr. Phalen acknowledged that it contained both unique tests and "test-report revisions that might contain the same test results as a prior version." (Doc. 235-1, pp. 21–22). As for whether the table itself is confusing, the Court agrees with Walmart that viewing the table in isolation, without the benefit of Dr. Phalen's introductory comments, could lead jurors to falsely believe that Dr. Phalen evaluated thirty-five unique product tests. The Court therefore instructs London Luxury's attorneys to make clear to the jury the reality of the testing situation and not to suggest that there were thirty-five unique tests. Further, to the extent London Luxury intends to display this table to the jury, it must be modified to indicate which of the line-items in the list were unique tests and which were "test-report revisions."

Finally, with respect to Walmart's argument that the test reports are unreliable because, in some cases, they do not mention Walmart or London Luxury's names or identify specific lot numbers, the appropriate remedy is not to exclude the test reports and

Dr. Phalen's interpretation of them out of hand. Instead, the parties are instructed to confer about the authenticity and admissibility of each individual test report at issue, and the Court will reserve ruling until either party attempts to introduce any such report into evidence at trial. Save and except for the Court's comments and instructions above regarding testimony concerning the test results and the demonstrative use of the table illustrating the same, Walmart's Motion to Exclude the Testimony of Dr. Phalen is **DENIED**.

    **IT IS SO ORDERED** on this 21st day of March, 2024.

                                                                          TIMOTHY L. BROOKS
                                                                          UNITED STATES DISTRICT JUDGE