## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**LONDON LUXURY, LLC**                          **PLAINTIFF/COUNTER-DEFENDANT**

**V.**                          **CASE NO. 5:22-CV-5059**

**WALMART, INC.**                          **DEFENDANT/COUNTER-PLAINTIFF**

## <u>MEMORANDUM OPINION AND ORDER</u>

## <u>TABLE OF CONTENTS</u>

I.   FACTUAL BACKGROUND ................................................................................. 2

II.  LEGAL STANDARDS...................................................................................... 15

    A. Rule 50(b): Overturning the Jury's Verdict ............................. 15

    B. Rule 59: Granting a New Trial ...................................................... 16

III. DISCUSSION .................................................................................................. 17

    A. Sufficient Evidence Supports the Jury's Breach-of-Contract Verdicts....... 18

        *1. Rule 50(b)* ................................................................................. 18

            a.  Violation of Walmart's Standard for Avoiding Conflicts of Interest 20

            b.  Delays in Shipping and Issues with Factory Sourcing and Quality 30

            c. Walmart's Claim for Damages for Non-Material Breach ................... 32

        *2. Rule 59* ...................................................................................... 33

    B. Issues Preserved for Appeal Do Not Constitute a Miscarriage of Justice...38

        *1. Walmart's Disagreement with the Summary Judgment Order* ............... 38

        *2. Walmart's Disagreement with Certain Final Jury Instructions* ............... 40

            a. Breach of Contract Instructions........................................... 41

            b. Fraud in the Inducement and Estoppel ............................... 42

        *3. Walmart's Disagreement with the Privilege-Log Orders*......................... 44

IV.  CONCLUSION................................................................................................ 46

Over the course of eleven days last year, the parties tried their claims and counterclaims to a nine-member jury. London Luxury prevailed on the parties' competing claims for breach of contract and was awarded compensatory damages in the amount of $101,218,680.00. Walmart prevailed on each of its three tort claims against London Luxury and was awarded $350,000.00 in damages. Now before the Court is Walmart's Renewed Motion for Judgment as a Matter of Law and, in the alternative, Motion for a New Trial.[1] For the reasons explained below, Walmart's Motion (Doc. 468) is **DENIED**.

## I. FACTUAL BACKGROUND[2]

In the summer of 2020 during the beginning of the COVID-19 pandemic, Walmart wanted to source millions of nitrile gloves for retail sale to its customers and for its employees' in-store use. Walmart solicited bids from qualified vendors—those with the ability to supply large quantities of nitrile goods in a marketplace where Personal Protective Equipment ("PPE") was scarce. London Luxury offered the lowest price and was awarded the business, even though it was not a manufacturer of gloves (or anything else) but instead was a pre-existing supplier of home goods to Walmart. In its sales pitch, London Luxury represented that it had established connections with nitrile glove

---

[1] The Court has considered Walmart's Motion (Doc. 468) and Brief in Support (Doc. 489), as well as London Luxury's Response in Opposition (Doc. 498) and Walmart's Reply (Doc. 502).

[2] While many of the facts described here are undisputed, others were certainly disputed at trial; the inferences and ascribed motivations to be drawn from the facts were argued by the parties from their differing perspectives. Regardless, owing to the standard of review here, all facts described below could be found as true by a reasonable jury having deliberated on the evidence presented at trial.

manufacturers in Southeast Asia who would be willing to allocate capacity to meet Walmart's needs.[3]

On July 21, 2020, Walmart issued London Luxury an award letter that contemplated purchasing up to 3 million boxes of nitrile gloves per month. Walmart also required London Luxury to sign a standard general-supplier agreement that explained in detail the way Walmart and London Luxury would do business when the time came for Walmart to issue purchase orders and pay for goods. Importantly, the general-supplier agreement did not specify what goods would be purchased, nor did it include information about pricing, quantities, or deadlines; the agreement explained that those material terms would appear in separate purchase orders which, if issued, would transform the supplier agreement into an enforceable contract. Before purchase orders were written, however, the supplier agreement was nothing more than boilerplate conditions that applied to the purchase of unspecified goods at some point in the future. And while the award letter suggested Walmart would be buying up to 3 million boxes of gloves per month, the supplier agreement contained a conflicting boilerplate provision which stated that Walmart would not assume a minimum-purchase obligation.

From the beginning of this arrangement, Walmart expressed frustration with London Luxury's pace in securing a suitable glove manufacturer. When those concerns were pressed, London Luxury lulled Walmart into believing that shipments were on the near horizon and that pandemic-related supply-chain hardships were to blame for slowing down the logistics. However, behind the scenes, London Luxury was struggling financially

---

[3] The evidence at trial suggested that London Luxury greatly exaggerated its ability to source nitrile gloves during the beginning of the pandemic.

and could not fund the up-front deposits that the glove manufacturers required before allocating production capacity. It seemed London Luxury was stuck in a *Catch-22* dilemma: Its bank was reluctant to finance manufacturing costs because Walmart's purchase commitment was contingent on issuing future purchase orders, and Walmart was reluctant to issue purchase orders before it knew the identity of London Luxury's manufacturer.

By November 2020, the parties had started exchanging proposed delivery schedules based on Walmart's belief that London Luxury had secured a qualified manufacturer and London Luxury's belief that Walmart would soon issue purchase orders. On December 14, 2020, Walmart's global sourcing team for pandemic-related goods was persuaded to write an entire year's worth of purchase orders at once. But, as it turned out, the sourcing team was out of sync with Walmart's merchandising team. Between July and December 2020, as the pandemic ebbed and flowed, Walmart's buyers had come to realize that they needed far fewer gloves than originally expected. Consequently, less than a week after issuing a year's worth of purchase orders, Walmart did an about-face and cancelled them all.

Walmart's cancellation came as a significant blow to London Luxury, which had literally bet the company on the deal going through as planned. When London Luxury protested and asserted its detrimental reliance, Walmart tried to soften the blow by agreeing to write new purchase orders—but for a significantly smaller quantity of gloves. London Luxury fired back that Walmart's award letter was a binding promise to buy 36 million boxes of gloves over a year's time; but more to the point, a smaller order would effectively derail London Luxury's ability to leverage the financing needed to secure

adequate manufacturing capacity. Walmart soon evaluated its legal exposure and advised the glove buyers that the unique set of events and circumstances surrounding the original glove deal might leave Walmart "on the hook" for the full 3 million boxes per month for twelve months.

A few weeks later, in January 2021, as Walmart looked to mitigate its miscalculated need for gloves, it stumbled upon a serendipitous opportunity.  A company called Heypex was trying to source a supply of nitrile gloves to sell to medical institutions. In a lemons-to-lemonade moment, Walmart negotiated a year-long contract to sell 55 million boxes of nitrile gloves (that it did not have) to Heypex. Walmart's plan was to acquire the nitrile gloves from London Luxury and sell them to Heypex at a good profit margin. Heypex would then resell the gloves to its customer in the medical industry. Walmart executives were ecstatic about the deal because it solidified Walmart's entrance into the Business-to-Business ("B2B") marketplace, where Walmart had long hoped to become competitive. But Walmart's commitment to Heypex was not without risk: If London Luxury's production and shipping schedule failed to satisfy the timeliness of Heypex's needs, then Walmart could be left with a huge supply of gloves and no alternative buyer.

As London Luxury would later argue to the jury, Walmart accepted that risk on February 19, 2021, when it contracted to sell gloves to Heypex, and in so doing, "Walmart made a big bet, a half a billion-dollar bet, on one customer: Heypex.  And Heypex wasn't reliable, and Walmart didn't do its due diligence. They got too excited. '$500 million here we come.' That's what happened." (Doc. 484, Tr. p. 2232).

On the supply side of this equation, London Luxury's CEO, Marc Jason, was apprehensive when he learned about Walmart's deal with Heypex. After all, just a few

weeks earlier, Walmart had touted its authority to cancel the entire glove order and signaled that any new order would be significantly less than before. Now, in a stunning reversal, Walmart's intent was to order millions *more* boxes of gloves than it had in December. Jason knew that London Luxury's bank was unlikely to finance a manufacturing commitment on an even larger scale when it had just witnessed Walmart attempt to renege on a smaller order.

Walmart's Senior Sourcing Director, Garrett Small, was Walmart's designated point of contact with Jason on the glove transaction. To make the Heypex B2B deal work, Small had to find a way to assuage Jason's (and his banker's) concerns. Initially, Small approached Walmart's buyer team to see if they might be willing to write a year's worth of purchase orders, as they had before, to give some assurance about the scope of the entire commitment. The buyers refused.

Returning to the drawing board, Small collaborated with Jason and Walmart's in-house legal counsel, Vicki Vasser, to create a truly binding minimum-purchase agreement between Walmart and London Luxury. This time, Jason took the pen and drafted the commitment language himself—which he insisted was necessary to satisfy his banker's concerns about Walmart's ability to cancel. On February 23, 2021—four days after Walmart executed a contract to supply Heypex with 55 million boxes of gloves for $8.75 per box—Small signed and emailed the minimum-purchase agreement to Jason. According to the new agreement, which was reviewed and approved by Walmart's in-house legal counsel, Walmart was committing to purchase a total of 60.7 million boxes of gloves from London Luxury "*on a noncancellable and irrevocable basis*," at a price not to exceed $7.48 per box, to be delivered in weekly shipments over the course of 52 weeks.

(DX-0924).[4]   The contract did not contain a start date. Instead, the 52-week course of performance would commence on "the date of first shipment of the Product." *Id.*

But Jason could not immediately sign the new agreement because London Luxury's banker remained skeptical and would not finance the manufacturing deposits. So, on March 4, 2021, after a series of further ideas and negotiations, Small emailed Jason to confirm that Walmart would provide additional assurances to secure its supply of gloves. Specifically, to pave the way for manufacturing, Walmart took the extraordinary step of having *its own bank* issue a letter of credit to guarantee that Walmart would make full payment on every purchase order issued to London Luxury. *See* DX-0149. In return, though, Walmart executives needed to streamline the supply chain and decided that the fastest and most reliable way was to have London Luxury transport the Asian-made gloves to an Asian port. *Id.* Walmart would then take custody of the glove containers, negotiate customs hurdles, and arrange the last leg of shipping to the United States. To accommodate the letter of credit and the new shipping terms, London Luxury had to become what Walmart calls a "direct-import supplier," which required London Luxury to execute a different type of boilerplate supplier agreement. *See* PX-2113.

While those details were being discussed and finalized, Jason requested new edits to the minimum-purchase agreement. Small incorporated those edits into a final draft, which he signed and emailed to Jason on March 12, 2021, and Jason countersigned on March 19, 2021. *See* DX-0292 & DX-0042. The revised minimum-purchase agreement included a provision that had the effect of incorporating the operative supplier agreement

---

[4] This is a Walmart trial exhibit.  London Luxury's exhibits are labeled "PX-####," while Walmart's trial exhibits are labeled "DX-####."

by reference. *Id*. For the reasons just explained, Walmart circulated the direct-import version of the supplier agreement, and it was made effective as of March 31, 2021. *See* DX-0147.

One final agreement rounded out the parties' deal: Walmart's "Minimum Requirements and Standards for Suppliers" ("Standards"), which were incorporated (by reference to a hyperlink[5]) into the Direct Import Supplier Agreement. The Standards are essentially an ethical code of conduct that Walmart requests its suppliers to abide by as a condition of doing business with Walmart. The rules are presented in the form of an online, multi-page brochure with color photos of Walmart personnel at work. *See* DX-0022. The first page of the brochure is a letter from Walmart's President and CEO Doug McMillon that invites suppliers to "embrace the spirit in which these Standards were developed and model the values that stand behind them." (DX-0022-012). Suppliers are "expect[ed]" to "[c]omply with relevant anti-corruption laws," "never offer, pay, or receive a bribe," "[r]ecognize and [a]void [c]onflicts of [i]nterest," and "not offer gifts and entertainment to Walmart associates who might influence your business with Walmart." (DX-0022-017 & -023). They are also warned that failing to live up to the Standards "may subject [them] to consequences, up to and including termination of business with Walmart." (DX-0022-014).

In late April 2021, Small learned that Heypex had increased its glove order by approximately 11 million boxes, which meant the minimum-purchase agreement with London Luxury had to be amended, too. Instead of 60.7 million boxes of gloves, Walmart

---

[5] http://corporate.walmart.com/sourcing-standards-resources

now needed to buy 72 million boxes of gloves from London Luxury. Small prepared and signed a letter noting the increased quantity commitment and sent it to Jason by email, copying Alex Hurd, who was Small's supervisor, and John Egerman, who was Walmart's Senior Director and Head of Capital Markets. *See* PX-0364 and PX-0366.[6] Egerman was responsible for working with Walmart's bank to secure an amended letter of credit to reflect the increased minimum quantity. PX-1181.

To recap, as of April 28, 2021, the parties' agreement consisted of: (1) a noncancellable and irrevocable agreement to purchase 72 million boxes of nitrile gloves over a 52-week term—beginning on the date the first purchased order was issued, (2) the Direct Import Supplier Agreement, and (3) the supplier Standards.

Between May 24 and September 30, 2021, Walmart issued 18 purchase orders. But for various reasons, many of which are disputed, London Luxury did not begin supplying gloves to Walmart until sometime in late September or early October 2021. Shortly thereafter, when London Luxury thought it had finally turned the corner in resolving various manufacturing glitches, the parties' relationship disintegrated.

On October 22, 2021, Small sent an email to London Luxury telling them that he was "continuing to have issues with [his glove team at Walmart]" and that they "need[ed] to stop all production until this [was] resolved." (PX-0582 & PX-2233). In a phone call later that evening with London Luxury executives, Small revealed that Walmart was having a

---

[6] As the Court explained in its Order on summary judgment, the contract did not specify that written amendments must be signed by both parties. *See* Doc. 399, p. 45. And according to the Arkansas Uniform Commercial Code, a contract for the sale of goods is enforceable as long as it is signed "by the party against whom enforcement is sought or by his authorized agent"—which, in this case, was Walmart. Ark. Code Ann. § 4-2-201(1).

problem with its customer, Heypex. (Doc. 475, Tr. pp. 274–75) (Tr. Test. Gordon Lewis); (Doc. 478, Tr. pp. 1014–15) (Tr. Test. Jason). Chronologically, the evidence showed that Walmart's directive to stop glove production occurred shortly after Heypex cancelled its agreement to purchase those same gloves from Walmart. An internal Walmart memo, dated November 10, 2021, provides a concise synopsis:

**Situation Background:**
- Walmart GNFR and US Merchandising (D40, D13) worked together with Global Sourcing for a 1.5 year contract to source approx. **60 million units of Nitrile Gloves at approx. $430 Million in cost value**
- The award was communicated by GNFR to the supplier. The award letter was signed by a GNFR analyst and by Garrett. It is unclear if an officer signed this contract.
- Domestic purchase orders were created by the US Merchant team for the product, GNFR pre-paid and issued orders as well.
- The Supplier (LLC) missed the ship dates in Fall of 2020. In December 2020, the domestic purchase orders were cancelled by the US Merchants.
- US merchants together with Global Sourcing then found a B2B buyer – Haypex, who then added another 10 million units to to the contract **(total now 70 mill units, approx. $525 mill cost value)**
- Julie Barber (US SVP) signed the Haypex B2B contract, Global Sourcing officers did not see this contract.
- Import purchase orders and a letter of credit created from Global Sourcing for the first 6 weeks of the B2B program to ship through Nov '21 **(10 million units at $75 million cost)**

**Status (November 2021):**
- The supplier experienced continued delays of more than 6 months
- Product testing was not submitted to verify that the product meets the specification required
- In October, due to the delays and quality concerns, the B2B buyer cancelled the order and US merchants asked to unwind the production commitment with LLC

(PX-3434).

The jury was presented with conflicting evidence as to Heypex's reason for cancelling. Walmart presented evidence that Heypex and its customer were concerned about London Luxury's manufacturing sources and lack of quality. Walmart also presented evidence that Heypex was concerned about shipping delays and whether London Luxury was sourcing gloves from the black market. London Luxury presented evidence that Heypex's customer was no longer interested in buying from Heypex because the market price for nitrile gloves had fallen precipitously by that point in the pandemic. The evidence and inferences were such that a reasonable jury could have believed either version.

In any event, on November 5, 2021, after being intentionally radio silent for almost two weeks, Small's boss—Alex Hurd—met with Jason in person to confirm that Walmart's glove deal with London Luxury was coming to an end. On November 11, Hurd sent an email confirming Walmart's instruction to stop production of nitrile gloves:

> Hello Marc:
>
> Thank you for meeting on Friday to discuss the status of the nitrile gloves orders and related matters.
>
> As discussed, London Luxury has had ongoing and significant issues meeting its obligations.  There have been repeated delays and a failure to comply with Walmart's supplier standards.  As discussed, we require strict compliance with the normal Walmart import process and standards for suppliers. London Luxury still has not met those standards, and we have not received timely and accurate information about the products.
>
> For these reasons, we request London Luxury stop production of any outstanding Walmart nitrile glove orders from your Malaysia and Thailand manufacturing facilities.  Because of the ongoing failure to meet obligations, Walmart will stop issuing new purchase orders to London Luxury for nitrile gloves.
>
> We are disappointed in the performance of London Luxury.  Let's plan to talk later today or tomorrow to further discuss this matter.
>
> Alex
>
> Alex Hurd
> Vice President
> Walmart, Inc.

(PX-3103).

By November 11, 2021, several more containers of gloves were in-transit from London Luxury's Asian manufacturer to Walmart's designated Asian port, while other containers full of gloves had been produced and were awaiting transport. It is undisputed that Walmart paid for all gloves it received from London Luxury. But Walmart took the position that the gloves were not merchantable, so it did not sell or use them. Instead, Walmart stored the gloves in a warehouse pending the resolution of this dispute.

In January 2022, London Luxury filed this lawsuit against Walmart for prematurely cancelling the minimum-purchase agreement and demanded damages equal to the profits it would have made if Walmart had purchased all 72 million boxes of gloves.

Walmart counterclaimed for breach of contract and demanded a full refund of the cost of gloves it had purchased, as well as reimbursement of all shipping and storage fees.

It was around this point in the timeline that the facts took an unexpected turn.

Attached to London Luxury's original complaint was a letter from Walmart dated June 14, 2021, and signed by Small that purported to extend the noncancellable and irrevocable nitrile glove purchase agreement from 72 million boxes *over one year*, to 75 to 80 million boxes *per year for five years*. *See* Doc. 1-4, p. 3; PX-0993. Walmart was flabbergasted: It was unimaginable that anyone at Walmart would have committed to such a lengthy term. The deal outlined in Small's June letter would have obligated Walmart to purchase more than $2.5 billion worth of gloves over five years. Walmart initially believed that Jason forged both the letter and Small's signature, but after further investigation, the surprising truth was revealed: The letter *was a complete fake*, and Small had conspired with Jason to create it.

Not long after London Luxury filed suit, Walmart discovered a trove of text messages between Small and Jason indicating that their relationship was more than just professional. Jason had provided Small with gratuities ranging from lunch and drinks to an all-expenses-paid trip to Miami. In arranging the Miami trip, Jason explained that he was meeting with investors about building a domestic nitrile-glove factory in south Florida, and that he wanted Small to have a management role in the new venture with significant compensation.

At trial, Walmart introduced hundreds of private communications between Small and Jason.[7] The pair would frequently address each other with words of mutual adoration. The evidence demonstrated that, at some point, Jason caused a breach of Small's duty of loyalty to Walmart. Less clear, however, was the precise timing, scope, and significance of the breach. The March 23, 2021, trip to Miami, for example (which occurred four days after the operative purchase agreement was fully executed), reasonably suggests that Small had succumbed to misplaced loyalties by that point. But if not by then, the breach of loyalty almost certainly occurred by no later than June 14, when Jason persuaded Small to sign the phony five-year-commitment letter. That said, there was at least some contextual evidence to explain why all of this was not as bad as it might appear at first blush.

Small testified that he regretted certain of his actions, but he nevertheless maintained that he was loyal to Walmart throughout. The trip to Florida and the prospect of running a new manufacturing company were shrugged off as contingent and ultimately unsuccessful garden-variety recruiting efforts. And while Small admitted that the June letter didn't look good, he said Jason promised him that the letter would never be provided to anyone—much less used to bind Walmart. Small testified that the purpose of the letter was to "flash it to potential investors" to persuade them to finance construction of the Florida glove factory. (Doc. 481, Tr. p. 1782) (Tr. Test. Small). The jury was told that the phony letter did not work, that investors never materialized, and that Small was never offered a job at the factory which was never built.

---

[7] Small would frequently communicate with Jason via a personal, non-Walmart email account and by private messaging applications.

Prior to this litigation, no one at Walmart was aware of the untoward personal relationship between Jason and Small. Consequently, in November 2021, Walmart had no reason to identify London Luxury's violation of Walmart's ethical Standards as the basis for cancelling the parties' purchase agreement. But once this information became known, it changed the way that Walmart viewed its glove deal with London Luxury. First, Walmart asserted London Luxury's violation of the Standards as an additional basis for Walmart's breach-of-contract counterclaim. Second, Walmart added new counterclaims against London Luxury for tortious interference with Small's employment relationship. Third, Walmart asserted a counterclaim for equitable rescission as an alternative to breach of contract. The rescission counterclaim posited that the minimum-purchase agreement was void *ab initio* because, at the time of contract formation, Walmart was laboring under material mistakes of fact regarding Small's loyalty to Walmart and Jason's tortious interference with Small's employment relationship with Walmart. By pleading in the alternative, Walmart knew that at some point it would be required to elect between its legal remedy of breach of contract and its equitable remedy of recission.  At the close of the trial, Walmart elected to forgo its recission claim and defenses and have the jury instructed on breach of contract instead.

The jury's verdicts reflect its finding that two things—simultaneously—were true: Walmart breached the parties' contract, *and* London Luxury tortiously interfered with Small's employment relationship and duty of loyalty to Walmart. In Walmart's Motion now before the Court, the central contention is that these verdicts are inconsistent.  According to Walmart, the only reasonable conclusion supported by the evidence is that London Luxury's violation of the Standards constituted a prior material breach that legally excused

Walmart's obligation to perform. Consequently, Walmart contends under Rule 50(b) that it is entitled to judgment as a matter of law on the competing breach-of-contract claims, or, in the alternative, that in the Court's own weighing of the evidence under Rule 59, it should find there has been a miscarriage of justice and order a new trial. After first reviewing the applicable legal standards, the Court will address each of Walmart's arguments in turn.

## II.  LEGAL STANDARDS

### A.  Rule 50(b): Overturning the Jury's Verdict

Walmart made both oral and written motions for judgment as a matter of law under Rule 50(a) at the close of all evidence. *See* Doc. 448.  With one caveat,[8] the Court took the motion under advisement. *See* Doc. 483, Tr. p. 2118. Walmart now renews its motion under Rule 50(b).  Where "the court does not grant a motion for judgment as a matter of law made under Rule 50(a)" prior to submitting the case to the jury, then, upon timely renewal of that motion, the Court may confirm the jury's verdict, order a new trial under Rule 59, or overturn the verdict and direct the entry of judgment as a matter of law. *See* Fed. R. Civ. P. 50(b)(1)–(3).

"The law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017) (quoting *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)) (internal alterations omitted).  The standard of review for granting a Rule 50(b) motion is whether sufficient

---

[8] The Court explained from the bench why the trial record bolstered its finding on summary judgment that the March 31 Direct Import Supplier Agreement did not supersede the noncancellable and irrevocable minimum-purchase agreement. *See* Doc. 483, Tr. pp. 2118–21.

evidence exists to support the jury's verdict. Therefore, the motion should only be granted when "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." *Washburn v. Kan. City Life Ins. Co.*, 831 F.2d 1404, 1407 (8th Cir.1987) (citation omitted). In particular, the Court must:

> (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved. That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

*Id.* (quoting *Ryther v. KARE 11*, 108 F.3d 832, 844 (8th Cir. 1997) (en banc)).

## B.  Rule 59: Granting a New Trial

A new trial is appropriate under Rule 59 when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice. *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). Importantly, the legal standards for setting aside a jury verdict under Rule 50(b), as discussed above, are more restrictive than—and "thoroughly differ" from—the standards applied to a new trial motion under Rule 59. *White v. Pence,* 961 F.2d 776, 779 (8th Cir. 1992). The Eighth Circuit has explained those differences and reconciled the sometimes-confusing language used to describe the metes and bounds of the trial court's discretion as follows:

> In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict. . . . [Our] cases establish the fundamental procedures or methodology to be applied by the district court in considering new trial motions and are in contrast to those procedures governing [Rule 50(b)] motions.
> . . .

16

Although the cases are not consistent in usage, some cases using the phrase "clear weight" and others using the phrase "overwhelming weight" or "overwhelming evidence," it seems clear that the jury's verdict must at least be against the great weight of the evidence before a new trial may be granted. Otherwise, . . . it would destroy the role of the jury as the principal trier of the facts, and would enable the trial judge to disregard the jury's verdict at will. . . .

Regardless of the rhetoric used the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred. When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not.
. . . .

The district court's discretion is not boundless, however. The district court is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. . . . [T]he trial judge may not usurp the functions of a jury . . . [which] weighs the evidence and credibility of witnesses.
. . . .

[I]n ruling on a motion for new trial, the district court must state its reasons for concluding that the verdict is against the great weight of the evidence. . . . The clear and careful articulation of reasons is necessary, . . . so that this court can exercise a closer degree of scrutiny and supervision . . . in order to protect the litigants' right to a jury trial . . . .

We have recognized . . . that the authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court, . . . [but] [w]e have plainly articulated the responsibility of the district court to give its reasons for such rulings . . . .

*Id.* at 780–81 (collecting cases) (internal citations omitted and cleaned up).

## III.  DISCUSSION

Walmart primarily seeks relief pursuant to Rule 50(b) on the premise that the jury's breach-of-contract verdicts in favor of London Luxury are not supported by sufficient evidence.  In the alternative, Walmart asks the Court to find that the weight of the evidence warrants a new trial under Rule 59 to avoid a miscarriage of justice. Walmart also points to a trio of supposedly erroneous legal rulings that it "preserves for appeal."  (Doc. 489,

17

p. 27). But since exceptions to legal rulings are not necessary to preserve an issue for appeal, it is not entirely clear what Walmart is asking the Court to do with this surplusage. Below, the Court first addresses Walmart's sufficiency-of-the-evidence arguments under Rules 50(b) and 59, and then it will construe the alleged legal errors as alternative grounds for a new trial under Rule 59.

### A. Sufficient Evidence Supports the Jury's Breach-of-Contract Verdicts.

#### 1. Rule 50(b)

Walmart contends that the evidence before the jury pointed solely to the conclusion that London Luxury breached the parties' agreement first. Consequently, both breach-of-contract verdicts should be set aside and judgment entered in favor of Walmart as a matter of law. The question for the Court under Rule 50(b) is whether there was sufficient evidence from which a reasonable jury could conclude that any alleged prior breaches by London Luxury either did not occur or occurred but were not material.

Before addressing the alleged prior breaches, it is important to first contextualize the parties' agreement.  Because of the Court's rulings on summary judgment, the jury was instructed that:

> The parties' contract for the sale of nitrile gloves is set forth in the terms of several documents, including:
>
> (1) The February 2021 Commitment Letter (that was signed by Garrett Small for Walmart on March 12, 2021, and signed by Marc Jason for London Luxury on March 19, 2021);
>
> (2) The Direct Import Supplier Agreement signed on March 31, 2021, and all terms incorporated by reference; and
>
> (3) The April Commitment Letter signed by Garrett Small on April 28, 2021, which increased the quantity of gloves that Walmart would purchase.

18

Reading these documents together, the parties agreed to a one-year commitment whereby London Luxury would supply, and Walmart would purchase, 72 million boxes of nitrile gloves. You are instructed that the Commitment Letter makes Walmart's purchase obligation "noncancellable and irrevocable" (and that specific term takes precedence over the "no minimum purchase" provision in the standard Supplier Agreement). Walmart's policy regarding conflicts of interest was incorporated into the parties' contract. The parties also agreed that Walmart would not be required to accept delivery or pay for gloves that failed to comply with specified standards for sourcing, quality, merchantability, or timeliness of delivery. As directed in the instructions that follow, you must decide whether either party breached the terms of their agreement.[9]

For London Luxury to prevail on its breach-of-contract claim, the jury was instructed that London Luxury had the burden of proving each of two essential elements:

First, that London Luxury did what the contract required of it, or that London Luxury's performance was excused; and

Second, that Walmart did not do what the contract required of it.[10]

Finally, as pertinent here, the jury was instructed to consider the materiality of any alleged breach as follows:

A "material breach" is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party.

A prior material breach by one party excuses the other party's obligation to perform what the contract required of it (and allows that party to sue for damages on the contract).

A non-material breach by one party does not excuse the other party's performance (but it would allow that party to seek damages for partial breach).

A material breach also occurs when a party repudiates the contract before performance is due.[11]

---

[9] Final Jury Instruction 10.

[10] Final Jury Instruction 12.1.

[11] Unobjected to Final Jury Instruction 12.2, based on Ark. Model Civ. Jury Inst. § 2427.

Walmart contends the proof at trial clearly established that London Luxury breached the parties' agreement in multiple different ways *prior to* Walmart's directive to stop production of nitrile gloves. According to Walmart, these prior material breaches excused its obligation to purchase the remainder of the 72 million boxes of nitrile gloves, and therefore London Luxury's breach-of-contract verdict must be set aside. Using this same logic, Walmart contends it is entitled to judgment as a matter of law on its counterclaim for breach of contract.

The bulk of Walmart's argument is that London Luxury failed to "recognize and avoid conflicts of interest," as required by the Standards for Suppliers, which was incorporated by reference into the Direct Import Supplier Agreement (the "Conflicts of Interest Policy"). *See* DX-0022-023. Walmart also points to its evidence that London Luxury breached the parties' agreement through untimely deliveries of gloves and failure to comply with contractual standards for sourcing, quality, and merchantability. The Court will consider each of these arguments in turn.

### a. Violation of Walmart's Standard for Avoiding Conflicts of Interest[12]

Among other things, Walmart's Conflicts of Interest Policy required London Luxury to:

- Avoid forming personal relationships with Walmart associates that would compromise or appear to compromise the independence, integrity, impartiality, or judgment of Walmart associates. Where such

---

[12] Walmart's briefing uses the term "anti-corruption rules" when describing its breach-of-contract argument, which is a little misleading. *See, e.g.*, Doc. 489, p. 9. It is true that the Standards outline Walmart's expectation that suppliers comply with the law, including anti-corruption laws, such as the Foreign Corrupt Practices Act. *See* DX-0022-016 & -017. It is also true that the jury was informed about some disreputable conduct by London Luxury's agents overseas. But this dispute is not about anti-corruption laws. The specific policy at issue here is titled, "Recognize and Avoid Conflicts of Interest." (DX-0022-023). For simplicity, in its instructions to the jury, the Court referred to this provision in the Standards as the "Conflicts of Interest Policy." The Court uses that same phrase here, as well.

relationships exist, they must be disclosed to Walmart. Whether a personal relationship is appropriate depends on the circumstances. Reach out to your primary Walmart business contact to discuss any potential issues.[13]

- Do not offer gifts and entertainment to Walmart associates who might influence your business with Walmart . . . . Walmart associates . . . are not permitted to accept gifts or entertainment, so please don't offer them.

*See* DX-0022-023.  The Standards warned, "Anyone who violates the Standards may be subject to consequences, up to and including termination of business with Walmart." (DX-0022-014).

Finally, the Direct Import Supplier Agreement (which incorporated the Standards by reference to an internet hyperlink) provided in pertinent part:

- [Walmart] reserves the right to cancel any outstanding [Purchase] Order, refuse any shipments and otherwise cease to do business with Supplier if Supplier fails to comply with any terms of the Standards or if [Walmart] reasonably believes Supplier has failed to do so.

(DX-0147-030).

- Supplier's breach of or failure to comply with any of the Terms or Conditions of this Agreement or any [Purchase] Order shall be grounds for [Walmart] to exercise any one or more of the following remedies: . . . (c) Termination or suspension of all current and future business relationships.

(DX-0147-027).

To be sure, the Court agrees with Walmart's characterization of the trial record as containing a "mountain of evidence" to support its argument that Jason formed an improper personal relationship with Small in violation of the Conflicts of Interest Policy. (Doc. 489, p. 19). And it is evident from the tort claim verdicts that the jury carefully

---

[13] Evidence was introduced at trial to the effect that Small was London Luxury's "primary business contact."

considered the evidence of Jason's inappropriate relationship with Small. For that wrongful conduct, the jury awarded Walmart $350,000 in damages—a sum equal to Small's annual salary and benefits.

Applying the contract provisions excerpted above to its "mountain of evidence," Walmart argues that it had a contractual right to terminate the nitrile glove agreement even though it was unaware of the improper relationship when it ordered London Luxury to cease glove production. *See* Doc. 489, pp. 15–18. Moreover, Walmart takes the position that, "even putting aside the termination clauses," there is "no question" that London Luxury's breach of the Conflicts of Interest Policy was a prior material breach of the parties' agreement. *Id*. at p. 17.

In response, London Luxury first notes that the Conflicts of Interest Policy is "inherently vague and subjective," and that "[t]he application of those terms is in the eye of the beholder and is a classic jury question." (Doc. 498, p. 10). Further, "[t]he subjectivity of the contract language that Walmart relies on makes this case a particularly inappropriate instance to overturn the unanimous verdict . . . ." *Id*. London Luxury then itemizes other evidence available to the jury to contextualize the nature, scope, and extent of the Conflicts of Interest violations, if any. According to London Luxury, there is sufficient evidence and inference in the trial record from which the jury could have reasonably concluded that any attempt to improperly influence Small or undermine his integrity was *de minimis* and ultimately unsuccessful. London Luxury notes Small's own testimony and reasoning as to why he was able to keep and maintain his honor and integrity throughout the entire course of the nitrile glove transaction. Further, according to London Luxury, evidence of an overly friendly relationship between a supplier and a Walmart employee

is not enough to establish a material breach of the Conflicts of Interests Policy. In London Luxury's view, something "closer to bribery" (which it says Walmart failed to prove) would be required to materially breach the Conflicts of Interest Policy. (Doc. 498, p. 11).

And while the improper-relationship evidence was sufficient for the jury to find in Walmart's favor on the tort claims, London Luxury sees no inconsistency in the verdicts. It contends there is sufficient evidence from which the jury could have reasonably concluded—when applying the breach-of-contract instructions—that any breach of the Conflicts of Interest Policy was not "material" and therefore did not excuse Walmart's performance. The argument goes like this:

> London Luxury had delivered hundreds of millions of gloves at the time of termination, with hundreds of millions more on the way. . . . That evidence showed that the "purpose of the contract"—to buy and sell gloves—was alive and well, and it certainly was not "substantially defeated."

*Id.* at p. 17.

Viewing the evidence in the light most favorable to the jury's verdicts, the Court finds that Walmart has broadly overstated the contextual application of the Conflicts of Interest Policy to the facts of *this* case.  Before addressing the legal authorities, the Court makes two threshold observations.

First, the Conflicts of Interest Policy is not as definitive as Walmart paints it. The Standards for Suppliers are presented in the form of a full-color brochure that expresses Walmart's idealistic values and culture. The Standards explain that Walmart expects suppliers to honor its values by complying with the Standards. But while Walmart's objectives are clear and honorable, the boilerplate text is necessarily broad, somewhat vague, and drafted to apply to a wide array of potential scenarios. For example, a supplier's formation of a straightforward personal relationship with a Walmart employee

23

is not prohibited. Instead, Walmart asks suppliers for their "help" in avoiding relationships that cross a non-specific gray line: one that could or would compromise the Walmart employee's integrity, impartiality, or judgment. (DX-0022-23). But even then, personal relationships are not automatically foreclosed—although they must be disclosed.[14]

Second, the Standards purport to give Walmart subjective discretion to determine whether a violation has occurred, and if so, what, if any, consequences will be meted out. However, as the Court explained in its Summary Judgment Order, the Standards for Suppliers—like the boilerplate Direct Import Supplier Agreement—are only enforceable when joined with the material terms on which Walmart agrees to purchase the supplier's goods. *See* Doc. 399, pp. 35–37. Here, it is telling that the entirety of Walmart's Rule 50(b) legal argument is devoid of any contextual mention of its highly unusual pandemic-necessitated "noncancellable and irrevocable" agreement to purchase $500 million worth of nitrile gloves. (Doc. 489, pp. 15–18). Nor does Walmart mention *its purpose* for agreeing to such an out-of-the-ordinary arrangement in first place: Walmart needed to quickly source tens of millions of boxes of gloves to sell to Heypex in a B2B transaction for an expected pass-through profit of $72 million.

Against this backdrop, the Court considers Walmart's legal argument that the improper relationship between Jason and Small violated the Standards and constituted "an objective condition authorizing termination [of the agreement] regardless of whether Walmart had knowledge of the breach." *Id.* at p. 18. The Court generally agrees that Walmart's after-acquired knowledge of a material breach is not an impediment to its

---

[14] As previously mentioned, the Conflicts of Interest Policy required London Luxury to disclose personal relationships to its "primary Walmart business contact"—which in this case was Small. (DX-0022-23).

argument that London Luxury's prior breach excused Walmart's performance. After all, London Luxury took great pains to actively conceal Jason's improper relationship with Small.

Likewise, it is certainly true that, "[b]y agreement, the parties [to a contract] may expressly reserve a power of termination to either or both of them." *Id.* at p. 16. But such a power is only enforceable under certain conditions, as Professor Corbin in his seminal treatise on contracts explains (and Walmart ignores):

> By agreement, the parties may expressly reserve a power of termination to either or both of them. The reservation of such a power neither invalidates the contract nor renders a promise given as consideration illusory. As long as the party with the reserved power to terminate is irrevocably bound for any period of time or has materially changed any of its legal relations or otherwise rendered some performance capable of operating as a consideration, consideration has been given and the other's promise is enforceable. If, however, the reservation is not that of a power to terminate a contract by some subsequent act, but is the reservation of a privilege not to render any part of the promised performance, solely as the promisor may subsequently desire, the apparent promise is itself illusory. It is not consideration for a return promise.

13 Corbin on Contracts § 68.9.

In other words, if a party's power to terminate (in the absence of a material breach) depends solely on its own judgment or subjective "desire," the apparent promise is illusory. *Id*. In the Court's estimation, Walmart's Standards do not create an "objective" condition precedent to performance because the question of whether a supplier's violation of the Standards warrants any discipline at all—let alone termination of the contract—is entirely subjective. According to the Policy, Walmart "ask[s] [its] associates to avoid situations where they might put personal interests or the interests of a third party ahead of Walmart's"; whereas suppliers, on the other hand, are only "asked" to "help" Walmart employees avoid conflicts by refraining from certain conduct. (DX-0022-23). "Asking for

help" does not sound like an objective way to preface a condition that can be tied to an express reservation of the power to terminate. Given the "noncancellable and irrevocable" language in the parties' contract, a non-material breach of a subjectively discretionary termination condition cannot serve as grounds for termination.

Indeed, the consequences for violating the Standards appear only once, in a section titled, "Who is Covered," and advise suppliers that "[a]nyone who violates the Standards *may be subject to consequences*, up to and including termination of business with Walmart." (DX-0022-014) (emphasis added). In other words, Walmart reserves for itself a *discretionary* and *flexible* power to punish a supplier for failing to live up to the Standards, with the full extent of such punishment resting exclusively in Walmart's hands according to its subjective judgment. Ironically, in trying to portray this language as creating an objective condition, Walmart ignores the trial testimony that it elected *not to terminate* its business relationship with London Luxury *even after* Walmart learned that Jason and Small had conspired to create the bogus June 2021 five-year commitment letter. Gordon Lewis, who at the time was London Luxury's Chief Financial Officer, testified that "in the first six months of 2022"—*after Walmart filed this lawsuit*—"Walmart did approximately a little more than $7 million of business with London Luxury in . . . non-glove related products and approximately $3 million *after Walmart had terminated Small*." (Doc. 484, Tr. pp. 2290–92) (emphasis added) (Tr. Test. Lewis).

At best, a violation of the Standards might be good enough to terminate future business with a supplier in the ordinary retail context where Walmart's supplier agreement already specifies that Walmart has no minimum purchase obligations. However, as discussed above, the exceptional, pandemic-motivated "noncancellable and irrevocable"

language that was directly tied to the contract's quantity, price, and delivery terms in this B2B context is inconsistent with an express right to terminate. The Court therefore finds that Walmart had no absolute right to terminate the contract unless London Luxury's violation of the Standards constituted a material breach.

Here, it was the jury's task to decide whether Jason's improper relationship with Small was material enough to "discharge [Walmart] of its obligations under the contract." *Chambers v. McDougald*, 2017 Ark. App. 357, at *7 ("Whether a breach is material is a question for the fact-finder."). And the jury was specifically instructed that "the contract required London Luxury to comply with a conflicts of interest policy, and to deliver gloves of a particular quality, from known manufacturing sources, and in a timely manner," (Doc. 455, Final Jury Instruction 13.1); and that "[a] 'material breach' is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party," *id.*, Final Jury Instruction 13.2.

In closing argument, Walmart frequently referred to these instructions and tried mightily to persuade the jury that Jason's conduct materially breached the parties' agreement. *See* Doc. 484, Tr. pp. 2367–415 (mentioning Jason's "conflict of interest" twenty-nine times during closing). But in the end, the jury decided that while Jason did tortiously interfere with Walmart's employment relationship with Small, such conduct was not material in that it did not substantially defeat for Walmart the essential purpose of its glove-purchase agreement. *See* Doc. 457, pp. 7, 9 (Jury Verdict). The jury's verdicts are consistent with the law and the evidence presented at trial.

Though Walmart presented a wealth of evidence to prove that London Luxury violated the Standards, the fact remains that Rule 50(b) is not focused on the extent or

weight of the loser's evidence; rather, the inquiry is whether sufficient evidence was presented to support the jury's verdict—which is afforded considerable deference. *Washburn,* 831 F.2d at 1407.

Here, the evidence and reasonable inferences to be drawn from the evidence did not point exclusively in Walmart's favor. As discussed above, Walmart's argument ignores the vagueness of the discretionary "consequences" provision in its Standards and the fact that the Standards did not operate as a standalone contract. Given the deferential standard of review, the evidence was sufficient for a jury to reasonably conclude that any failure by London Luxury to comply with the Standards was not a breach of "an essential term or condition that substantially defeat[ed] the purpose of the contract for [Walmart]." (Doc. 455, Final Jury Instructions 12.2 and 13.2 (defining "material breach")). For example, there was evidence that contracting on "noncancellable and irrevocable" minimum-purchase terms was completely outside Walmart's normal retail merchandising practices. *See* Doc. 476, Tr. p. 402 (Tr. Test. Shannon Allen). This was because Walmart's commitment to buying a year's worth of nitrile gloves from London Luxury was predicated on its separate contractual obligation to supply a single wholesale customer (Heypex) with an (almost) identical quantity of gloves.[15]  *Id.* at Tr. pp. 401–10 (Tr. Test. Allen).

The jury also heard evidence that Walmart was so invested in the success of the of this B2B transaction that it took the highly unusual step of issuing a letter of credit to

---

[15] Of the gloves Walmart contemplated it would receive on a weekly basis from London Luxury, about 90% (30 containers) was to be resold to Heypex. Walmart planned to retain the remaining 10% (4 containers) for retail sales and employee use.

London Luxury—effectively guaranteeing payment to London Luxury's manufacturers, and thereby inducing them to allocate manufacturing capacity. *See* Doc. 476, Tr. pp. 620–39 & Doc. 477, Tr. pp. 662–704 (Tr. Test. Egerman); PX-3306; PX-2328; PX-2484. Moreover, the Conflicts of Interest Policy was not a listed requirement or contingency to Walmart's letter-of-credit obligations, which was yet another reason for the jury to conclude that compliance with the Conflicts of Interest Policy was not essential to Walmart's purpose in contracting with London Luxury in the context of a B2B transaction.

Suppose the B2B transaction had been on a successful track in October 2021, and Walmart learned of Small's corruption in that moment. Would Small have been removed from the glove deal? Absolutely. Would he have been fired? Probably. Would London Luxury have been banned as a supplier of goods in the future? Perhaps.[16] But would Walmart have really cancelled its contract with London Luxury when it had no other source of gloves to fulfill its contract with Heypex? Surely that question was pondered in the jury room.  And if so, the jury could have reasonably found it unlikely that Walmart would have passed up a $72 million profit because of London Luxury's violations of the Conflicts of Interest Policy (which was enforceable at Walmart's discretion anyway). The jury also heard evidence that Heypex terminated its purchase agreement with Walmart in the same month that Walmart ordered London Luxury to stop glove production—October 2021. *See* Doc. 475, Tr. pp. 274–75 (Tr. Test. Lewis); Doc. 478, Tr. pp. 1014–15 (Tr. Test. Jason); PX-3434. The point, stated differently, is that a jury could have reasonably

---

[16] Walmart put on the testimony of its senior executive, Julie Barber, to that effect. But London Luxury countered that Walmart continued to do millions of dollars' worth of business with London Luxury for months after the lawsuit was filed and after it became aware of Small's corruption. *See* Doc. 484, Tr. pp. 2290–92 (Tr. Test. Lewis).

concluded from the evidence that Walmart's assertion of the Standards violations was a post-hoc rationale to justify Walmart's decision to breach the parties' contract.

In sum, the Court finds under Rule 50(b) sufficient evidence in the record from which a reasonable jury could conclude that Jason's corruption of Small's loyalties occurred at some point in time, and to a relative extent, but that such conduct did not substantially defeat the purposes for which Walmart had contracted.

### b. Delays in Shipping and Issues with Factory Sourcing and Quality

The trial record was also sufficient to allow the jury to conclude that London Luxury's delays in delivery, problems with factory sourcing, and third-party testing failures were: (1) knowingly waived by Walmart, (2) cured by London Luxury and then knowingly waived by Walmart, or (3) immaterial to the overall purpose and performance of the contract.

As for timeliness, the contract supplied no "start time" for shipping, and performance was to commence on the date of the first purchase order, which was not issued until May 2021. London Luxury put on expert testimony to explain how normal supply chains were impacted by the pandemic. (Doc. 478, Tr. p. 1136) (Tr. Test. Shih). And London Luxury presented evidence that Walmart's executives were aware of those shipping delays and sourcing problems but still wanted London Luxury to perform.[17]

---

[17] *See, e.g.*, PX-2912 (Small updating Walmart executives and in-house counsel that due to the "lockdown situation in Malaysia" as of June 2021, "production ha[d] been reduced from 60% to 30% capacity"); PX-3377 (Walmart attorney Vasser explaining to glove merchandising team: "Some of the obstacles LL is currently facing to deliver to Walmart could arguably be a force majeure event."); PX-2165 (Walmart contracting analyst explaining to glove team: "Due to much of the labor issues in many glove factories that has been exposed during the pandemic, London Luxury has switched factories multiple times since we originally awarded them back in July."); (Doc. 476, Tr. pp. 434–35) (Tr. Test. Allen) (Walmart executive testifying that Walmart "still wanted gloves" despite

Based on this evidence, the Court instructed the jury on London Luxury's affirmative defense of waiver. *See* Doc. 455, Final Jury Instruction 13.3.  Accordingly, the Court finds there was sufficient evidence at trial for the jury to reasonably conclude that Walmart knew of its contractual rights but, given the historic interruptions in supply chains caused by the pandemic, decided to intentionally and voluntarily abandon its rights. *Id*.

As for breaches related to ethical sourcing and product quality, London Luxury provided the jury with expert testimony to explain, among other things, industry norms to establish whether testing failures can be remedied without rejecting the entire order. This included the testimony of glove experts Professor Robert Phalen and biomedical engineer Ryan Siskey.

Professor Phalen, one of the leading researchers in the field of nitrile gloves and the author of the technical guide *Protective Gloves for Occupational Use*, testified that the gloves that London Luxury shipped to Walmart met established industry testing standards. He theorized that some gloves failed third-party testing because they overheated and degraded in transit to the testing facility in China—not because they suffered from manufacturing defects. *See* Doc. 480, Tr. pp. 1533–48, 1552–73 (Tr. Test. Phalen). Mr. Siskey testified that London Luxury's factory reacted appropriately when

---

knowing that London Luxury had recently changed factories); PX-0857 (amendment to Walmart's letter of credit resetting expected shipping dates to conform to known delays); PX-2442 (September 24, 2021 email from Heypex confirming that it was "good with the timing and additional quantities of gloves" and would take "all quantities up to 90 million boxes through July 2022"); PX-2636 (Walmart executive confirming that Walmart is "ok allowing this [glove] program to continue" despite known delays with shipping and factory approval); PX-3418 (September 23, 2021 email from Vasser stating that Small and his merchandising team were given legal advice "to proceed with LL (despite delays) and with Heypex (even with a 30-day notice termination clause) because WM is on the hook . . . .").

presented with a failing test result and swiftly diagnosed and corrected the problem. *See id.* at Tr. pp. 1625–37 (Tr. Test. Siskey).

Finally, Walmart omits from its briefing the fact that it made a tactical decision—for unstated reasons—to not call any of its properly disclosed and well-qualified rebuttal experts. The jury was instructed that it could give expert testimony whatever weight they deemed appropriate. So having not called its own experts, Walmart can hardly complain about how the jury weighed London Luxury's expert testimony.

For all these reasons, the Court concludes under Rule 50(b) that more than enough evidence was presented at trial to allow a reasonable jury to conclude that London Luxury did not materially breach the contract through shipping delays (and/or that Walmart waived any timeliness issues related to workflow), poor factory sourcing, or failed product testing.

### c. Walmart's Claim for Damages for Non-Material Breach

Walmart's argument of last resort under Rule 50(b) is that all the evidence *at least* points to London Luxury committing non-material breaches of the parties' agreement, which would entitle Walmart to at least some amount of damages, per Final Jury Instruction 12.2 ("A non-material breach by one party does not excuse the other party's performance (but it would allow that party to seek damages for partial breach")). For the reasons explained above, the Court finds that breaches of the Conflicts of Interest Policy would only have been actionable if material—due to the "noncancellable and irrevocable" language in the parties' agreement and the subjective nature of the Standards' termination language. As for other possible breaches—including delivery delays, sourcing issues, and testing failures—the jury was instructed that it could award damages for

partial, non-material breach but declined. Substantial evidence supported that decision. And as for Walmart's suggestion that nominal damages for partial breach may have been appropriate, *see* Doc. 489, pp. 26–27, Walmart never asked for a nominal damages instruction though it had ample opportunity.

The Court therefore concludes that Walmart in not entitled to judgment as a matter of law on London Luxury's breach-of-contract claim; and since Walmart was the first party in material breach, it is also not entitled to judgment as a matter of law on its breach-of-contract counterclaim against London Luxury.

### 2. *Rule 59*

In the alternative, Walmart argues "at the very least, London Luxury's breaches of the anti-corruption provisions entitle Walmart to a new trial based on a reweighing of the evidence." (Doc. 489, p. 18). As explained when discussing the applicable legal standards, Rule 59 is more deferential to the trial court's weighing of the evidence. That said, a trial judge "may not usurp the functions of a jury," which "weighs the evidence and credibility of witnesses." *White*, 961 F.2d at 781.

In the year that has passed since the trial concluded, the Court has benefited from time and distance to more objectively reflect on whether the jury's verdict in favor of London Luxury was so against the weight of the evidence that it resulted in a miscarriage of justice. But even with the passage of time, the Court remains troubled by the record evidence of London Luxury's unsavory business practices. Jason's deceitful tactics reveal a consistent pattern: London Luxury viewed the means, however questionable or unethical, as being justified by the prospect of a nine-figure profit it would receive for

successfully supplying gloves to Walmart.[18]  And to the extent that the Court is permitted to assess Jason's credibility, it finds that he mostly lacks any. Nevertheless, the Court's careful review of the record leads to the conclusion that a new trial is not warranted.  Three principal reasons rise to the surface.

First, the standard of review, while more deferential than Rule 50(b), presents a difficult bar to chin. The Eighth Circuit cautions trial judges to refrain from viewing the evidence as if the matter were being tried to the bench. A trial judge must not exercise its discretion in a way that effectively usurps the role of the jury, simply because it believes one side presented better evidence—or because the judge was personally more persuaded by one side's evidence. Rather, the threshold inquiry is whether there is a discernable pathway by which the jury's verdict is consistent with the law as instructed and supported by reasonable inferences and rational conclusions drawn from the evidence presented, even if the Court might draw different inferences and conclusions from that same evidence. Here, the Court believes it can see how and why the jury rendered the verdicts that it did. The jury's thought processes—as revealed by the algorithm of its interrogatory responses–are sufficiently transparent and logical to be well understood, and this weighs in favor of deferring to the jury's verdict.

Second, the jury obviously believed London Luxury's theory of the case. The tag line, "500 million, here we come!", repeated throughout London Luxury's closing argument, was not lawyer hyperbole or exaggerated bluster—it came straight from the evidence. Walmart's glove buyer, Shannon Allen, reported to her bosses on February 1,

---

[18] Walmart's closing argument gave a fair accounting of the means used by London Luxury in the pursuit of this objective. *See* Doc. 484, Tr. pp. 2374–2411 (Walmart closing argument).

2021, that selling $479 million of nitrile gloves to Heypex would result in a $72 million profit to Walmart. After explaining how the B2B transaction would work, she concludes her update with apparent excitement: "500M here we come!". *See* PX-3172. More importantly, the evidence established that Walmart's B2B purpose for contracting with London Luxury was well beyond its normal retail merchandising practices and expertise. *See* Doc. 476, Tr. pp. 401–11 (Tr. Test. Allen); Doc. 476, Tr. pp. 620–39; Doc. 477, Tr. pp. 662–704 (Tr. Test. Egerman). And, as documented above in the Rule 50(b) discussion, the evidence established that although Walmart was acutely aware of London Luxury's factory sourcing problems and shipping delays, it repeatedly waived those deficiencies because it had no other means of fulfilling its obligations to Heypex.

Meanwhile, London Luxury's expert, Professor Willy Shih, placed these facts into the context of pandemic supply chains, and he explained the risk–reward trade-off associated with Walmart's B2B transaction. *See* Doc. 478, Tr. pp. 1147–55. (Tr. Test. Shih).  In summarizing his opinions, Professor Shih put it like this:

> If you look at the economics, this was a good deal [for Walmart]. And if that bet had played out and demand had stayed high and prices had stayed high, Walmart could have made a lot of money.  But it didn't.  [In] the beginning, just looking at the economics and kind of the risk profile of it, it made sense.  It was an atypical supply chain for Walmart because it was B2B instead of B2C, business to consumer. So, it was very different. It was new for them.
>
> So then what we see is, at the beginning of the pandemic, them entering a purchase agreement which says, I'm going to secure a large supply of this hot commodity -- nitrile gloves -- at a favorable price, in exchange for committing to take a lot of this volume. Had the pandemic continued in a different course and demand for gloves stayed high and the price stayed high, this could have been a very successful bet.
>
> But then as the pandemic evolved, the need for gloves changed, supply caught up with demand, and the price collapsed. What looked like a good

bet turned out to be not such a good bet. So, you can make smart bets, but sometimes the market turns against you, and that's what happened here.

*Id.* at pp. 1154–55.

While the Court remains troubled by London Luxury's questionable business practices, and even though the Court may have "drawn different inferences or conclusions" or "feel that other results are more reasonable," the Court is required to weigh the evidence as a whole and "measure the result in terms of whether a miscarriage of justice has occurred." *White*, 961 F.2d at 780–81. Here, there is a rational and factually grounded basis for the jury's findings: Walmart took a gamble on London Luxury—a company Walmart only knew as a purveyor of home goods—to source tens of millions of PPE from Asia in the middle of a pandemic. And when Walmart ventured outside of its normal retail merchandising practices, it further gambled that its B2B customer would stick with Walmart through the uncertainty of an unprecedented global supply-chain crisis, even though the customer was *not* bound to Walmart with a parallel noncancellable, irrevocable agreement and was free to end the commitment with no real repercussions. All these business decisions lay in Walmart's hands alone, and it is quite possible that the jury took a dim view of Walmart's response when the gamble did not pay off. Given this bed that Walmart made for itself, the Court cannot say that the result here amounts to a miscarriage of justice.

Third, the Court observes that Walmart preserved up until trial its ability to seek recission of the contract as an equitable remedy for its grievance that London Luxury had engaged in deceitful conduct and actively concealed Jason's improper relationship with Small. *See* Doc. 194, pp. 22, 66–67. Indeed, since Walmart essentially contends that it would never have gone forward with this deal had it known the true facts along the way,

36

recission may have been a better fit to the facts—especially when given the benefit of 20/20 hindsight.

Professor Brill explains that courts may rescind contracts for, among other things, both actual fraud and constructive fraud. Howard W. Brill, *Arkansas Law of Damages*, § 31:3 (6th ed. 2014). At summary judgment, the Court found that Walmart had timely asserted equitable recission and avoidance of the contract due to fraud, as an alternative to the option of pursuing damages for breach of a valid contract. *See* Doc. 399, pp. 51–52. Before submission to the jury, however, Walmart was required to make an election between its conflicting theories of breach and recission. *Herrick v. Robinson*, 267 Ark. 576, 587 (1980).

At trial, Walmart presented substantial evidence of London Luxury's misrepresentations of material facts and concealment of Jason's improper relationship with Small—all of which would have supported an equitable recission theory based on actual fraud. But at the close of all evidence, Walmart elected to have the jury instructed on its breach of contract claim. This was no doubt a difficult strategic decision that Walmart carefully considered. Arguing the breach of contract instructions, Walmart hammered in closing, again and again, that London Luxury's false representations and concealment of improper conduct constituted multiple prior material breaches. *See, e.g.*, Doc. 484, Tr. p. 2411. That the jury disagreed does not mean that its interpretation of the record evidence was unreasonable. Nor has there been a miscarriage of justice. It was, after all, Walmart that elected to pursue damages for material breach of a valid contract,

rather than use the same fraud and concealment evidence as the basis for equitable recission of an arguably invalid contract procured through fraud.[19]

Accordingly, under Rule 59, the Court in its discretion declines to order a new trial and finds that the jury's verdict was not against the weight of the evidence, nor did it result in a miscarriage of justice.

**B. Other Issues "Preserved for Appeal" Do Not Constitute a Miscarriage of Justice Under Rule 59.**

*1. Walmart's Disagreement with the Summary Judgment Order*

Walmart continues to disagree with the Court's decision on summary judgment that the parties' contract was composed of three interdependent documents. In Walmart's view, the Direct Import Supplier Agreement dated March 31, 2021, entirely superseded the noncancellable and irrevocable purchase commitment that was fully executed by the parties as of March 19, 2021. As the Court explained on summary judgment, Walmart's supplier agreements are, as a matter of law, "[a]t most, . . . normative agreements about future business procedures, since the only benefit a supplier receives upon signing a supplier agreement with Walmart is the hope of someday doing business with the retailing

_____

[19] When Walmart's counsel were asked at the close of trial whether they wanted to pursue the counterclaims and defenses sounding in contract or those sounding in rescission, they initially asked for more time to decide, acknowledging that "[t]here's a little strategy to the issue of whether we go with recission and how to argue and those things." (Doc. 482, Tr. p. 2079). Perhaps implicit in Walmart's ultimate decision to pursue its breach of contract claim was its calculation that the potential recovery of $27 million in contract damages was more valuable than merely asking the Court to declare the contract a nullity. Or maybe Walmart was concerned about whether it had sufficiently proven when London Luxury violated the Standards in relation to when Walmart first struck the B2B deal with Heypex. In any case, implicit in Walmart's strategic election was a $100 million risk that the jury might view the breach-of-contract evidence differently than Walmart did. Which, as it turns out, is what happened.

giant." (Doc. 399, p. 37). So, the Direct Import Supplier Agreement could not have superseded a valid contract because the Direct Import Agreement *was not a contract*. As the Court noted: "All suppliers must sign these agreements in order to do business with Walmart; no products are specified (let alone quantities, prices, or other material terms); no consideration is described or offered; and the same generic language appears in every agreement, giving instructions on how to handle returns, cancellations, taxes, insurance, shipping, credits, and remedies." *Id.* at pp. 36–37.

Moreover, as the Court mentioned in response to Walmart's oral Rule 50(a) motion, the trial evidence supports the Court's findings on summary judgment. Walmart's trial exhibit DX-0149 is one example of the record proof that the parties clearly intended the noncancelable and irrevocable purchase agreement to be read in conjunction with— and not to be superseded by—the Direct Import Agreement. This exhibit includes an email chain from March 4 and 5 between various key figures involved in the glove transaction at Walmart and London Luxury. According to the email, Walmart's glove buying team wanted London Luxury to sign a new supplier agreement that would change the shipping terms, with the goal of speeding up the overseas shipping process and receiving the gloves faster. The emailed discussion took place *after* Small, on behalf of Walmart, sent Jason the draft minimum-purchase agreement on February 23 but *before* Jason signed the final version of the agreement on March 19 *and before* the Direct Import Supplier Agreement was signed on March 31. The parties' March 4 and 5 emails also explicitly refer to the fact that Walmart intended to secure a letter of credit from its own bank to guarantee the total agreed minimum purchase—which further proves that the parties intended the minimum-purchase agreement and the Direct Import Supplier Agreement to

be read in harmony, with the minimum-purchase agreement representing the primary contract document and the Direct Import Supplier Agreement supplying other necessary terms.

In view of the above discussion, the Court finds that Walmart's narrow, self-serving view of the parties' contract is wrong as a matter of fact and law and does not provide a basis for Rule 50(b) relief.

### 2. *Walmart's Disagreement with Certain Final Jury Instructions*

Walmart disagrees with the Court's Final Jury Instructions with respect to Walmart's breach-of-contract counterclaim and argues that the Could should have given Wamart's proposed instructions for fraudulent inducement and estoppel. Before diving into the substance of Walmart's arguments, the Court observes that it is "not bound to give the jury instruction requested by the litigants, nor is the court constrained to follow the language contained in a state's uniform instructions." *Fin. Holding Corp. v. Garnac Grain Co.*, 965 F.2d 591, 594 (8th Cir. 1992). Instead, the Court's duty is to give a set of instructions that, "taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submit[s] the issues in the case to the jury." *The Shaw Grp., Inc. v. Marcum*, 516 F.3d 1061, 1068 (8th Cir. 2008) (internal quotations and citation omitted). Moreover, "The form and language of jury instructions are committed to the sound discretion of the district court so long as the jury is correctly instructed on the substantive issues in the case." *Slathar v. Sather Trucking Corp.*, 78 F.3d 415, 418 (8th Cir. 1996) (internal quotations and alterations omitted), *cert. denied*, 519 U.S. 867 (1996). This means that "jury instructions are sufficient if they state the governing law fairly when read as a whole, and considering each instruction in light of the whole." *Bolin v. Black*, 875

F.2d 1343, 1348 (8th Cir.), *cert. denied*, 493 U.S. 993 (1989). With those preliminaries out of the way, the Court addresses each of Walmart's arguments in turn.

### a. Breach of Contract Instructions

Walmart argues that the Court's Final Jury Instructions misled the jury into believing that Walmart's only recourse for receiving late or unmerchantable gloves was to refuse delivery or refuse to pay—but not to terminate the contract. This argument is disingenuous at best. Not only was the jury instructed that a prior material breach by London Luxury would excuse Walmart's performance, but Walmart specifically argued that it was well within its rights to cancel the contract when it did.

The Final Jury Instructions were organized in such a way as to separate London Luxury's breach-of-contract claim against Walmart, (Final Jury Instructions 12.1–12.4), from Walmart's breach-of-contract counterclaim against London Luxury, (Final Jury Instructions 13.1–13.4). *See* Doc. 455, pp. 1–2. The instructions for each claim explained the elements of breach of contract, the definition of "breach," and the elements of damages. *See id.* With respect to Walmart's claim, Final Jury Instruction 13.1 explained to the jury:

> Walmart claims that London Luxury breached the contract and has the burden of proving each of three elements:
>
> > *First*, that the contract required London Luxury to comply with a conflicts of interest policy, and to deliver gloves of a particular quality, from known manufacturing sources, and in a timely manner;
> >
> > *Second*, that Walmart did what the contract required of it, or that Walmart's performance was excused; *and*
> >
> > *Third*, that London Luxury did not do what the contract required of it.

*Id.* at p. 21 (emphasis in original).

In the Court's estimation, the effect of Final Jury Instruction 13.1 was to inform the jury that Walmart's counterclaim for breach of contract depended on whether there was proof that London Luxury failed to comply with Walmart's various requirements (ethics, quality, factory sourcing, and timing), to the extent that London Luxury did not do what the contract required of it; and that Walmart would prevail on this claim if it also proved that it did what the contract required of it or that its performance was excused. Walmart argued at trial that London Luxury breached the contract in various material ways, which excused Walmart from accepting more gloves or otherwise continuing to perform. In other words, Final Jury Instruction 13.1—which is a correct statement of the law—provided the means for Walmart to explain its breach-of-contract theory to the jury.

Furthermore, Final Jury Instruction 13.2 explained that "[a] prior material breach by one party *excuses* the other party's obligation to perform what the contract required of it (and allows the party to sue for damages on the contract)." *Id.* at p. 22 (emphasis in original). Again, this instruction appropriately advised the jury that if it determined that London Luxury materially breached the contract, such breach would excuse any subsequent failure or refusal by Walmart to perform. For all these reasons, Walmart's concerns about jury confusion with respect to the breach-of-contract instructions are unfounded.

### b. Fraud in the Inducement and Estoppel

Walmart objects that the Court declined to give its proffered instructions on the affirmative defenses of fraud in the inducement and estoppel. The Court solicited proposed instructions from the parties prior to trial, and neither instruction was included in Walmart's packet. On April 4, 2024, the ninth day of trial, the Court emailed a discussion

set of final instructions to the parties and requested written feedback. The following morning, April 5, Walmart responded with its comments and two new instructions that it had never before proposed—one for fraud in the inducement and one for estoppel.

The Court finds that Walmart asserted an estoppel defense in its answer to London Luxury's breach-of-contract claim, *but not a fraud-in-the-inducement defense*. *See* Doc. 194, p. 22. In any event, even if Walmart had appropriately pleaded fraud in the inducement, it would not have been proper to include it in the jury's final instructions once Walmart elected to abandon its counterclaim for rescission and proceed instead on its counterclaim for breach of contract. The reason is relatively straightforward.

Walmart's counterclaim for equitable rescission rested on a theory that Jason fraudulently induced Walmart to enter into the minimum-purchase agreement by bribing Small. If that claim had been proven, the Court in equity could have deemed the parties' contract void and unenforceable *ab initio*. But the rescission claim never got that far. Arkansas law does not permit a party to submit both an equitable rescission claim and a breach-of-contract claim to the jury at the same time. The claims "are not consistent, because rescission is based upon disaffirmance of the contract and recovery for breach requires its affirmance." *Herrick*, 267 Ark. at 587.

When it came time for Walmart to make its election of remedies, it chose breach of contract and not rescission. The Court then, perhaps somewhat cynically, interpreted Walmart's eleventh-hour offer of an instruction for fraud in the inducement—which it never pleaded to begin with—as a thinly veiled attempt to resuscitate its rescission theory and present it to the jury as an alternative to breach of contract. Permitting Walmart to do this would have led to juror confusion. Moreover, the Final Jury Instructions captured

Walmart's allegations of London Luxury's tortious and unethical conduct, since the breach-of-contract instructions suggested that the jury could find London Luxury in breach if it committed such conduct that materially frustrated the purpose of the contract. The jury was also separately instructed on Walmart's three tort claims. In sum, there was no miscarriage of justice. The Court finds that its final charge provided Walmart with multiple avenues to present its assertions of fraudulent conduct to the jury.

As for Walmart's estoppel instruction, the Court issued a separate written Order explaining the reasons why the proffered instruction was not included in the final set. *See* Doc. 451. After canvassing the law and soliciting the oral and written arguments of the parties on the matter, the Court declined to give the instruction for the following reasons:

> [A]n instruction on estoppel is improper where, as here, the case is postured such that Walmart would receive the benefit of pursuing its counterclaim for breach of the same contract that it contends London Luxury should be estopped from enforcing. Walmart has availed itself of the opportunity to address and argue the alleged improper estoppel conduct through the lenses of its substantive defenses to London Luxury's breach of contract claim and its own counterclaim for breach of contract. . . . Moreover, Walmart is hardly left without other remedies: it has brought not one but three tort claims that are also based on the same improprieties. For these reasons, Walmart's request to instruct the jury on the defense of estoppel would reach far beyond that doctrine's ordinary application[.]

*Id.* at pp. 4–5. The Court therefore disagrees with Walmart that the decision to omit the estoppel instruction from the final charge led to a verdict that was tantamount to a miscarriage of justice.

### 3. Walmart's Disagreement with the Privilege-Log Orders

Walmart's last argument in support of its motion for a new trial is that the Court's privilege-log rulings prejudiced it to such a degree that a new trial is warranted. Some helpful context is in order.

44

The Court issued ten separate orders addressing documents withheld by Walmart due to attorney-client or work-product privilege. Five of those orders were issued prior to trial, *see* Docs. 398, 405, 408, 413, 414, and the other five were issued during trial, *see* Docs. 429, 431, 434, 442, 444. The last of these orders was filed at 1:30 a.m. on April 3, 2024, directing Walmart to produce eleven multi-page documents that had been improperly withheld. *See* Doc. 444. Of course, London Luxury was distracted from its trial preparation whenever it received document productions from Walmart. And these productions—totaling hundreds and sometimes thousands of documents at a time— occurred throughout the trial, right up until the day before London Luxury called its final witness.

Before issuing each privilege-log order, the Court would conduct a page-by-page review of a document production *in camera*. During the trial, this document-review process would develop as follows:

- Walmart would email London Luxury and the Court to confirm that it had complied with the Court's most recent privilege-log order, which meant that it had produced all non-privileged documents;

- London Luxury would question Walmart's assertion;

- Walmart would submit to the Court hundreds of documents for *in camera* review to verify that it had asserted the privilege appropriately; and

- the Court would review the documents until the wee hours of the morning, issue an order directing that some documents be produced, and then proceed with the next day of trial.

This happened over and over again until the Court reviewed all documents on Walmart's privilege log. Considering the painstaking nature of the Court's review, it strains credulity that Walmart would object to privilege rulings without citing a specific document that was erroneously produced. The Court cannot hazard a guess as to which documents

Walmart believes were wrongly admitted into evidence, and if so, whether such evidence "had a substantial influence on the jury's verdict" and would require a new trial "to prevent a miscarriage of justice." *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 770–71 (8th Cir. 2020) (quotations and citations omitted).

Walmart alludes to the Court's "overbroad" privilege rulings and contends they "gave London Luxury the unfair strategic advantage of having access to Walmart's privileged legal advice about broad swaths of the case." (Doc. 489, p. 36). Though the Court disagrees that it ordered privileged documents to be produced improperly, Walmart is certainly right about one thing: Walmart dumped thousands of new documents on London Luxury, day and night, throughout the presentation of London Luxury's case-in-chief, and *still* London Luxury managed to pluck out a few documents to use to its strategic advantage at trial. London Luxury did not particularly deserve to suffer through this process, and arguably it was unfair. But *Walmart* had no cause to complain.

## IV.   CONCLUSION

For the reasons explained herein, **IT IS ORDERED** that Walmart's Motion for Judgment as a Matter of Law, and, in the Alternative, Motion for New Trial (Doc. 468) is **DENIED**.

**IT IS SO ORDERED** on this 31st day of March, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE