IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**LONDON LUXURY, LLC**                                          **PLAINTIFF/COUNTER-DEFENDANT**

V.                          CASE NO. 5:22-CV-5059

**WALMART, INC.**                                                **DEFENDANT/COUNTER-PLAINTIFF**

## MEMORANDUM OPINION AND ORDER

Before the Court are the following:

- Plaintiff/Counter-Defendant London Luxury, LLC's Motion for Attorneys' Fees, Costs, and Pre- and Post-Judgment Interest (Doc. 472) and Brief in Support (Doc. 473); Defendant/Counter-Plaintiff Walmart, Inc.'s Response in Opposition (Doc. 497); and London Luxury's Reply (Doc. 501);

- Walmart's Motion to Extend Stay of Execution and Approve Security (Doc. 492) and Brief in Support (Doc. 493); and

- London Luxury's Motion to Stay Judgment Pending Appeal (Doc. 503), Brief in Support (Doc. 504), Supplement (Doc, 510), and Addendum (Doc. 511).

For the reasons stated herein, the Motion for Attorneys' Fees, Costs, and Pre- and Post-Judgment Interest is **GRANTED IN PART AND DENIED IN PART**; Walmart's Motion to Extend Stay of Execution and Approve Security is **GRANTED**; and London Luxury's Motion to Stay Judgment Pending Appeal is also **GRANTED**.

### I. ATTORNEYS' FEES, COSTS, INTEREST, AND SANCTIONS

Walmart and London Luxury sued one another for breach of contract, and Walmart separately sued London Luxury for tortious interference. Following an eleven-day trial, the jury returned its verdicts on April 9, 2024, siding with London Luxury on the contract claim and awarding it $101,218,680.00 in compensatory damages for Walmart's breach. Separately, the jury awarded Walmart $350,000.00 for London Luxury's tortious conduct during the performance of the contract. In post-trial motion practice, the Court denied

1

Walmart's Rule 50(b) and 59 requests. *See* Doc. 512.  Accordingly, London Luxury is the prevailing party on its contract claim,[1] and Arkansas Code § 16-22-308 permits the Court to award the company "a reasonable attorney's fee to be assessed by the court and collected as costs." Whether and how much to award in fees are decisions that are left to the Court's discretion. *TCBY Sys., Inc. v. RSP Co.,* 33 F.3d 925, 930 (8th Cir. 1994); *First United Bank v. Phase II*, 347 Ark. 879, 901 (2002).

To put into context the roles that various lawyers played in the course of this multi-year litigation, the Court sets forth the following timeline of events:

- January 5, 2022: The complaint was filed in New York state court by London Luxury's lawyers from the New York firm of Quinn Emanuel Urquhart & Sullivan, LLP.

- January 24, 2022: Walmart removed the case to the U.S. District Court for the Southern District of New York.

- March 28, 2022: All Quinn Emanuel lawyers withdrew and a new set of lawyers from the New York firm of Debevoise & Plimpton, LLP entered their appearances for London Luxury.

- April 4, 2022: The Southern District of New York transferred the case to this district.

---

[1] Walmart makes a perfunctory argument that London Luxury should not be considered the prevailing party because it originally based its breach-of-contract claim, at least in part, on a document that was not a contract at all. Although Walmart is right about that, it omits the fact that only two months after the lawsuit was filed, London Luxury explicitly withdrew its reliance on this document as a basis for its breach-of-contract claim. London Luxury's lawyers wrote a letter to the presiding judge at the time, the Honorable Cathy Seibel, United States District Judge for Southern District of New York, explaining their client's position. *See* Doc. 51. In response, Judge Seibel issued a text-only order confirming her understanding that neither party would rely on this particular document to prove the existence of a contract. *See* Doc. 55. And they never did. Litigation continued for approximately two more years until a jury determined that Walmart breached the contract. This claim was at the heart of the parties' dispute, and London Luxury claimed a multi-million-dollar victory. It is therefore clear that London Luxury meets the definition of a prevailing party under Arkansas law.

- April 25, 2022: London Luxury hired local counsel McDaniel Wolff, PLLC, based in Little Rock, and lawyers from that firm entered their appearances.

- June 1, 2022: The Court held a Rule 16 case management hearing by videoconference, which the McDaniel Wolff and Debevoise & Plimpton lawyers attended on behalf of London Luxury.

- August 25, 2022: London Luxury advised the Court in a motion (Doc. 120) that its lawyers from Debevoise & Plimpton would soon be replaced by lawyers from a different firm.

- Mid-September 2022: The Debevoise & Plimpton attorneys withdrew, and lawyers from the New York firm of Holwell Shuster & Goldberg, LLP ("HSG") entered their appearances.

- March 27, 2023: An attorney from the Washington, DC firm of Fairmark Partners, LLP entered his appearance in this case, *pro hac vice*. The attorney never filed anything more, nor did he appear for any court proceeding.

- March 25–April 9, 2024: Attorneys from HSG and McDaniel Wolff represented London Luxury in an eleven-day jury trial. HSG attorneys Brendan DeMay and Priyanka Timblo presented all aspects of London Luxury's case to the jury.

Given the preceding timeline, the following chart summarizes the names, locations, and dates that law firms representing London Luxury appeared in this case:

| LAW FIRM | LOCATION | DATE APPEARED | DATE WITHDRAWN |
|---|---|---|---|
| **Quinn Emanuel Urquhart & Sullivan, LLP** | New York, NY | 1/5/22 | 3/28/22 |
| **Debevoise & Plimpton, LLP** | New York, NY | 3/28/22 | 9/15/22 |
| *CASE TRANSFERRED IN FROM SOUTHERN DISTRICT OF NEW YORK, 4/4/22* | | | |
| **McDaniel, Wolff, PLLC** | Little Rock, AR | 4/25/22 | N/A |
| **Holwell Shuster & Goldberg, LLP (HSG)** | New York, NY | 9/27/22 | N/A |
| **Fairmark Partners, LLP** | Washington, DC | 3/28/23 | N/A |

**A. HSG's and McDaniel Wolff's Fees and Costs**

As noted above, McDaniel Wolff's lawyers entered their appearances approximately two years before the trial, at around the time the case was first transferred to this Court from the Southern District of New York. HSG's attorneys became involved in the case about five months later and quickly took the lead in litigating this case, ultimately prevailing over Walmart at trial. London Luxury was awarded every penny it requested in damages.

Counsel's representation before and during trial was professional and organized; the issues were complex and vigorously contested; and the positive result London Luxury achieved is undeniable. Over the course of eighteen to twenty-four months, the Court became very familiar with the high-quality lawyering displayed by HSG and McDaniel Wolff.

According to London Luxury's Motion for Fees, HSG entered into a contingency fee arrangement in which London Luxury agreed to pay HSG 33.33% of all gross amounts recovered from Walmart. Assuming Walmart pays only the amount of the verdict, $101,218,680.00, London Luxury would be obligated to pay HSG $33,739,222.60.00 of the collected verdict as fees. London Luxury therefore asks the Court to award it an amount in fees that will entirely cover what it will owe to HSG under the contingency fee arrangement.  According to London Luxury, it would be "inequitable" to award fees in a lesser amount.  *See* Doc. 473, p. 13. The Court disagrees.  Awarding London Luxury more than $33 million for HSG's services would result in a windfall to London Luxury, which would, in itself, be inequitable and run counter to the intent of the Arkansas fee-shifting statute. Instead, the Court will begin its calculation a reasonable fee using the

4

"lodestar," which is "the number of hours [they] reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

"As a general rule, a reasonable hourly rate is the prevailing market rate, that is, 'the ordinary rate for similar work in the community where the case has been litigated.'" *Moysis v. DTG Datanet*, 278 F.3d 819, 828 (8th Cir. 2002) (quoting *Emery v. Hunt*, 272 F.3d 1042, 1048 (8th Cir. 2001)). The Court also gives due consideration to the applicable factors set forth by the Arkansas Supreme Court in *Chrisco v. Sun Industries, Inc.*, 304 Ark. 227, 229–30 (1990), and cited to with approval by the Eighth Circuit, *see All-Ways Logistics, Inc. v. USA Truck, Inc.*, 583 F.3d 511, 521 (8th Cir. 2009), namely: the amount of time counsel invested in the lawsuit; the appropriateness of counsel's rates, given the experience and ability of the attorneys; the time and labor required to perform the legal services properly; the amount potentially at issue in the case; the results obtained; the novelty and difficulty of the issues involved; and the prevailing rate customarily charged in this area for similar legal services.

"While courts should be guided by [these] factors, there is no fixed formula in determining the reasonableness of an award of attorney's fees." *Phelps v. U.S. Credit Life Ins. Co.*, 340 Ark. 439, 442 (2000). And "when the trial judge is familiar with the case and the service done by the attorneys," as is true here, "the fixing of a fee is within the discretion of the court." *Hartford Accident & Indem. Co. v. Stewart Bros. Hardware Co.*, 285 Ark. 352, 354 (1985).

HSG's own lodestar calculation yields a fee award of $17,361,981.00. But that assumes the Court would consider approving partner billing rates of more than $1,200.00 an hour—which it will not. Rather, the Court finds it appropriate to award HSG's counsel

5

the rate that a highly skilled, highly experienced litigator would charge in the Northwest Arkansas legal market for complex, specialty litigation. Based on HSG's counsel's experience, positive results, thorough trial preparation, management of voluminous amounts of electronic discovery and difficult privilege-log issues, and significant time and labor required to perform the legal services properly, the Court awards HSG and McDaniel Wolff a rate of $375.00 per hour for partners; $200.00 per hour for associates; and $75.00 per hour for paralegals. Both firms' claimed hours are reasonable—given the complexity of the trial, amounts at issue, and quality of the attorneys' legal services—and are approved.

In total, London Luxury is awarded the following attorneys' fees for the services of HSG and McDaniel Wolff:

| LAW FIRM | POSITION | RATE/HR | HOURS | LODESTAR | |
|---|---|---|---|---|---|
| **HSG** | Partner | $ 375 | 7,011.2 | | $ 2,629,200.00 |
| | Associate | $ 200 | 11,298.8 | | $ 2,259,760.00 |
| | Paralegal | $ 75 | 2,699.4 | | $ 202,455.00 |
| | | | | TOTAL | $ 5,091,415.00 |
| | | | | | |
| **McDaniel Wolff** | Partner | $ 375 | 566.6 | | $ 212,475.00 |
| | Associate | $ 200 | 256.5 | | $ 51,300.00 |
| | Paralegal | $ 75 | 260.4 | | $ 19,530.00 |
| | | | | TOTAL | $ 283,305.00 |

McDaniel Wolff's attorneys also submitted invoices documenting the costs they expended on behalf of London Luxury in litigating this case. Federal Rule of Civil Procedure 54(d) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Taxable costs are set forth in detail at 28 U.S.C. § 1920 and include fees of the clerk and marshal, fees for printed and electronically recorded transcripts necessarily obtained for use in the case, fees and disbursements for printing and witnesses, fees for copies of any materials necessarily obtained for use in the case,

6

docket fees, and compensation of court-appointed experts and interpreters. In addition to the taxable costs listed in § 1920, the prevailing party may recover as attorneys' fees "out-of-pocket expenses of the kind normally charged to clients by attorneys." *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294–95 (8th Cir. 1996).

The Court has reviewed all of McDaniel Wolff's line-item requests for reimbursement; the costs correspond to charges for court fees, transcripts, photocopies, postage, and reasonable travel expenses (airfare, lodging, mileage, and meals) to attend hearings related to this case. *See* Docs. 473-13 & 473-14. Accordingly, London Luxury is also awarded **$7,633.60 in costs**.

### B. Fees for Counsel from Fairmark Partners

A careful review of the docket shows that on March 27, 2023, an attorney from McDaniel Wolff moved on behalf of a Fairmark attorney, Jamie Crooks, for permission for him to appear *pro hac vice*. *See* Doc. 149. However, the Court was not aware that anyone from Fairmark Partners performed work in this case until the Motion for Fees was filed. According to the declaration of London Luxury's Chief Managing Officer, Gordon A. Lewis, it appears that the DC-based Fairmark firm "served as limited-purpose conflicts counsel to London Luxury from approximately March 2023 to August 2023," specifically in connection with a third-party subpoena issued to HSBC Bank USA, N.A. (Doc. 473-15, p. 3 & n.3).

Three Fairmark invoices are attached to Mr. Lewis's declaration, *see* Doc. 473-18, but neither the invoices nor the declaration provides the Court with information about the billing attorneys' backgrounds, their years of experience, the specific rates they charged London Luxury, or the services they performed. The first Fairmark invoice, dated April 24,

7

2023, requests a total of $15,884.00 in fees; however, none of the billers are identified—not even by their initials—and the billing rates range from $650.00 per hour on the low end to $850.00 per hour on the high end. *Id.* The same is true of the second Fairmark invoice dated July 17, 2023. *Id.* The third invoice dated October 2, 2023, is unlike the other two in that it does not even include a breakdown of the hours billed and rates charged. *See id.* The Court is skeptical that this set of attorneys is entitled to any fees for this litigation, but in any event, the Court has insufficient information from which to award a reasonable fee for Fairmark's legal services and, thus, declines to award any fee.

### C. Fees for Counsel from Debevoise & Plimpton

Attorneys from Debevoise & Plimpton were involved in the case from March 28 to September 25, 2022, approximately six months. When the case was transferred from the Southern District of New York to this Court, the attorneys from Debevoise & Plimpton did not enter their appearances as *pro hac vice* counsel until May 26, 2022. Those attorneys also appeared on London Luxury's behalf by videoconference at the Court's June 1 case management hearing. It seems that shortly after that, and certainly by late August 2022, London Luxury was looking to substitute Debevoise & Plimpton for HSG.

In the brief period that Debevoise & Plimpton's attorneys appeared in the case, the firm submitted a single invoice to London Luxury for $57,177.45 in fees, which were purportedly discounted by 70%. *See* Doc. 473-17.[2] The only information provided about

---

[2] The bill also contains a line-item for "charges and disbursements" totaling $1,468.74. But the Court cannot tell what these charges and disbursements were for or whether they qualify as reimbursable costs under 28 U.S.C. § 1920. Accordingly, the Court declines to include this amount in its total fee and cost award.

8

the attorneys and staff listed on the invoice is their names and titles (partner, associate, discovery/data manager, or managing attorney).

Examining the New York billing rates charged by the Debevoise & Plimpton attorneys (before the 70% discount), it appears that two partners charged $1,950.00 per hour, three associates charged between $1,100.00 and $1,275.00 per hour, the "discovery/data manager" charged $475.00 per hour, and two "managing attorneys"—who, despite the title, are not likely to be licensed attorneys, given the rates they charge—billed at $520.00 per hour and $385.00 per hour.  Must be nice to live and bill like a New Yorker, but this Court will not consider a fee award based on those rates in this case.

No fees will be awarded for time billed by the "discovery/data manager" or the "managing attorneys." The Court cannot tell whether the individuals with these titles were equivalent to paralegal, law students, docket clerks, or legal secretaries. Furthermore, based on the rates charged by the "managing attorneys"—which are the lowest rates on the bills—the Court doubts that they are performing skilled attorney work. As for the partners and associates, they appeared before this Court in a few filings and in one case management hearing, so their work is a known quantity. Therefore, the Court has calculated the lodestar for work performed by the partners and associates using low-end hourly rates for the Northwest Arkansas legal market, which results in the following award:

| LAW FIRM | POSITION | RATE/HR | HOURS | LODESTAR |
|---|---|---|---|---|
| **Debevoise & Plimpton** | Partner | $ 200 | 21.8 | $ 4,360.00 |
| | Associate | $ 100 | 118.9 | $ 11,890.00 |
| | | | | **TOTAL  $ 16,250.00** |

### D.  Fees for Counsel from Quinn Emanuel

Unlike Debevoise & Plimpton's lawyers, Quinn Emanuel's lawyers never appeared before this Court in any respect, and the Court was not provided with specific information

9

about the nature of the legal services provided by the lawyers in that firm, their respective backgrounds and years of experience, or their billing rates. The Court cannot evaluate the quality of their legal work or assess any of the *Chrisco* factors. As a result, London Luxury's request for reimbursement of Quinn Emanuel's legal fees is denied in its entirety.

### E.  Pre-judgment Interest

"Prejudgment interest is compensation for recoverable damages wrongfully withheld from the time of the loss until judgment." *Dorsett v. Buffington*, 2013 Ark. 345, at *11 (2013). It "ensure[s] that an injured party is fully compensated for its loss," *City of Milwaukee v. Cement Div. Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995), by requiring that "[o]ne who has had the use of money owing to another . . . pay interest from the time payment should have been made," *Miller v. Robertson*, 266 U.S. 243, 257–58 (1924).

"State law governs whether a diversity litigant may recover pre-judgment interest." *Lincoln Benefit Life Co. v. Edwards*, 243 F.3d 457, 462 (8th Cir. 2001). In Arkansas, awarding pre-judgment interest is appropriate "if the amount of damages is definitely ascertainable by mathematical computation, or if the evidence furnishes data that make it possible to compute the amount without reliance on opinion or discretion." *Dorsett*, 2013 Ark. 345 at 11. A method must exist "for fixing the exact value of a cause of action at the time of the occurrence of the event that gives rise to the cause of action." *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 539 (8th Cir. 2015) (quoting *Sims v. Moser*, 373 Ark. 491, 509 (2008)). "If the damages are not by their nature capable of *exact determination*, both in *time* and *amount*, prejudgment interest is not an item of recovery." *Id.* (brackets omitted).

10

Walmart argues that pre-judgment interest is inappropriate here because the jury's award of compensatory damages for breach of contract was not definitely ascertainable by mathematical determination on the date Walmart cancelled the contract—which both parties agree was October 22, 2021, the day Garrett Small of Walmart emailed London Luxury to stop producing gloves. *See* London Luxury Tr. Exhibit PX-0582.

London Luxury responds that David Bones, its expert witness on damages, used a demonstrative exhibit to explain to the jury how a simple mathematical calculation of London Luxury's actual and expected profits yielded the exact dollar amount of damages for breach of contract. The demonstrative exhibit was a series of slides, one featuring three columns. The first column showed the total profits that London Luxury would have made if Walmart had fully performed and purchased all 7.2 million cartons of nitrile gloves at $74.80 per carton. The second column showed the net profits that London Luxury realized from the sale of 400,000 cartons of gloves to Walmart (before Walmart cancelled the contract). And the third column showed the difference between the first column and the second column: the total expected profits that London Luxury would have netted if 6.8 million cartons—the rest of the gloves in the total order—had been delivered to Walmart.

The jury apparently agreed with Mr. Bones's calculation because it awarded London Luxury the exact dollar amount of damages that Mr. Bones testified were owed for the remaining gloves. In Walmart's view, however, his calculation depended on a figure he could not have known: London Luxury's purchase price for the remaining 6.8 million cartons of gloves. Walmart contends that at the time of the breach, there was no way of knowing that what price London Luxury would have paid for the remaining gloves,

which means there was no way that Mr. Bones could have calculated with any degree of certainty the profits that London Luxury would have realized on those gloves.

In the Court's view, the price Mr. Bones used in his calculation, $60.00 per carton, was not the product of wild speculation but was instead a figure reasonably derived from the evidence in the trial record. London Luxury introduced into evidence a contract it negotiated in July 2021 with a glove distributor called CoShield. *See* PX-0868. The CFO of London Luxury, Gordon Lewis, testified that CoShield sourced gloves from two Walmart-approved factories, one in Malaysia called CareGlove and the other in Thailand called Mercator. *See* Doc. 475, pp. 224–25. Though London Luxury had relied on a distributor called MNA to package and ship gloves for Walmart before July 2021, when London Luxury signed its new contract with CoShield, the plan going forward, according to London Luxury's CEO Marc Jason, was to discontinue product sourcing from MNA and move all production to CoShield's factories, which had agreed to charge London Luxury $60.00 per carton. *See* Doc. 478, p. 67. Mr. Jason described the CoShield contract as "a game-changer for [London Luxury] to be working directly with probably two of the best factories in all of Southeast Asia for gloves and to be working direct with no one in the middle." *Id.*

It is undisputed that in September of 2021, London Luxury had pivoted away from MNA as a supplier and was shipping Walmart gloves that were produced in CoShield's partner factories. Mr. Lewis testified that London Luxury expected that the flow from

12

CoShield "was just going to ramp up," *id.* at p. 243, but that Walmart cancelled the parties' contract in October, just as production was increasing.[3]

In deciding whether to award pre-judgment interest to London Luxury, it is instructive to contrast the facts of this case with those in *Simmons Foods, Inc. v. Industrial Risk Insurers*, 863 F.3d 792 (8th Cir. 2017), where the Eighth Circuit held that pre-judgment interest was not readily calculable at the time of breach. *Simmons* involved damage to an industrial warehouse after a severe storm. The owner of the warehouse, Simmons, disagreed with its insurer over whether the building should be repaired or entirely rebuilt. *See id.* at 795. Simmons decided on its own to rebuild the structure as it saw fit, and the insurer reimbursed Simmons for only about half of its costs. *Id.* at 795–96. The jury sided with Simmons but did not award it the $3.5 million in damages its lawyers requested during closing argument; instead, the jury's award was $2,817,380.11. *Id.* at 796. The peculiar and very specific award was the focus of the Eighth Circuit's discussion when deciding whether Simmons was entitled to pre-judgment interest. The Court of Appeals noted that the jury "did not [ ] blindly accept every invoice Simmons offered into evidence" and, therefore, "had to use its discretion to ascertain which experts to believe, which expenses were covered under the policies, and whether the invoices reflected reliable and fair dollar amounts." *Id.* at 800 (internal quotation and citation

---

[3] Mr. Lewis also testified that London Luxury had secured a back-up source of gloves in case CoShield could not supply the entire order Walmart needed for a year-long term. The back-up supplier was a company called Meditech, and, subject to Walmart's approval, it had agreed to sell London Luxury two million cartons of gloves at $59.50 per carton—even lower than CoShield's $60.00 price point. *See* PX-1997. The fact that London Luxury had secured a back-up supplier of similarly priced gloves undercuts Walmart's argument that the trial evidence failed to prove that London Luxury was capable of supplying Walmart with the remaining 6.8 million cartons and could do so at a price of about $60.00 per carton.

13

omitted). All this meant that the award of damages was not capable of exact mathematical determination "until the jury spoke," and not before. *Id.*

Unlike the jury in *Simmons*, the jury in the case at bar awarded exactly the amount that London Luxury sought. This award was calculated using a simple mathematical model developed by Mr. Bones that relied on the following trial evidence:

- the number of gloves that London Luxury delivered to Walmart prior to the breach;

- the profits that London Luxury realized on the gloves it delivered;

- the number of gloves that were yet to be delivered in light of Walmart's total minimum purchase;

- the price-per-carton that London Luxury had negotiated with CoShield in an express agreement; and

- the price-per-carton that London Luxury had negotiated with Walmart in an express agreement.

Accordingly, the Court finds that the amount of damages owed to London Luxury was "definitely ascertainable by mathematical computation" and that "the evidence furnishe[d], data that ma[de] it possible to compute the amount without reliance on opinion or discretion." *Dorsett*, 2013 Ark. 345 at 11. Judging by the amount awarded to London Luxury, the jury must have agreed with Mr. Bones's mathematical method "for fixing the exact value of [the] cause of action at the time of the occurrence of the event that gives rise to the cause of action." *Yazdianpour*, 779 F.3d at 539. It is therefore clear to see how the jury calculated damages and equally clear that the jury did not rely on its discretion when doing so, as the figure was capable of exact determination at the time of breach.

For all these reasons, the Court finds it appropriate to award pre-judgment interest to London Luxury. Per Arkansas Code § 16-65-114(a)(1)(A), pre-judgment interest is

calculated at the Federal Reserve primary credit rate, which was 5.5% per annum on the date of the jury's verdict, plus 2%, resulting in a rate of 7.5%. There are 901 days between October 22, 2021, the day of breach, and April 10, 2024, the date of the jury's verdict awarding London Luxury $101,218,680.00 for breach of contract. Accordingly, the daily rate of pre-judgment interest is $20,798.36.[4] London Luxury is entitled to $18,739,321.40 in pre-judgment interest.[5]

### F.  Post-judgment Interest

Federal law governs the availability of post-judgment interest. *See Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 735 F.3d 993, 1007 (8th Cir. 2013). An award of such interest is mandatory and "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of judgment." 28 U.S.C. § 1961(a) (footnote omitted).

The jury verdict in London Luxury's favor, totaling $101,218,680.00, was reduced to a paper judgment on April 10, 2024. *See* Doc. 460. Post-judgment interest on that amount began accruing as of that date. Subsequent to the entry of this Order, the Court will file an amended judgment that incorporates additional awards of pre-judgment interest and attorneys' fees and costs. Post-judgment interest on the value of the amended judgment will accrue on the date of entry and continue accruing until fully paid.

---

[4] ($101,218,680.00 x 0.075)/365 = $20,798.36.

[5] $20,798.36 x 901 = $18,739,321.40.

### G. Sanctions

London Luxury separately asks the Court to impose sanctions on Walmart for discovery abuses. London Luxury made this request during trial, and the Court declined to impose sanctions. The Court's opinion on the matter has not changed.

The privilege-log issues that the parties and the Court grappled with both prior to and during trial were extremely complex and time-consuming due to the nature of electronic discovery and the facts of the case. The Court was required to parse its discovery rulings to account for various nuances and issued ten separate privilege-log orders as more and more documents were submitted for *in camera* inspection. In sum, the Court finds that Walmart's behavior with respect to discovery was not in bad faith, and the request for sanctions is denied.

## II. STAYING EXECUTION OF THE JUDGMENT AND APPROVING SECURITY

Walmart requests a stay of execution on the judgment against it while it appeals the jury's verdict. In support of this request, Walmart has produced a letter of credit in the amount of $105,000,000.00 issued by Wells Fargo & Company. Rule 62(b) provides that a party may obtain a stay pending appeal "by providing a bond or other security." London Luxury does not object to Walmart's proposed security, and the Court further finds that there is no danger of Walmart being unable to pay the amount of the judgment following the appeal, plus interest.

The Court finds that both the type and amount of security proposed by Walmart are sufficient to secure the amount of the judgment during the pendency of the appeal. Once the amended judgment is entered, execution will be stayed pending the conclusion

16

of the expected appeal, and Walmart will be required to submit its letter of credit to the Clerk as security.

London Luxury originally requested a stay of execution on Walmart's judgment against it because London Luxury filed for bankruptcy. However, it appears that in October 2024, the bankruptcy case was resolved and the automatic stay lifted. *See* Doc. 510. London Luxury states that it is prepared to post a supersedeas bond in the amount of $386,000.00 and has prepared a sample bond. *See* Doc. 504-1. Walmart does not object to London Luxury's proposed security, and the Court approves both London Luxury's request for a stay and the form of the bond.

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that London Luxury's Motion for Attorneys' Fees, Costs, and Pre- and Post-Judgment Interest (Doc. 472) is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) The Court awards London Luxury pre-judgment interest totaling **$18,739,321.40**;

(2) the Court awards London Luxury post-judgment interest as described in this Order;

(3) London Luxury's separate request for discovery sanctions is **DENIED**; and

(4) London Luxury is awarded attorneys' fees and costs for prevailing on its claim for breach of contract in the total amount of **$5,398,603.60**, as detailed below:

| LAW FIRM | FEES | COSTS | TOTAL |
|---|---|---|---|
| **HSG** | $ 5,091,415.00 | N/A | $ 5,091,415.00 |
| **McDaniel Wolff** | $ 283,305.00 | $ 7,633.60 | $ 290,938.60 |
| **Debevoise & Plimpton** | $ 16,250.00 | $ 0.00 | $ 16,250.00 |
| **Fairmark Partners** | $ 0.00 | N/A | $ 0.00 |
| **Quinn Emanuel** | $ 0.00 | N/A | $ 0.00 |
| | | | TOTAL  $ 5,398,603.60 |

**IT IS FURTHER ORDERED** that Walmart's Motion to Extend Stay of Execution and Approve Security (Doc. 492) is **GRANTED**. The Court **APPROVES** as security on appeal a letter of credit issued by Wells Fargo & Company in favor of the Clerk of Court in the amount of $105,000,000.00 and containing provisions describing when the funds secured by the letter of credit would be due. *See* Doc. 492, p. 3. Once the Letter of Credit is presented to the Clerk, any proceeding to enforce the judgment against Walmart will be **STAYED** pursuant to Fed. R. Civ. P. 62(d) until Walmart's appeal is exhausted and a mandate is issued by the appellate court.

**IT IS FURTHER ORDERED** that London Luxury's Motion to Stay Judgment Pending Appeal (Doc. 503) is **GRANTED**. London Luxury is **ORDERED** to file a supersedeas bond with the Clerk of Court in the amount of $386,000.00 to secure the judgment against it on appeal. Once the bond is presented to the Clerk, any proceeding to enforce the judgment against London Luxury will be **STAYED** pursuant to Fed. R. Civ. P. 62(d) until the appeal is exhausted and a mandate is issued by the appellate court.

**IT IS SO ORDERED** on this 31st day of March, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE